1

Volume I, Pages 1-146

Exhibits: 48-49

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

-----------------------------

DAVID SCOLLINS, individually and

on behalf of BOTTOM LINE

ADVERTISING, a sole proprietorship

             Plaintiff

vs.                        Docket No. 03-12489FH

SENTIENT, f/k/a eBizJets, a

Delaware corporation

             Defendant

-----------------------------

DEPOSITION OF JOSEPH F. CREED, JR.

Wednesday, May 25, 2005, 10:00 a.m.

Sullivan, Weinstein & McQuay, P.C.

2 Park Plaza, Suite 610

Boston, Massachusetts

-------Reporter:  Joan M. Cassidy, RPR, CRR-------

Farmer Arsenault Brock LLC

50 Congress Street, Suite 415

Boston, Massachusetts 02109

617.728.4404   Fax 617.728.4403

2

1    APPEARANCES:

2         The Parker Law Firm

3         John D. Parker, II, Esq.

4         141 East Palm Lane, Suite 111

5         Phoenix, Arizona 85004

6         602-257-8100   Fax: 602-257-8110

7         jparker@ptlaw.net

8         for Plaintiff

9

10        Sullivan, Weinstein & McQuay, P.C.

11        C. Max Perlman, Esq.

12        2 Park Plaza, Suite 610

13        Boston, Massachusetts 02116

14        617-348-4300   Fax: 617-348-4343

15        max@swmlawyers.com

16        for Defendant

17

18        Cooley Manion Jones LLP

19        Earle C. Cooley, Esq.

20        21 Custom House Street

21        Boston, Massachusetts  02110

22        617-737-3100   Fax: 617-737-3113

23        for the Witness

24

3

```
1              P R O C E E D I N G S
2            Joseph F. Creed, Jr., Sworn
3               DIRECT EXAMINATION
4    BY MR. PARKER:
5        Q.   Sir, please state your full name and
6    address.
7        A.   Joseph F. Creed, Jr., 4307 Southeast Bay
8    View Street, Stuart, Florida.
9        Q.   And Mr. Creed, for the record, are you
10   represented by counsel today?
11       A.   I am, Earle Cooley.
12       Q.   Mr. Creed, you are the founder of the
13   company that is now known as Sentient Jets; is that
14   correct?
15       A.   Yes, it is.
16       Q.   What was the name of the company when it
17   was originally founded?
18       A.   When it was originally founded, it was
19   called Executive Jet Worldwide Charter.
20       Q.   And when did you found the company?
21       A.   '97, 1997.
22       Q.   And the company underwent a name change
23   from Executive Jet to Worldwide Charter?
24       A.   To eBizJets.
```

4

1     Q.  Would you mind if -- through the deposition

2    I'll refer to either the company or eBizJets, and

3    you'll know what I'm talking about?

4     A.  Yes, absolutely.

5     Q.  Okay.

6         MR. PERLMAN:  And does that -- just for

7    purposes of clarity, that also includes Executive

8    Jet Worldwide Charter?

9         MR. PARKER:  Yes.

10        MR. PERLMAN:  You might want to confirm

11   that with Mr. Creed.

12    Q.  Oh, sure.  And if I refer to eBizJets, I'm

13   also referring to Executive Jet Worldwide Charter as

14   well.  Okay?

15    A.  That's fine.

16    Q.  All right.  I'm just generally curious,

17   where did you get the -- well, what type of services

18   did the company provide?

19    A.  Private jet charter services.

20    Q.  And I'm curious, where did you get the idea

21   for the company?

22        MR. PERLMAN:  Objection.  You can

23   answer.

24    A.  I started as a pilot, and I flew small

6

1    individuals in the company, setting up contracts for

2    customers, contracts for carriers.  It went down to

3    advertising, cleaning floors, everything in that

4    original start-up.

5        Q.  As president of the company, were you also

6    authorized to enter into contracts with vendors --

7        A.  Yes.

8        Q.  -- for services that would service the

9    company?

10       A.  Yes.

11       Q.  How do you know the plaintiff in this

12   action, Donald Scollins?

13       A.  He's my cousin.

14       Q.  How long have you known Don?

15       A.  Forty-seven years.

16       Q.  Did you hire Don to work for eBizJets?

17       A.  I did.  At the time I think it was

18   Executive Jet Worldwide, but yes.

19       Q.  Do you remember when that was?

20       A.  Either '98 or '99.

21       Q.  Did you hire Don pursuant to an interview?

22       A.  Not per se, no.

23       Q.  What went into hiring Don?

24       A.  Don was --

18

1    firms, they want money upfront to represent you.

2    All right?  And some of them were really, really

3    high, as we can attest to later on with Credit

4    Suisse.  We're paying people $200,000 upfront before

5    they even want to work with you, which was something

6    that I voted against at every board meeting, to pay

7    these people that kind of ransom.

8        Q.   *But if you had to have an advertising

9    agency to place ads in The Wall Street Journal --

10       A.   Uh-huh.

11       Q.   -- I mean, what did you decide to do?

12       A.   I used Donny's firm.**

13            MR. PERLMAN:  I'm sorry, could you just

14   repeat that question and answer?  Is that okay,

15   Joan?

16            (Record read from * to **)

17            MR. PERLMAN:  Objection to that

18   question.

19       Q.   When you say "Donny's firm," what firm are

20   you referring to?

21       A.   Donny had an advertising agency prior to

22   him ever coming into the jet business called Bottom

23   Line Advertising.

24       Q.   Were you aware of Bottom Line Advertising

FARMER ARSENAULT BROCK LLC

24

1      A.   Donny and his firm were going to have to be
2  the ones to put the ads in to save us that initial
3  15 percent, plus any -- I don't want to say finder's
4  fee, I'll call it a retainer fee that I know these
5  ad agencies charged.
6      Q.   Did you discuss how the company would
7  compensate Bottom Line Advertising for its services?
8      A.   Donny was --
9           MR. PERLMAN:  Objection.
10     A.   Donny was always looking for money.  I
11 brought Donny back into Massachusetts.  He didn't
12 want to come.  He had an ex-wife that he had to pay.
13 Part of the deal of me bringing Donny back is he had
14 to pay his ex-wife any money that was owed to her or
15 I wasn't going to bring him back.  And I actually
16 took the money from his check to make sure that she
17 got paid when I brought him back.
18           So Donny was always look for money.  And
19 at that time, with all these guys that I brought on,
20 when I started them out on their pay, it was
21 basically verbal:  "I'm going to take care of you,
22 this is how it's going work."  You know?
23     Q.   Uh-huh.
24     A.   If you're asking about, were there promises

25

1   made on the monetary amount, honestly, the answer

2   has to be no, there was no "I'm going to give you

3   exactly this"; but he also knew that I was also fair

4   and that I would work something out, just the same

5   way that I split commissions with him when he first

6   came in, the way that I -- when I took Paul from my

7   other business and split commissions with him in the

8   beginning of this business.  They knew I was fair,

9   and they knew I was going to take care of my people,

10  and that's why they all worked for me.

11           So Donny knew I was going to take care

12  of him, but I never really gave him an exact amount

13  of how much he was going to get at that time.

14  Q.   When you say you didn't give him an exact

15  amount, you mean in terms of dollars and cents?

16  A.   Yeah, I didn't say, like, "Well, they want

17  a $200,000 retainer, so I'm going to give you

18  50,000, and they want 15 percent, so I'm going to

19  give you 7 1/2 or 10."  We really didn't get into

20  that.  I think he knew that my word was good and

21  that he was going to be taken care of as this

22  company grew.

23  Q.   When you say your word, you mean your word

24  on behalf of the company as the president of the

26

1    company?

2              MR. PERLMAN:  Objection.

3        A.   Well, of course.

4        Q.   So, in other words, this was not a personal

5    promise?

6        A.   No, this was a benefit for the company.

7    This wasn't benefiting me or my household.  This was

8    benefiting the company.  The company -- as I was the

9    president of the company, he was going to be taken

10   care of by this company.

11       Q.   When you say "work something out," what do

12   you mean by that?

13       A.   I don't know what I meant by that.  All of

14   my guys basically knew, when I took them on, that --

15   'cause they had worked for me in my prior

16   business -- that when I gave them my word I was

17   going to work something out for them, it was worked

18   out and it was beneficial for them.  Again, it was

19   going to be beneficial for the company, but it was

20   going to be fair and equitable.  That's how I did

21   business.  That's how I retained these people.

22   That's why I never had to fire anybody ever.

23       Q.   Did you ever promise Don to -- that the

24   company would pay Bottom Line Advertising the 15

27

1   percent fee that it saved by using his ad agency to

2   place ads in The Wall Street Journal?

3           MR. PERLMAN:  Objection.

4       A.  I never used the term "15 percent."  This

5   is what -- this is how this whole thing came down:

6   In the beginning I told him that I would take care

7   of him.  Do you want me to tell a story, or do you

8   want to ask me questions?  How do you want me to do

9   this?

10      Q.  Well, no.  I'd like you to describe

11  everything that you recall about the discussions

12  setting up the relationship between the company and

13  Bottom Line Advertising.

14      A.  Okay.  Here's how it all went down.

15          MR. PERLMAN:  Objection.

16      A.  Here's how it all went down:  In the

17  beginning these guys came to work for me for

18  peanuts.  The company really started growing and

19  expanding very, very quickly.  Credit Suisse came

20  into the fold with UBS Capital.  They were both

21  bidding for the business at that time to invest in

22  the company.

23          We ended up choosing -- I ended up

24  choosing Credit Suisse First Boston in -- it was

FARMER ARSENAULT BROCK LLC

28

1    sometime in the beginning of 2000.  The deal got

2    consummated sometime in June of 2000, where at that

3    time they were coming in with between 10 and 14

4    million dollars as an initial investment in the

5    company, at that time 20 some-odd percent of

6    eBizJets.  Okay?

7              When that original amount of money came

8    in, I gave Paul Svensen, who was with me for 18

9    years in my other business, $2 million.  I gave

10   Donny, Greg, and Dan a hundred thousand each as

11   basically compensation for them earning nothing in

12   the first year, year and a half, they were with me,

13   small change, whatever they made.

14             That money, by the way, did not come

15   from the business.  That came from me.  That hundred

16   thousand dollars came from me.

17        Q.   But the $2 million, that came from the

18   business, the $2 million that went to Paul Svensen?

19        A.   Actually, the way it worked out was that --

20   and things had changed a lot.  It was supposed to be

21   that myself and Paul were taking $2 million off the

22   table which would never have to be paid back.  Long

23   story short, by the time all this paperwork and all

24   of this stuff came out, it ended up being a loan

FARMER ARSENAULT BROCK LLC

35

1  whatever's going to be fair and equitable to both of

2  us." But in all fairness, I had partners; and I was

3  trying to get them the stock options, not just for

4  Donny, but for the rest of my guys too.

5          But yes, he was going to be compensated,

6  absolutely, for doing the advertising for the

7  company, 'cause it had to be paid anyway. It had to

8  be paid. So in the beginning it was initial savings

9  for the company, which of course I can make any deal

10 to save the company money which wasn't affecting

11 anybody. But I was a fair guy. They were going to

12 get paid.

13         Now, can I say it was 15 percent? I've

14 got to be honest, no, I never came out and said it's

15 going to be 15 percent. I was trying to get him

16 options which might have been worth more than the 15

17 percent for his total commission-wise.

18    Q.   Now, when I asked you about the 15 percent,

19 maybe I didn't ask the question properly. I guess

20 the question was whether or not there had been a

21 promise made to Don that Bottom Line Advertising

22 would be paid the 15 percent savings that the

23 company had realized by using the agency to place

24 the ads.

53

1    he was going to terminate him.  It was just kind of

2    John's way.

3            And the deal was -- and I remember

4    calling John and telling him that he knew what the

5    deal was because he was in those board meetings --

6    telling him, "You can't fire any one of my people

7    without me or without them stealing.  And unless you

8    can show me that this kid stole, he's not going

9    anywhere."

10   Q.  Did John Williams call you to let you know

11   that he was thinking about firing Donny before that

12   meeting that you're referencing?

13   A.  You know, I think he probably did.  I think

14   he did.  And I think I told him, "I think Donny's

15   going to quit anyway, so don't fire him.  He's going

16   to quit."  I think John Williams did call me and I

17   told him, "Don't fire him.  I think he's going to

18   quit anyway."

19           I don't know if it was going to be at

20   that particular meeting or at that time, but I knew

21   he wanted to go to Arizona.  He knew I was gone at

22   that particular point, even though I was still being

23   paid and all that stuff.  I wasn't in the day-to-day

24   operations of the business.  And I think I remember

54

1    telling him, "I think Donny's going to quit.  We'll

2    work something out," because, of course, I wanted

3    him to get his stock options and any other options

4    they should have given him for his advertising deal,

5    "but let me handle that end of it."  But I think he

6    and Paul already had their minds made up that they

7    were going to get rid of this kid.

8        Q.   Do you remember anything else about Don's

9    phone call to you after his meeting with

10   Mr. Williams?

11       A.   I just remember that they said they

12   railroaded him and he was really pissed and he was

13   going to kill Paul.  I remember that.  You know what

14   I'm saying, that he was really upset.

15       Q.   Did he use those exact words, that he was

16   going to kill Paul?

17       A.   Well, I'm sure he didn't, but...

18            MR. PERLMAN:  You'd have a different

19   kind of case if that were so.

20            THE WITNESS:  Yeah, exactly.  And that

21   was five years ago, so...

22       Q.   Okay.

23            MR. COOLEY:  A little hyperbole there.

24       A.   But I think the way that I felt when this

72

1    regarding payment for advertising services?

2         A.   No.  If you want to go back to the fight

3    that we had in the office -- is that what you're

4    alluding to?

5         Q.   No, I am just trying to figure out in

6    general terms -- I want to figure out -- I want to

7    make sure I have from you the most specific

8    recollection of what you said to Mr. Scollins about

9    how eBizJets would compensate him for doing the

10   advertising.  From what I understand, you have said

11   that you'd work something out for him?

12        A.   Yes, I said I'd work something out for him.

13   Once the bank came in, I was trying to get them

14   options, more options for the stuff that they did,

15   like anyone that did extra stuff.  Like Donny had

16   the ad agency.  Dan would do extra stuff with the

17   computers and work at night to try and format things

18   for us.  So they weren't really being paid their

19   basic, if you want to say, 9:00 to 5:00.  So my

20   original five guys that helped me to start the

21   company, I wanted them to get more.  And I needed my

22   partners at that time to agree to how are we going

23   to do this.

24        Q.   By your "partners" I take it you mean

FARMER ARSENAULT BROCK LLC

75

1    Q.   Okay.  Did you promise him any specific way

2    of calculating or computating what he would be paid

3    for his advertising services prior to Credit Suisse

4    coming in?

5    A.   No, there was never an amount.  It was

6    always, "I'm fair.  You know I'll be fair.  We'll

7    work it out."

8    Q.   There was never an amount, right?

9    A.   Right, correct, there was never an amount.

10   Q.   And there was never a method of

11   computation; isn't that right?

12   A.   There was never a method that was probably

13   brought out forward to Don.

14   Q.   Right, okay.

15   A.   Just as -- if I can just add, just as when

16   I hired these guys, I didn't say, "Okay," you know,

17   "in six months you're going to get 75 grand."  You

18   know what I mean?  I kind of knew how things were

19   going to go and how I would split things up and be

20   fair.  But no, I would never give a specific amount

21   to how he was going to get paid.

22   Q.   *Prior to Credit Suisse coming into the

23   company, had you reached an agreement with

24   Mr. Scollins about him being paid for advertising

FARMER ARSENAULT BROCK LLC

97

1      A.   I know that it was brought up at one point.

2   I don't know who I explained it to.  I don't know if

3   it was Ed Johnson, Lee Wright, or to their due

4   diligence team that they brought in.

5      Q.   What did you say?

6      A.   I had said to them -- they asked about any

7   agreements, oral agreements, any other types of

8   written agreement.  I said, "Well, these guys are

9   hired, they're being paid.  I told them they're

10   going to get raises."  "Do you have any agreements

11   as for that?"  "Well, no, it's just they're going to

12   get raises.  They want to know how things are going

13   to work out.  I mean, these guys are going to get

14   paid more than the $300, $400, $500 a week that

15   they're making."  I know I had conversations about

16   the ad agency that Don had worked with, the Bottom

17   Line Advertising agency.  To what extent?  There was

18   no written agreement as to how much Donny would get.

19   Was it discussed with them?  Yes.

20      Q.   What did you tell Credit Suisse was the

21   agreement between the company and Don Scollins or

22   Bottom Line Advertising prior to the consummation of

23   the --

24      A.   I don't exactly remember, because there was

98

1  never an actual amount of money that he was going to

2  be paid.

3      Q.   You hadn't even reached an agreement as to

4  how much would be paid at that point?

5      A.   Correct, I didn't.

6      Q.   So you couldn't tell Credit Suisse how much

7  he was going to get paid?

8      A.   Correct.

9      Q.   You only told Credit Suisse in general

10  terms there was an arrangement that Mr. Scollins was

11  doing the advertising; isn't that right?

12     A.   Yes.

13     Q.   And did you tell Credit Suisse that he was

14  going to be paid something for that?

15     A.   Oh, yes.

16     Q.   Were you any more specific than that with

17  Credit Suisse?

18     A.   No, probably not, Max, probably not,

19  because I was, "These guys  have got to be taken

20  care of, and that's the deal."

21     Q.   Were there any other oral agreements that

22  the company had with anyone or any entity prior to

23  the consummation of the Credit Suisse deal that you

24  discussed with Credit Suisse but that don't show up

FARMER ARSENAULT BROCK LLC

126

1       Q.   But whatever amount that you allege

2   Mr. Scollins would be entitled to is not reflected

3   as a payable --

4       A.   Probably not, because there wasn't an

5   amount they could probably put in.

6       Q.   Why is that?

7       A.   Because there was never an agreed-upon

8   amount.  Is it going to be 15 percent or 10 or 7 1/2

9   percent?

10      Q.   Or anything lower than that?

11      A.   Right, or anything lower, you know, which

12  is why in the conversation we had in the settlement

13  agreement, when he asked me, "What would you have

14  probably done," I said I probably would have split

15  it.

16      Q.   That was your perspective on where this

17  should be settled?

18      A.   I just think fair, right.  A good deal

19  for -- I don't think anyone gets hurt when you split

20  something.  No one can ever come after me saying

21  that I got more than them.  We split it.

22      Q.   But just to be clear for the record --

23      A.   Okay.

24      Q.   -- you never agreed at any point on behalf

FARMER ARSENAULT BROCK LLC

155

1   mean prior to that, I don't believe so, no.

2       Q.   Let me confine the question.   Prior to the

3   23rd of November, which I'll tell you thereabouts

4   was the date that Mr. Scollins was terminated from

5   the company or informed he was terminated, using

6   that as a reference --

7               MR. COOLEY:  What was the date?

8               MR. PERLMAN:  November 23rd, 2001.

9       Q.   Did you ever see any document that was

10  created prior to that date that outlines or

11  discusses the terms of any agreement between

12  eBizJets and Scollins regarding advertising?

13      A.   I don't believe so.  However, I think at

14  one time Donny came to me with something that he

15  wanted me to sign or acknowledge at one time.  It

16  would be in the year 2000 or '99 or something, that

17  he wanted to get paid in full for advertising.

18  There may have been something that he wrote up.

19  There was never an agreement between him and me for

20  a specific amount that he was going to get.

21      Q.   So he presented you with a document that

22  had the terms that he wanted to be included in an

23  agreement, right?

24      A.   I believe so, yes.

FARMER ARSENAULT BROCK LLC

156

1    Q.   And you refused to sign it?

2    A.   At that time, yes.

3    Q.   And you never signed any agreement with

4    Donald Scollins regarding advertising; is that

5    right?

6    A.   True.

7    Q.   But you've contended that there is an

8    agreement between eBizJets and Scollins regarding

9    advertising.

10   A.   Yes.

11   Q.   What were Mr. Scollins' obligations under

12   that agreement?

13   A.   His obligations?  I don't know what his --

14   I don't know what you mean by his obligations.  What

15   he was doing for us was placing the advertising with

16   firms that wanted to charge us a 15 percent fee.  I

17   didn't want to pay the 15 percent fee.  I thought

18   that was outrageous.  He was going to place that

19   with us, and we were going to work something out for

20   him when the time came.

21   Q.   So his obligation was to place the ads?

22   A.   Yes.

23   Q.   The ads were being developed by someone

24   else, right?

163

1    Q.    Were they paid $500,000?

2    A.    Yes.

3         MR. COOLEY:  Was who paid 500,000, the

4    ad agency?

5         THE WITNESS:  Yes.

6         MR. COOLEY:  What was the name of the ad

7    agency?

8         THE WITNESS:  I don't remember.  It was

9    two or three.  I fired one of them when I found out

10   they were stealing.

11   Q.    Do you know the name of the ad agency that

12   Credit Suisse hired or encouraged eBizJets to hire?

13   A.    One of them, I want to say is KSL.  I'm not

14   positive those are the right initials.  That's the

15   one I fired.  And then Bloom.

16   Q.    Bloom or Bloomberg?

17   A.    I think Bloomberg.

18   Q.    Did these ad agencies take on any of the

19   responsibilities that Mr. Scollins had to that

20   point?

21   A.    I think now they did everything.  They

22   would come up with us with different types of

23   creative -- I remember them coming into the office

24   setting up boards.  I remember at one point I was

FARMER ARSENAULT BROCK LLC

193

1        A.    I remember this situation, yes.

2        Q.    Can you give me more details on this

3    situation?

4        A.    I think Donny gave me the bill for the full

5    15 percent.  I think I was pissed off at that.  He

6    always said he would work something out but never

7    said what this was going to be.  When he went to

8    give me the bill with 15 percent at that time, I was

9    outraged.

10       Q.    Do you remember when that was?  Was it

11   before or after CSFB?

12       A.    I think CSFB was already in the deal.

13       Q.    CSFB had already made the investment?

14       A.    Yeah, I believe so.

15       Q.    Eddie Johnson says to you:  "I am not

16   saying you lied.  If you are referring to the

17   'supposedly,' that word was purposefully used

18   because we had no documentation and it was not

19   disclosed to anyone at our close."

20              Did you respond to Mr. Johnson?

21       A.    I don't know.  I'm sure I did.

22       Q.    Do you know what you said to Mr. Johnson in

23   response to that?

24       A.    No.

FARMER ARSENAULT BROCK LLC