ORIGINAL

1

1          Volume 1, Pages 1 - 259

2           Exhibits:  1 - 14

3          UNITED STATES DISTRICT COURT

4          DISTRICT OF MASSACHUSETTS

5          Civil Action No. 03-12489EFH

6      -------------------------------------

7      DONALD SCOLLINS, individually and on

8      behalf of BOTTOM LINE ADVERTISING, a

9      sole proprietorship,

10                 Plaintiff

11     vs.

12     SENTIENT, f/k/a eBizJets, a Delaware

13     corporation,

14                 Defendant

15     -------------------------------------

16         DEPOSITION OF DONALD H. SCOLLINS, JR.

17         Tuesday, July 13, 2004, 10:00 a.m.

18         Sullivan, Weinstein & McQuay, P.C.

19            2 Park Plaza, Suite 610

20             Boston, Massachusetts

21      --------- Janis T. Young, RDR, CRR ---------

22          Farmer Arsenault Brock LLC

23     50 Congress Street, Boston, Massachusetts 02109

24          617.728.4404   Fax 617.728.4403

2

```
1    APPEARANCES:
2        John D. Parker II, Esq.
3        The Parker Law Firm
4            141 East Palm Lane, Suite 111
5            Phoenix, Arizona 85004
6            602-257-8100    Fax 602-257-8110
7            jparker@ptlaw.net
8            for Plaintiff
9
10   C. Max Perlman, Esq.
11   Sullivan, Weinstein & McQuay, P.C.
12            2 Park Plaza, Suite 610
13            Boston, Massachusetts 02116-3932
14            617-348-4326    Fax 617-348-4343
15            max@swmlawyers.com
16            for Defendant
17
18
19
20
21
22
23
24
```

FARMER ARSENAULT BROCK LLC

3

| | | |
|---|---|---|
| 09:50:10 | 1 | Tuesday, July 13, 2004 |
| 10:01:33 | 2 | P R O C E E D I N G S    10:00 a.m. |
| 10:01:58 | 3 | DONALD H. SCOLLINS, JR., Sworn |
| 10:01:58 | 4 | EXAMINATION |
| 10:01:59 | 5 | BY MR. PERLMAN: |
| 10:01:59 | 6 | Q.   Can you please state your name for the |
| 10:02:00 | 7 | record. |
| 10:02:01 | 8 | A.   Donald H. Scollins, Jr. |
| 10:02:03 | 9 | Q.   And your address, please? |
| 10:02:04 | 10 | A.   5631 East Presidio Road, Scottsdale, |
| 10:02:10 | 11 | Arizona 85254. |
| 10:02:13 | 12 | Q.   Did you go to high school? |
| 10:02:14 | 13 | A.   Yes. |
| 10:02:15 | 14 | Q.   Where did you go to high school? |
| 10:02:15 | 15 | A.   Marshfield High School, Marshfield, |
| 10:02:17 | 16 | Massachusetts. |
| 10:02:18 | 17 | Q.   When did you graduate? |
| 10:02:19 | 18 | A.   1975. |
| 10:02:20 | 19 | Q.   Did you go to college? |
| 10:02:21 | 20 | A.   Yes. |
| 10:02:23 | 21 | Q.   Which college did you go to? |
| 10:02:25 | 22 | A.   University of Massachusetts Amherst. |
| 10:02:28 | 23 | Q.   What years did you attend U. Mass. Amherst? |
| 10:02:31 | 24 | A.   '76 to '79. |

17

| | | |
|---|---|---|
| 10:18:01 | 1 | Q. Jeff knew you? |
| 10:18:03 | 2 | A. Right. |
| 10:18:03 | 3 | Q. So Jeff hired you? |
| 10:18:05 | 4 | A. Right. |
| 10:18:05 | 5 | Q. When did you begin at Executive Jet Charter |
| 10:18:10 | 6 | Worldwide? |
| 10:18:10 | 7 | A. I believe it was March of '99. |
| 10:18:16 | 8 | Q. What was your position in March of '99? |
| 10:18:18 | 9 | A. What was it called? Charter |
| 10:18:24 | 10 | representative. |
| 10:18:26 | 11 | Q. At some point you became director of |
| 10:18:29 | 12 | charter operations? |
| 10:18:30 | 13 | A. Yes. |
| 10:18:30 | 14 | Q. When was that? |
| 10:18:31 | 15 | A. I don't know; probably about three months |
| 10:18:35 | 16 | later. |
| 10:18:37 | 17 | Q. What were your responsibilities as charter |
| 10:18:40 | 18 | representative? |
| 10:18:41 | 19 | A. Just to take the calls from the clients, |
| 10:18:48 | 20 | work out a figure to charge them for their |
| 10:18:52 | 21 | itinerary, and then find an aircraft to do their |
| 10:18:59 | 22 | itinerary that was less expensive than what we |
| 10:19:01 | 23 | charged them. |
| 10:19:02 | 24 | Q. You were matching people with planes? |

FARMER ARSENAULT BROCK LLC

19

| | | |
|---|---|---|
| 10:20:08 | 1 | reported to you? |
| 10:20:09 | 2 | A.   Yes. |
| 10:20:10 | 3 | Q.   As a charter representative, did you have |
| 10:20:15 | 4 | people who reported to you? |
| 10:20:17 | 5 | A.   Not really. |
| 10:20:19 | 6 | Q.   How about as director of charter |
| 10:20:21 | 7 | operations?  Who reported to you? |
| 10:20:22 | 8 | A.   Steve Schofield, Greg Goodwin, Paul |
| 10:20:27 | 9 | Sullivan -- I don't know how long you want to go. |
| 10:20:30 | 10 | I mean, it ended up being 20 people, probably, as |
| 10:20:32 | 11 | time goes on. |
| 10:20:33 | 12 | Q.   Over the time that you were director of |
| 10:20:35 | 13 | charter operations. |
| 10:20:37 | 14 |         And were you director of charter |
| 10:20:39 | 15 | operations from approximately June of 1999 until you |
| 10:20:42 | 16 | stopped working for the company? |
| 10:20:44 | 17 | A.   Yes. |
| 10:20:47 | 18 | Q.   Was that a full-time position? |
| 10:20:50 | 19 | A.   Yes. |
| 10:20:53 | 20 | Q.   How many hours did you put in a week, on |
| 10:20:56 | 21 | average, as director of charter operations? |
| 10:20:58 | 22 | A.   Ninety. |
| 10:21:03 | 23 | Q.   What were your regular hours as director of |
| 10:21:06 | 24 | charter operations? |

21

| | | |
|---|---|---|
| 10:22:17 | 1 | What was your salary when you were first |
| 10:22:19 | 2 | brought in? |
| 10:22:19 | 3 | A.  $300 a week. |
| 10:22:23 | 4 | Q.  Any commissions? |
| 10:22:24 | 5 | A.  No. |
| 10:22:25 | 6 | Q.  When did you receive your first pay raise? |
| 10:22:27 | 7 | A.  Two months later. |
| 10:22:30 | 8 | Q.  What was your rate of pay after your first |
| 10:22:32 | 9 | pay raise? |
| 10:22:33 | 10 | A.  $400 a week. |
| 10:22:34 | 11 | Q.  How about your next pay raise?  When was |
| 10:22:37 | 12 | that? |
| 10:22:37 | 13 | A.  Two months later, $500 a week. |
| 10:22:40 | 14 | Q.  And when was your next pay raise? |
| 10:22:42 | 15 | A.  About two months later, $600 a week. |
| 10:22:45 | 16 | Q.  Did it keep on going up by $100 a week |
| 10:22:50 | 17 | every -- |
| 10:22:50 | 18 | A.  Well, it ended up being $75,000 a year. |
| 10:22:54 | 19 | Q.  That was your final salary? |
| 10:22:55 | 20 | A.  Right. |
| 10:22:55 | 21 | Q.  Did you receive any other compensation from |
| 10:22:57 | 22 | the company? |
| 10:22:58 | 23 | A.  Yes.  I got $100,000 bonus paid over four |
| 10:23:04 | 24 | payments of $25,000 each in 2000. |

FARMER ARSENAULT BROCK LLC

27

| 10:29:57 | 1 | Q. When was that agreement made? |
| 10:29:58 | 2 | A. It was made in 1999, probably in June of |
| 10:30:03 | 3 | '99. June or July, yes. |
| 10:30:13 | 4 | Q. And what happened in June or July to make |
| 10:30:16 | 5 | this agreement? |
| 10:30:20 | 6 | A. The company decided they wanted to expand |
| 10:30:23 | 7 | their advertising. |
| 10:30:24 | 8 | Q. How did you know that? |
| 10:30:25 | 9 | A. There was only five of us there at the |
| 10:30:29 | 10 | time, and they decided they wanted to advertise in |
| 10:30:31 | 11 | the Wall Street Journal. |
| 10:30:32 | 12 | Q. Before that point, before June of '99, they |
| 10:30:35 | 13 | had never advertised in the Wall Street Journal? |
| 10:30:37 | 14 | A. No. |
| 10:30:37 | 15 | Q. So what happened next? |
| 10:30:38 | 16 | A. Well, at that time, since I had a |
| 10:30:46 | 17 | background in advertising, they more or less put it |
| 10:30:48 | 18 | on my shoulders, that I could handle the |
| 10:30:50 | 19 | advertising. We had one guy who was pretty good |
| 10:30:57 | 20 | with computers, so he designed the ads as I told him |
| 10:31:00 | 21 | I wanted them designed, and then -- |
| 10:31:02 | 22 | Q. Who was that? |
| 10:31:03 | 23 | A. That would be Dan Underwood. |
| 10:31:05 | 24 | Q. Did he have a separate agreement with the |

28

| | | |
|---|---|---|
| 10:31:07 | 1 | company? |
| 10:31:07 | 2 | A.    No, I don't believe so. |
| 10:31:11 | 3 | Q.    Did he get any compensation for designing |
| 10:31:13 | 4 | the ads? |
| 10:31:13 | 5 | A.    No. |
| 10:31:14 | 6 | Q.    Did you ever pay him any compensation for |
| 10:31:17 | 7 | designing the ads? |
| 10:31:17 | 8 | A.    No. |
| 10:31:19 | 9 | Q.    Did Bottom Line Advertising ever pay him |
| 10:31:23 | 10 | any compensation for designing the ads? |
| 10:31:26 | 11 | A.    No.   But I mean, I designed the ads.   I |
| 10:31:31 | 12 | mean, he just put in the text, he typed it.   I |
| 10:31:34 | 13 | designed the ads, really. |
| 10:31:35 | 14 | Q.    What did he do? |
| 10:31:37 | 15 | A.    More or less put the data inside the ad. |
| 10:31:40 | 16 | Like made it the right size to fit the ad that was |
| 10:31:43 | 17 | in the Journal, that sort of thing. |
| 10:31:45 | 18 | Q.    So what happened in June or July -- and you |
| 10:31:48 | 19 | can't remember whether it was June or July? |
| 10:31:50 | 20 | A.    I'm going to say it was actually probably |
| 10:31:52 | 21 | July. |
| 10:31:53 | 22 | Q.    Strike that -- |
| 10:31:56 | 23 | A.    Because the first ad was placed in either |
| 10:31:59 | 24 | August or September.   So it was either July or |

FARMER ARSENAULT BROCK LLC

29

| | | |
|---|---|---|
| 10:32:01 | 1 | August is what it was.  Let's say a month before the |
| 10:32:04 | 2 | first ad went in. |
| 10:32:05 | 3 | Q.   So initially it was June or July; now it's |
| 10:32:08 | 4 | July or August?  When was this conversation? |
| 10:32:11 | 5 | A.   The conversation would have been in August, |
| 10:32:20 | 6 | August. |
| 10:32:24 | 7 | Q.   Why is it that just a minute ago you |
| 10:32:26 | 8 | thought it might have been in June? |
| 10:32:27 | 9 | A.   Because at first, I was starting to do the |
| 10:32:32 | 10 | advertising for them, and some ideas, and we did |
| 10:32:35 | 11 | some radio and things like that. |
| 10:32:37 | 12 | And it obviously was going to become a |
| 10:32:40 | 13 | bigger job, and that's when my advertising agency |
| 10:32:45 | 14 | got involved, because it was an opportunity for a |
| 10:32:53 | 15 | savings in costs for the company, and obviously |
| 10:32:58 | 16 | something for me in compensation. |
| 10:33:01 | 17 | Q.   Was there one meeting at which you came up |
| 10:33:03 | 18 | with an agreement? |
| 10:33:04 | 19 | A.   Yes. |
| 10:33:04 | 20 | Q.   And you're saying that that meeting took |
| 10:33:06 | 21 | place in August, correct? |
| 10:33:07 | 22 | A.   Right. |
| 10:33:07 | 23 | Q.   Do you remember that meeting well? |
| 10:33:09 | 24 | A.   Yes, well enough. |

FARMER ARSENAULT BROCK LLC

30

| | | |
|---|---|---|
| 10:33:10 | 1 | Q. Where was that meeting held? |
| 10:33:12 | 2 | A. In Mr. Creed's office. |
| 10:33:14 | 3 | Q. Where was Mr. Creed's office? |
| 10:33:16 | 4 | A. At Sharp Street in Hingham, Mass. |
| 10:33:22 | 5 | Q. 72 Sharp Street? |
| 10:33:23 | 6 | A. Yes. |
| 10:33:24 | 7 | Q. What time of day was it? |
| 10:33:27 | 8 | A. 4:00 or 5:00 in the afternoon. |
| 10:33:34 | 9 | Q. Who was present in Mr. Creed's office at |
| 10:33:38 | 10 | the time? |
| 10:33:38 | 11 | A. Myself, Mr. Creed and Greg Goodwin. |
| 10:33:41 | 12 | Q. How long did the meeting last? |
| 10:33:42 | 13 | A. Five minutes. |
| 10:33:44 | 14 | Q. Were Mr. Creed and Mr. Goodwin there for |
| 10:33:49 | 15 | the entire five minutes? |
| 10:33:50 | 16 | A. Yes. |
| 10:33:51 | 17 | Q. How did the conversation start? |
| 10:34:02 | 18 | A. The conversation started with Mr. Creed |
| 10:34:08 | 19 | saying that they wanted to expand into the Wall |
| 10:34:13 | 20 | Street Journal, and what did I think about that? |
| 10:34:15 | 21 | And I said, I think it's a good idea; |
| 10:34:17 | 22 | it's definitely a target market for our company. |
| 10:34:23 | 23 | And he said, can you do anything with |
| 10:34:27 | 24 | their pricing? He had their rates. |

32

| | | |
|---|---|---|
| 10:35:24 | 1 | vehicle; where did I think we should be advertising. |
| 10:35:28 | 2 | Q.  But that conversation in August was the |
| 10:35:30 | 3 | first time that you spoke with him about Bottom Line |
| 10:35:34 | 4 | Advertising being involved, right? |
| 10:35:35 | 5 | A.  Yes. |
| 10:36:10 | 6 | (Marked, Exhibit 3, Declaration of |
| 10:36:12 | 7 | Donald Scollins.) |
| 10:36:22 | 8 | Q.  I'm putting in front of you what we've |
| 10:36:24 | 9 | marked as Exhibit 3, Mr. Scollins.  Do you recognize |
| 10:36:28 | 10 | this document? |
| 10:36:28 | 11 | A.  I guess it's some answers to some questions |
| 10:36:46 | 12 | I was asked. |
| 10:36:46 | 13 | Q.  I don't think so.  If you just take a look |
| 10:36:49 | 14 | a little closer at the document, it's entitled -- |
| 10:36:54 | 15 | correct me if I'm wrong -- Declaration of Donald |
| 10:36:56 | 16 | Scollins. |
| 10:36:57 | 17 | A.  Yes. |
| 10:36:57 | 18 | Q.  The date on the document is June 23, 2003. |
| 10:37:01 | 19 | A.  Yes. |
| 10:37:02 | 20 | Q.  Is that your signature at the end on Page |
| 10:37:12 | 21 | 3? |
| 10:37:13 | 22 | A.  Yes. |
| 10:37:13 | 23 | Q.  In this document, Mr. Scollins, you state, |
| 10:37:18 | 24 | you declare under penalty of perjury certain facts; |

FARMER ARSENAULT BROCK LLC

38

| | | |
|---|---|---|
| 10:43:46 | 1 | we've marked as Exhibit 4.  Do you recognize that |
| 10:43:47 | 2 | document, sir? |
| 10:43:48 | 3 | A.   Yes. |
| 10:43:48 | 4 | Q.   What is that? |
| 10:43:49 | 5 | A.   It was answers to some questions that were |
| 10:43:55 | 6 | given to me from you, I believe. |
| 10:43:59 | 7 | Q.   Answers to interrogatories? |
| 10:44:00 | 8 | A.   Yes. |
| 10:44:01 | 9 | Q.   Is that your signature on Page No. 10? |
| 10:44:04 | 10 | A.   Yes, it is. |
| 10:44:12 | 11 | Q.   If you look at the page, the top of Page |
| 10:44:17 | 12 | No. 2, it says, "In order to save eBizJets |
| 10:44:22 | 13 | desperately-needed capital, Mr. Scollins agreed to |
| 10:44:26 | 14 | place eBizJets advertisements in WSJ through Bottom |
| 10:44:32 | 15 | Line Advertising." |
| 10:44:33 | 16 | What do you mean by "desperately-needed |
| 10:44:36 | 17 | capital"? |
| 10:44:37 | 18 | A.   Those words weren't exactly mine. |
| 10:44:40 | 19 | Q.   I'm sorry? |
| 10:44:40 | 20 | A.   I mean, the company wanted to save money, |
| 10:44:43 | 21 | so I mean, they wanted to save as much money as they |
| 10:44:47 | 22 | could.  They didn't have a lot of money to spend; |
| 10:44:49 | 23 | they wanted to keep their expenses down, so... |
| 10:44:51 | 24 | Q.   Is it true that eBizJets desperately needed |

39

| | | |
|---|---|---|
| 10:44:55 | 1 | capital at that time? |
| 10:44:56 | 2 | A.   It wasn't eBizJets actually then; it was |
| 10:44:59 | 3 | the earlier company that became eBizJets.  But yes, |
| 10:45:01 | 4 | I'd say they were definitely on a tight budget. |
| 10:45:04 | 5 | Q.   But just yes or no, did that company |
| 10:45:07 | 6 | desperately need capital? |
| 10:45:11 | 7 | A.   Yes, they did. |
| 10:45:13 | 8 | Q.   And how did you know that? |
| 10:45:15 | 9 | A.   Because they wanted to expand, and they |
| 10:45:18 | 10 | wanted to spend a lot of money in advertising, and |
| 10:45:20 | 11 | they didn't have a lot of money to spend. |
| 10:45:25 | 12 | Q.   Now, turn to Page 3, in the answer to |
| 10:45:33 | 13 | Question 2-D.  You state that "The agreement, the |
| 10:45:36 | 14 | advertising placement agreement, was verbal.  The |
| 10:45:38 | 15 | matter was discussed and settled on the same day |
| 10:45:40 | 16 | over a 20-minute span." |
| 10:45:43 | 17 | Now, you testified earlier that it was a |
| 10:45:45 | 18 | five-minute conversation.  Why is there a |
| 10:45:48 | 19 | discrepancy in your signed answers to |
| 10:45:50 | 20 | interrogatories and your testimony today? |
| 10:45:51 | 21 | A.   My guess would be, one is looking at the |
| 10:45:53 | 22 | amount of time it took us to discuss where the |
| 10:45:56 | 23 | advertising plans were going to go, and in the |
| 10:45:58 | 24 | shorter term to say how we're going to handle the |

FARMER ARSENAULT BROCK LLC

42

| | | |
|---|---|---|
| 10:48:53 | 1 | But I don't know; we were probably fighting about |
| 10:48:55 | 2 | something else other than this. |
| 10:48:56 | 3 | Q.  Well, it says, "I got in a screaming match |
| 10:48:59 | 4 | with Donny over the advertising."  Do you see that? |
| 10:49:03 | 5 | A.  Yes. |
| 10:49:05 | 6 | Q.  Did you ever tell Mr. Creed that you wanted |
| 10:49:07 | 7 | to give him a bill for your ad agency? |
| 10:49:09 | 8 | A.  Yes. |
| 10:49:09 | 9 | Q.  And when was that? |
| 10:49:10 | 10 | A.  When he started talking about me placing |
| 10:49:13 | 11 | the advertisement through my ad agency. |
| 10:49:19 | 12 | Q.  Did Mr. Creed say to you that he would, |
| 10:49:22 | 13 | quote, "work something out" for you? |
| 10:49:25 | 14 | A.  Yes.  Then I asked him more about, what |
| 10:49:30 | 15 | would "work something out" be? |
| 10:49:32 | 16 | And he said, well, we'll compensate you |
| 10:49:34 | 17 | when the company is sold or when you leave. |
| 10:49:37 | 18 | I said, good enough for me. |
| 10:49:39 | 19 | Q.  Do you remember Paul Svensen being in the |
| 10:49:41 | 20 | room at the time? |
| 10:49:42 | 21 | A.  No.  I don't think he was there the whole |
| 10:49:44 | 22 | time, if he was there. |
| 10:50:00 | 23 | Q.  Now, as a part of the advertising placement |
| 10:50:05 | 24 | agreement, did you have responsibility to develop |

FARMER ARSENAULT BROCK LLC

44

| | | |
|---|---|---|
| 10:51:15 | 1 | Q.    That he would work something out? |
| 10:51:18 | 2 | A.    Correct. |
| 10:51:18 | 3 | Q.    Any other document that you know of that is |
| 10:51:24 | 4 | evidence of the terms of the agreement? |
| 10:51:27 | 5 | A.    Yes. |
| 10:51:28 | 6 | Q.    What document? |
| 10:51:29 | 7 | A.    I would say all the bills from the Wall |
| 10:51:32 | 8 | Street Journal that show the gross and net amount |
| 10:51:36 | 9 | due. |
| 10:51:36 | 10 | Q.    The bills from the Wall Street Journal to |
| 10:51:38 | 11 | whom? |
| 10:51:39 | 12 | A.    To my company, Bottom Line Advertising. |
| 10:51:44 | 13 | Q.    I mean, that shows the performance of |
| 10:51:46 | 14 | services, right? |
| 10:51:47 | 15 | A.    It shows that there was a discount given |
| 10:51:52 | 16 | because my ad agency was involved. |
| 10:51:54 | 17 | Q.    Right.  But is there any document that |
| 10:51:59 | 18 | shows that you were going to be paid back that |
| 10:52:01 | 19 | discount? |
| 10:52:08 | 20 | A.    No. |
| 10:52:18 | 21 | Q.    Now, again, regarding the advertising |
| 10:52:21 | 22 | placement agreement, did you ever have conversations |
| 10:52:23 | 23 | with people in which you told them about this |
| 10:52:28 | 24 | agreement, the existence of this agreement? |

FARMER ARSENAULT BROCK LLC

49

| | | |
|---|---|---|
| 10:56:32 | 1 | just came up in conversation.  He didn't ask me; I |
| 10:56:34 | 2 | guess I just assumed that he knew that I was |
| 10:56:38 | 3 | expecting to get what the company had saved from |
| 10:56:41 | 4 | placing the ads within the company. |
| 10:56:46 | 5 | Q.   Why did you assume that? |
| 10:56:48 | 6 | A.   Because the bills went from me to the |
| 10:56:50 | 7 | company to get paid. |
| 10:56:51 | 8 | Q.   Did they go to his office? |
| 10:56:52 | 9 | A.   Yes. |
| 10:56:53 | 10 | Q.   What bills went from you to the company? |
| 10:56:54 | 11 | A.   The bills from the Wall Street Journal. |
| 10:56:56 | 12 | Q.   So the bills came from the Wall Street |
| 10:57:02 | 13 | Journal to Bottom Line Advertising? |
| 10:57:03 | 14 | A.   Yes. |
| 10:57:03 | 15 | Q.   And did Bottom Line Advertising pay the |
| 10:57:06 | 16 | Wall Street Journal? |
| 10:57:07 | 17 | A.   No; I brought them in to the company, and |
| 10:57:09 | 18 | the company paid. |
| 10:57:10 | 19 | Q.   The company paid from its own account? |
| 10:57:12 | 20 | A.   From its own account, the discounted |
| 10:57:14 | 21 | amount, yes. |
| 10:57:15 | 22 | Q.   Is that typical in the advertising field? |
| 10:57:18 | 23 | A.   I'd say it's not typical, but not -- |
| 10:57:24 | 24 | certainly it has been done hundreds and thousands of |

FARMER ARSENAULT BROCK LLC

53

| | | |
|---|---|---|
| 11:00:56 | 1 | thing.  I'll put together the package for you, and |
| 11:00:59 | 2 | you can pay me this much; that's what it was.  It |
| 11:01:01 | 3 | was never like invoices; it was maybe like an |
| 11:01:05 | 4 | invoice sort of thing. |
| 11:01:06 | 5 | Q.   One invoice? |
| 11:01:07 | 6 | A.   Yes, for the amount. |
| 11:01:08 | 7 | Q.   Did you ever send an invoice to eBizJets? |
| 11:01:11 | 8 | A.   No. |
| 11:01:11 | 9 | Q.   Did you ever send an invoice to Executive |
| 11:01:15 | 10 | Jet Charter? |
| 11:01:15 | 11 | A.   No. |
| 11:01:16 | 12 | Q.   Why not? |
| 11:01:17 | 13 | A.   Because the agreement we had was that the |
| 11:01:19 | 14 | compensation would be at the end, when the company |
| 11:01:24 | 15 | was either sold or I left. |
| 11:01:26 | 16 | Q.   Pursuant to the agreement, how long did the |
| 11:01:29 | 17 | company have to pay you after you left? |
| 11:01:32 | 18 | A.   They'd pay me as soon as I left. |
| 11:01:35 | 19 | Q.   Would they pay you on the day you left? |
| 11:01:38 | 20 | A.   Yes, when I left.  I mean, it wouldn't have |
| 11:01:43 | 21 | been the day, the week; certainly within a short |
| 11:01:45 | 22 | amount of time. |
| 11:01:46 | 23 | Q.   So you didn't specifically agree to that, |
| 11:01:48 | 24 | when you would be paid? |

54

11:01:49　1　　　A.　No, I didn't say it had to be like that day

11:01:51　2　when I left.　Frankly, I was never planning on

11:01:54　3　leaving.　I was planning on the company being sold

11:01:57　4　and getting compensated through stock and cash.

11:01:59　5　　　Q.　Now, what did the agreement contemplate by

11:02:01　6　way of the company being sold?

11:02:03　7　　　A.　In other words, the company, Credit Suisse

11:02:14　8　-- my understanding, anyway -- Credit Suisse bought

11:02:16　9　it more or less as a venture company for them in the

11:02:22　10　hopes of selling it or taking it public, at which

11:02:25　11　point in time the people that were there were going

11:02:28　12　to be compensated for having done the work.

11:02:30　13　　　　　　And I had already been given a number of

11:02:33　14　stock options at the time, and I guess when the

11:02:35　15　stock options became -- were good or the company was

11:02:40　16　sold in that manner so that the stocks were paid,

11:02:42　17　then I expected to get paid for the Bottom Line

11:02:47　18　Advertising.

11:02:47　19　　　Q.　I want to break that down a little bit.

11:02:50　20　　　　　　Credit Suisse First Boston bought

11:02:53　21　Executive Jet Worldwide; is that correct?

11:02:55　22　　　A.　I believe they bought a portion of it.　I

11:02:57　23　mean, I wasn't part of the negotiations or anything.

11:03:00　24　　　Q.　Did that trigger the company's obligation

FARMER ARSENAULT BROCK LLC

55

| | |
|---|---|
| 11:03:02 | 1 |
| 11:03:03 | 2 |
| 11:03:10 | 3 |
| 11:03:15 | 4 |
| 11:03:17 | 5 |
| 11:03:22 | 6 |
| 11:03:25 | 7 |
| 11:03:29 | 8 |
| 11:03:34 | 9 |
| 11:03:35 | 10 |
| 11:03:39 | 11 |
| 11:03:40 | 12 |
| 11:03:44 | 13 |
| 11:03:48 | 14 |
| 11:03:50 | 15 |
| 11:03:51 | 16 |
| 11:03:53 | 17 |
| 11:03:58 | 18 |
| 11:04:02 | 19 |
| 11:04:04 | 20 |
| 11:04:05 | 21 |
| 11:04:06 | 22 |
| 11:04:08 | 23 |
| 11:04:09 | 24 |

to pay you?

A.   No.   They continued to utilize my services and save the money.  That was more or less, they bought in -- Jeff and Paul got money for being the founders, and it just triggered that it was the next step in selling the company, I guess, having the backing of a company like Credit Suisse.

Q.   Would a merger have triggered your right to be paid?

A.   Yes, I believe so.

Q.   What do you base --

A.   I believe as soon as the stocks were able to be sold, I would have thought that that's when I would be paid.

In other words, if the company merged with somebody else, and they said, okay, your options are now worth $2 a share, everyone gets $1.50 a share, if they had 50-cent options, then, yes, I would expect to get paid at that point.

Q.   That was your expectation when you made this agreement with the company?

A.   That was my expectation, yes.

Q.   That when your stock options --

A.   To me, that would constitute the company

FARMER ARSENAULT BROCK LLC

56

| | | |
|---|---|---|
| 11:04:12 | 1 | being sold.  I did not consider Credit Suisse's |
| 11:04:15 | 2 | buying in part of the company the company being |
| 11:04:18 | 3 | sold.  I didn't think that's what happened. |
| 11:04:19 | 4 | Q.   But the trigger would be the exercisability |
| 11:04:22 | 5 | of your stock options? |
| 11:04:24 | 6 | A.   Yes, I guess when the company would pay us |
| 11:04:27 | 7 | for our stock, I guess. |
| 11:04:30 | 8 | Q.   But you didn't have any stock options in |
| 11:04:32 | 9 | August '99, did you? |
| 11:04:33 | 10 | A.   No.  I said when the company gets sold.  I |
| 11:04:36 | 11 | was told that I would get compensated for when the |
| 11:04:39 | 12 | company went to the next level, got sold, did |
| 11:04:42 | 13 | whatever. |
| 11:04:42 | 14 | Q.   But you just said in August of '99 you |
| 11:04:45 | 15 | thought you would be paid when your stock options |
| 11:04:48 | 16 | were sold. |
| 11:04:48 | 17 | A.   No, I didn't say that.  I said I now had |
| 11:04:52 | 18 | options, so you're asking me now -- |
| 11:04:52 | 19 | Q.   When did you have options? |
| 11:04:53 | 20 | A.   I had options after Credit Suisse bought |
| 11:04:55 | 21 | it. |
| 11:04:56 | 22 | Q.   So sometime in 2002? |
| 11:04:57 | 23 | A.   Yes.  2001, I think -- no, 2000, 2000. |
| 11:05:01 | 24 | Q.   What did I say?  2002? |

FARMER ARSENAULT BROCK LLC

57

| | | |
|---|---|---|
| 11:05:04 | 1 | A.   Yes. |
| 11:05:04 | 2 | Q.   I meant 2000. |
| 11:05:05 | 3 | A.   Okay.  At that point in time, I assumed |
| 11:05:07 | 4 | that that's what we meant; since I now had stock, so |
| 11:05:12 | 5 | when the company got sold, the stock was available |
| 11:05:14 | 6 | to me as capital, I guess. |
| 11:05:16 | 7 | Q.   So you didn't have that understanding in |
| 11:05:18 | 8 | August of '99? |
| 11:05:19 | 9 | A.   No; I had the understanding in August of |
| 11:05:23 | 10 | '99 that Jeff was planning on growing the company in |
| 11:05:26 | 11 | order to get it either sold or go public or do |
| 11:05:29 | 12 | something about it.  Credit Suisse, no one else was |
| 11:05:33 | 13 | involved; so I just assumed whenever it was sold, if |
| 11:05:36 | 14 | we had stock, we got stock.  If the company was sold |
| 11:05:38 | 15 | and there was no stock, he would compensate me at |
| 11:05:41 | 16 | that point in time. |
| 11:05:42 | 17 | Q.   Do you know whether Jeff Creed ever |
| 11:05:44 | 18 | disclosed the advertising placement agreement to |
| 11:05:48 | 19 | Credit Suisse in connection with the stock purchase? |
| 11:05:50 | 20 | A.   I have no idea. |
| 11:05:51 | 21 | Q.   Going back to the communications that you |
| 11:05:56 | 22 | had regarding this agreement, what communications |
| 11:06:00 | 23 | did you have with Don Smith about this agreement? |
| 11:06:05 | 24 | I'm talking about the advertising placement |

FARMER ARSENAULT BROCK LLC

62

| | | |
|---|---|---|
| 11:10:13 | 1 | A.   Same context as the other people. |
| 11:10:15 | 2 | Q.   Just one communication? |
| 11:10:16 | 3 | A.   Maybe it came up more than once, because we |
| 11:10:20 | 4 | talked -- because there was more than one time that |
| 11:10:24 | 5 | things got strenuous, I guess. |
| 11:10:27 | 6 | But, no, I'd say in general it was |
| 11:10:29 | 7 | probably one time it was mentioned.  I never felt |
| 11:10:32 | 8 | the need to mention it again.  I'm not saying I |
| 11:10:34 | 9 | didn't, but I had no need to. |
| 11:10:47 | 10 | Q.   Steve Morton, who's Steve Morton? |
| 11:10:53 | 11 | A.   Steve Morton is the gentleman that they |
| 11:10:55 | 12 | hired to handle the creative and the negotiation, I |
| 11:11:02 | 13 | guess, of some of the advertising, like somebody |
| 11:11:07 | 14 | that specifically did that job 100 percent of the |
| 11:11:09 | 15 | time. |
| 11:11:10 | 16 | Q.   When was he hired? |
| 11:11:11 | 17 | A.   I can't say for sure exactly, but I would |
| 11:11:14 | 18 | say it was probably in September of 2000, maybe. |
| 11:11:18 | 19 | Q.   And did he assume some of the duties that |
| 11:11:20 | 20 | Bottom Line Advertising had been doing? |
| 11:11:23 | 21 | A.   Yes. |
| 11:11:23 | 22 | Q.   What duties were those? |
| 11:11:25 | 23 | A.   He started placing the ads for Bottom Line |
| 11:11:32 | 24 | Advertising.  He took over the advertising position |

FARMER ARSENAULT BROCK LLC

63

| | |
|---|---|
| 11:11:40 | 1 |
| 11:11:44 | 2 |
| 11:11:51 | 3 |
| 11:11:52 | 4 |
| 11:11:54 | 5 |
| 11:11:59 | 6 |
| 11:12:02 | 7 |
| 11:12:05 | 8 |
| 11:12:09 | 9 |
| 11:12:12 | 10 |
| 11:12:14 | 11 |
| 11:12:14 | 12 |
| 11:12:15 | 13 |
| 11:12:19 | 14 |
| 11:12:20 | 15 |
| 11:12:23 | 16 |
| 11:12:29 | 17 |
| 11:12:39 | 18 |
| 11:12:42 | 19 |
| 11:12:44 | 20 |
| 11:12:50 | 21 |
| 11:12:53 | 22 |
| 11:12:56 | 23 |
| 11:13:01 | 24 |

1  as a full-time person, whereas I had just been doing

2  it in between my regular duties.

3      Q.   Did he work for Bottom Line Advertising?

4      A.   No; he worked for the company.

5      Q.   So in September 2000, when Mr. Morton was

6  hired, you stopped placing ads for the company?

7      A.   No.  I think I still continued to place

8  them, but over the next couple of months he probably

9  started placing them.

10      Q.   Over the next few months after September

11  2000?

12      A.   Yes, I believe so.

13      Q.   So by the end of the year 2000, your

14  placement of advertising ended?

15      A.   At the end of the year 2000, yes.  I

16  probably -- I stopped placing the ads, and he took

17  care of it, except I believe I did continue to sign

18  insertion orders to some of the companies.

19      Q.   Why did you do that?

20      A.   I believe it was just because I was

21  registered as the contact.  Every once in a while I

22  still -- there was a point in time where he would

23  give me the material that he had for the ad, and I

24  would then fill out their insertion order and send

FARMER ARSENAULT BROCK LLC

64

11:13:04  1    it.  Eventually it got to the point where he did all

11:13:07  2    of that, and even entered into a contract with the

11:13:10  3    Wall Street Journal as Bottom Line Advertising.

11:13:18  4        Q.   That was in August 2001?

11:13:20  5        A.   I think so.

11:13:22  6        Q.   Were you aware of that at the time?

11:13:24  7        A.   Yes.  I mean, it was up for renewal.  I

11:13:33  8    didn't know Steve had signed it or whatever.  It

11:13:37  9    didn't really matter to me.

11:13:38  10       Q.   You identified Steve Morton as one of the

11:13:42  11   individuals with whom you had communications

11:13:43  12   regarding the advertising placement agreement.

11:13:45  13       A.   Correct.

11:13:46  14       Q.   How many communications did you have with

11:13:48  15   Mr. Morton?

11:13:49  16       A.   Same type; probably one.

11:13:51  17       Q.   Probably one.  What was the context of

11:13:54  18   that?

11:13:55  19       A.   Same type of conversation I had with all

11:13:57  20   the other people, you know.  At the time, I guess I

11:14:03  21   wanted them to know that I had some compensation

11:14:05  22   coming if things didn't work out there.

11:14:07  23       Q.   Why did you want them to know that?

11:14:10  24       A.   I guess because when you kind of, when

11:21:38   14 |  Jet Charter.

73

| | | |
|---|---|---|
| 11:22:05 | 1 | set off the agreement. |
| 11:22:06 | 2 | Q.   Isn't it the practice of an advertising |
| 11:22:09 | 3 | agency to keep records of the invoices that it |
| 11:22:13 | 4 | contributes to? |
| 11:22:17 | 5 | A.   There were copies of them.  I knew where |
| 11:22:19 | 6 | they were. |
| 11:22:19 | 7 | Q.   But you didn't have them? |
| 11:22:20 | 8 | A.   No. |
| 11:22:20 | 9 | Q.   And you didn't ask to retain those files |
| 11:22:23 | 10 | when you left the company, right? |
| 11:22:24 | 11 | A.   I asked for my files.  I didn't ask |
| 11:22:30 | 12 | specifically for those, no. |
| 11:22:40 | 13 | Q.   And you said that you told Mr. Williams in |
| 11:22:43 | 14 | November that the company owed you $378,000? |
| 11:22:46 | 15 | A.   Roughly, yes. |
| 11:22:48 | 16 | Q.   How did you compute that? |
| 11:22:51 | 17 | A.   I did it -- I believe I encompassed the |
| 11:23:01 | 18 | Wall Street Journal savings, along with some other |
| 11:23:03 | 19 | advertisements that I knew I had placed and had |
| 11:23:06 | 20 | gotten a discount on. |
| 11:23:07 | 21 | Q.   What other -- |
| 11:23:07 | 22 | A.   Some, just one-shot magazines.  Some Gulf |
| 11:23:14 | 23 | Coast -- Coast magazine, Flying magazine, a few |
| 11:23:21 | 24 | others.  The Wall Street Journal was the main thing. |

FARMER ARSENAULT BROCK LLC

81

| | | |
|---|---|---|
| 11:47:36 | 1 | Q. I'm sorry; you probably misunderstood me. |
| 11:47:39 | 2 | Not Interrogatory No. 4. Let's be very clear; we're |
| 11:47:43 | 3 | talking about Exhibit 4, Page 4, Interrogatory No. |
| 11:47:47 | 4 | 6. "Mr. Scollins, Plaintiff, placed all insertion |
| 11:47:50 | 5 | orders and signed all contracts establishing Bottom |
| 11:47:54 | 6 | Line as the responsible party." |
| 11:47:56 | 7 | A. That's not accurate. |
| 11:47:57 | 8 | Q. That's not true? |
| 11:47:57 | 9 | A. No. |
| 11:47:58 | 10 | Q. You signed this under the pains and |
| 11:48:00 | 11 | penalties of perjury, right? |
| 11:48:01 | 12 | A. It was assumptive on my part. The last |
| 11:48:05 | 13 | agreement was signed for Bottom Line Advertising, |
| 11:48:09 | 14 | but was signed by Steve Morton. |
| 11:48:12 | 15 | Q. Who's an employee of eBizJets? |
| 11:48:14 | 16 | A. Correct. |
| 11:48:14 | 17 | Q. Who was an employee of eBizJets. |
| 11:48:17 | 18 | A. Right, yes. |
| 11:48:19 | 19 | Q. Is it true that you placed all insertion |
| 11:48:22 | 20 | orders? |
| 11:48:22 | 21 | A. No. For the last eight months, I didn't |
| 11:48:27 | 22 | place many of them. |
| 11:48:28 | 23 | Q. You didn't place many of them or any of |
| 11:48:31 | 24 | them? |

FARMER ARSENAULT BROCK LLC

109

| | | |
|---|---|---|
| 12:18:08 | 1 | when you testified.  You said there's a computer and |
| 12:18:10 | 2 | some pens and pencils and a desk.  You didn't say |
| 12:18:14 | 3 | anything about a fax machine. |
| 12:18:15 | 4 | A.   There was a fax machine, also. |
| 12:18:17 | 5 | Q.   There was a fax machine in the bedroom? |
| 12:18:19 | 6 | A.   Yes. |
| 12:18:19 | 7 | Q.   And was there a printer? |
| 12:18:21 | 8 | A.   Yes. |
| 12:18:26 | 9 | Q.   Now, the 877-834-1182 number, when was that |
| 12:18:32 | 10 | number established for you, or by you? |
| 12:18:34 | 11 | A.   In probably 1999. |
| 12:18:41 | 12 | Q.   1999, when you started work with the |
| 12:18:44 | 13 | company? |
| 12:18:44 | 14 | A.   Right. |
| 12:18:45 | 15 | Q.   Who paid for the bills to that number for |
| 12:18:50 | 16 | the year 1999? |
| 12:18:51 | 17 | A.   I did. |
| 12:18:52 | 18 | Q.   And how about for the year 2000?  Who paid |
| 12:18:55 | 19 | for the phone bills? |
| 12:18:56 | 20 | A.   Then they did. |
| 12:18:57 | 21 | Q.   They paid for Bottom Line Advertising's |
| 12:18:59 | 22 | phone bills? |
| 12:19:00 | 23 | A.   Right. |
| 12:19:00 | 24 | Q.   How about 2001?  Who paid for the 877 |

FARMER ARSENAULT BROCK LLC

110

| | | |
|---|---|---|
| 12:19:04 | 1 | number? |
| 12:19:04 | 2 | A.   They did for most of the year; then I took |
| 12:19:07 | 3 | it over. |
| 12:19:07 | 4 | Q.   When did you take it over? |
| 12:19:09 | 5 | A.   After -- well, midway through December of |
| 12:19:12 | 6 | that year. |
| 12:19:18 | 7 | Q.   Why did eBizJets pay for the phone line |
| 12:19:23 | 8 | that was dedicated to your company, Bottom Line |
| 12:19:25 | 9 | Advertising? |
| 12:19:25 | 10 | A.   Because they were the ones getting the |
| 12:19:28 | 11 | benefit from the things that I was doing, you know. |
| 12:19:33 | 12 | Q.   That's what I thought. |
| 12:19:36 | 13 |        Did you ever write off any of the Bottom |
| 12:19:40 | 14 | Line Advertising expenses on your taxes? |
| 12:19:43 | 15 | A.   As Bottom Line Advertising?  Never. |
| 12:19:44 | 16 | Q.   I mean as anyone else? |
| 12:19:47 | 17 | A.   As A1 Executive Jet. |
| 12:19:49 | 18 | Q.   But A1 Executive Jet has nothing to do with |
| 12:19:51 | 19 | Bottom Line Advertising, does it? |
| 12:19:52 | 20 | A.   No, it doesn't; but I would have to say we |
| 12:19:54 | 21 | used the same office, I guess, if you want to call |
| 12:19:56 | 22 | it that. |
| 12:19:57 | 23 | Q.   You used the same office? |
| 12:19:58 | 24 | A.   Sure.  But there's no money -- Bottom Line |

FARMER ARSENAULT BROCK LLC

113

| | | |
|---|---|---|
| 12:21:54 | 1 | A.   No. |
| 12:21:55 | 2 | Q.   Did Bottom Line Advertising ever have any |
| 12:21:59 | 3 | employees? |
| 12:21:59 | 4 | A.   Just me. |
| 12:22:03 | 5 | Q.   You were an employee of the company? |
| 12:22:07 | 6 | A.   I would say yes.  I certainly did the work. |
| 12:22:11 | 7 | If an employee does work, yes.  I can't say -- I |
| 12:22:15 | 8 | didn't have anybody else do anything.  I was Bottom |
| 12:22:17 | 9 | Line Advertising, as far as placing the ads. |
| 12:22:20 | 10 | Q.   Did you ever have any independent |
| 12:22:22 | 11 | contractors who did services for Bottom Line |
| 12:22:25 | 12 | Advertising? |
| 12:22:26 | 13 | A.   If you consider like Kinko's or someplace |
| 12:22:35 | 14 | like that, where sometimes I would have them design |
| 12:22:39 | 15 | things, make them look nicer. |
| 12:22:41 | 16 | Q.   Who would pay the bills for Kinko's? |
| 12:22:44 | 17 | A.   I would. |
| 12:22:45 | 18 | Q.   You would, personally? |
| 12:22:46 | 19 | A.   Right. |
| 12:22:46 | 20 | Q.   Did Bottom Line Advertising have a bank |
| 12:22:50 | 21 | account? |
| 12:22:51 | 22 | A.   Yes. |
| 12:22:52 | 23 | Q.   Where was that bank account? |
| 12:22:54 | 24 | A.   In Fleet Bank in Marshfield, Massachusetts. |

FARMER ARSENAULT BROCK LLC

115

| | | |
|---|---|---|
| 12:24:05 | 1 | from that account, too? |
| 12:24:07 | 2 | A.    Right. |
| 12:24:07 | 3 | Q.    Were you paying A1 Executive Jet's bills |
| 12:24:10 | 4 | from that, too? |
| 12:24:11 | 5 | A.    No.  They had a separate account for that. |
| 12:24:13 | 6 | Q.    When did you establish this account at |
| 12:24:16 | 7 | Fleet Bank? |
| 12:24:17 | 8 | A.    I established it, I believe, in November of |
| 12:24:21 | 9 | 2001. |
| 12:24:23 | 10 | Q.    After you had been terminated? |
| 12:24:25 | 11 | A.    Yes. |
| 12:24:25 | 12 | Q.    So during the time when you were performing |
| 12:24:28 | 13 | services for eBizJets and Executive Jet as Bottom |
| 12:24:32 | 14 | Line Advertising, Bottom Line Advertising had no |
| 12:24:34 | 15 | bank account? |
| 12:24:35 | 16 | A.    Correct. |
| 12:24:35 | 17 | Q.    And no ability to write checks? |
| 12:24:37 | 18 | A.    Correct. |
| 12:24:37 | 19 | Q.    No ability to deposit checks? |
| 12:24:40 | 20 | A.    Correct. |
| 12:24:47 | 21 | Q.    We may have covered this.  Who was it that |
| 12:24:49 | 22 | wrote checks to the Wall Street Journal for the |
| 12:24:51 | 23 | advertising? |
| 12:24:52 | 24 | A.    Those were written by eBizJets. |

FARMER ARSENAULT BROCK LLC

126

| | | |
|---|---|---|
| 13:24:40 | 1 | Q.   I want you to look about halfway down this |
| 13:24:46 | 2 | e-mail where it starts the sentence, "By the way." |
| 13:24:49 | 3 | A.   The sentence, "By the way"? |
| 13:24:59 | 4 | "By the way, our ads are run through |
| 13:25:01 | 5 | Donny to save the 15 percent ad fee, which saves us |
| 13:25:06 | 6 | 25 to 30K per month, five times what he's paid." |
| 13:25:14 | 7 | Q.   Did you see this e-mail before it went to |
| 13:25:16 | 8 | Mr. Johnson, or any draft thereof? |
| 13:25:21 | 9 | A.   No.  But now I do remember the e-mail, |
| 13:25:28 | 10 | seeing it after the fact. |
| 13:25:29 | 11 | Q.   Any idea why Mr. Creed doesn't mention any |
| 13:25:34 | 12 | obligation on the company's part to pay you? |
| 13:25:37 | 13 | A.   Let me read it again. |
| 13:25:56 | 14 | Obviously he's only interested in the |
| 13:25:58 | 15 | fact that I should never have been fired. |
| 13:26:01 | 16 | Q.   But isn't he saying that the ads running |
| 13:26:05 | 17 | through you saves the company the 15 percent fee? |
| 13:26:09 | 18 | A.   Yes. |
| 13:26:09 | 19 | Q.   He doesn't mention in this e-mail to |
| 13:26:13 | 20 | Mr. Johnson that you're going to be compensated for |
| 13:26:15 | 21 | that same 15 percent, does he? |
| 13:26:18 | 22 | A.   No, he doesn't. |
| 13:26:26 | 23 | Well, I disagree.  He says, "This could |
| 13:26:30 | 24 | cost us a fortune.  We don't need the exposure, |

| | | |
|---|---|---|
| 13:27:42 | 1 | A.   I got just a thing to be able to do |
| 13:27:49 | 2 | business from Mesa, Arizona, from the town clerk, |
| 13:27:53 | 3 | under that name; and I also got one out here in |
| 13:27:56 | 4 | Massachusetts from the Marshfield Town, saying it |
| 13:28:03 | 5 | wasn't a retail site, that sort of thing; there |
| 13:28:06 | 6 | would be no foot traffic. |
| 13:28:07 | 7 | MR. PERLMAN:  For the record, I have not |
| 13:28:09 | 8 | received those documents, either, and I'd like to |
| 13:28:11 | 9 | see them. |
| 13:28:12 | 10 | Q.   When was it that you got the certificate |
| 13:28:15 | 11 | from the Marshfield town clerk? |
| 13:28:17 | 12 | A.   At the same time I got -- after I was |
| 13:28:24 | 13 | fired, like November or early December of 2001. |
| 13:28:27 | 14 | Q.   So during the time that you were performing |
| 13:28:36 | 15 | advertising services for eBizJets and Executive Jet, |
| 13:28:42 | 16 | you were not authorized to do business as Bottom |
| 13:28:47 | 17 | Line Advertising in the State of Massachusetts? |
| 13:28:48 | 18 | A.   At that point in time I hadn't had any |
| 13:28:51 | 19 | income coming in, so I didn't see a need to do |
| 13:28:55 | 20 | anything, you know.  Now I knew there was going to |
| 13:28:57 | 21 | be money coming in, so I'd have the company listed. |
| 13:29:01 | 22 | Q.   Did you do that to make the company look a |
| 13:29:06 | 23 | little more official for the purposes of this case? |
| 13:29:08 | 24 | A.   Well, I thought it would look more |

13:49:41    1    Q.    Do you have any idea?

13:49:42    2    A.    The way that they said it to me meant

13:49:44    3    certainly years.  A year, years; I don't know.  It

13:49:47    4    was definitely over a year.

13:49:49    5    Q.    Well, how do you know that at the end of

13:49:50    6    your employment with eBizJets that they were

13:49:54    7    eligible to put in their own ads?

13:49:56    8    A.    Because the Wall Street Journal said that

13:50:00    9    they would make them eligible when they went to put

13:50:04    10    them in themselves, and they said it was based upon

13:50:09    11    the payment history that came through my company.

13:50:15    12    Steve Morton had placed some advertising

13:50:22    13    in different vehicles, also, through eBizJets.

13:50:40    14    Q.    And you've never dealt with the Wall Street

13:50:45    15    Journal for any other entity other than eBizJets,

13:50:49    16    right?

13:50:49    17    A.    No.

13:50:50    18    Q.    Has Bottom Line Advertising performed any

13:51:00    19    advertising services for any person or entity since

13:51:05    20    November 2001?

13:51:06    21    A.    No.

13:51:25    22    Q.    When was it exactly that Bottom Line

13:51:32    23    Advertising stopped performing services for

13:51:36    24    eBizJets?

14:03:11   1      A.   In other words, Bottom Line Advertising is

14:03:16   2   their -- the contract is with Bottom Line

14:03:19   3   Advertising, but now we had the split, and we

14:03:20   4   couldn't work things out.  So they were now going to

14:03:23   5   do their own advertising in-house, and they decided

14:03:27   6   to take those months off of the books, as far as I

14:03:30   7   was concerned, and just bill the company directly.

14:03:33   8      Q.   Take what months off the books?

14:03:35   9      A.   Whatever the 54 -- whatever those amounts

14:03:38  10   were.

14:03:39  11      Q.   Oh, I see.  You never received any checks

14:03:44  12   -- did you ever receive any checks from Dow Jones?

14:03:47  13      A.   Never.

14:03:48  14      Q.   Or the Wall Street Journal?

14:03:49  15      A.   No.

14:03:50  16      Q.   A few days after your lawyers submitted

14:03:53  17   this to me, June 10, you answered the

14:03:56  18   interrogatories, which we've looked at a number of

14:03:59  19   times today.  I want you to look at Exhibit BB to

14:04:06  20   the interrogatories.

14:04:18  21      A.   Okay; yes.

14:04:24  22      Q.   Now, whereas the initial disclosures claim

14:04:32  23   that you're owed $376,000, four days later the

14:04:40  24   interrogatory answers say that you're owed $351,000.

FARMER ARSENAULT BROCK LLC

158

14:04:43   1   What happened in those four days?

14:04:46   2        A.   I believe that this is probably, the Wall

14:04:53   3   Street Journal doesn't include my estimation on what

14:04:56   4   Bottom Line Advertising had saved on the magazines.

14:05:01   5        Q.   It looks like somebody did an adjustment

14:05:05   6   for the credits, right, if you look at Exhibit BB of

14:05:11   7   the interrogatories?

14:05:16   8        A.   Yes.   Maybe originally he included those

14:05:20   9   amounts because the sheets that I originally gave

14:05:22   10  them would have had Bottom Line as the payee, and

14:05:26   11  these were updated.   In other words, the original

14:05:28   12  documents would show that Bottom Line was going to

14:05:30   13  pay those.   That's all I can think of.   And then

14:05:34   14  they took them off.

14:05:35   15       Q.   So which one's right?   Which one's correct?

14:05:38   16       A.   I would say this one here is going to be

14:05:40   17  the most up-to-date one because it took into account

14:05:44   18  where the Wall Street Journal changed the account

14:05:46   19  over to being billed directly to the client.

14:05:48   20       Q.   But it also takes into account these

14:05:50   21  credits, right?

14:05:51   22       A.   Yes.   I mean -- frankly, I'm not sure.   All

14:05:56   23  I know is, I never got any credits.   The company,

14:05:59   24  the client, got the benefit of any credits.

FARMER ARSENAULT BROCK LLC

229

| | | |
|---|---|---|
| 15:40:10 | 1 | Q.   Break it down for me, how you're related. |
| 15:40:13 | 2 | Your father or mother -- |
| 15:40:14 | 3 | A.   My mother and his father are brother and |
| 15:40:17 | 4 | sister, and we grew up like three houses away from |
| 15:40:20 | 5 | each other and graduated together. |
| 15:40:21 | 6 | Q.   How close are you in age? |
| 15:40:23 | 7 | A.   I'm ten months older -- not even ten |
| 15:40:27 | 8 | months.  I'm six months older. |
| 15:40:30 | 9 | Q.   You're six months older than he is? |
| 15:40:32 | 10 | A.   Yes. |
| 15:40:32 | 11 | Q.   You grew up in the same block? |
| 15:40:35 | 12 | A.   Yes. |
| 15:40:35 | 13 | Q.   He's a loyal friend to you? |
| 15:40:42 | 14 | A.   Most of the time, yes. |
| 15:40:43 | 15 | Q.   And you're loyal to him? |
| 15:40:44 | 16 | A.   Yes. |
| 15:40:55 | 17 | Q.   You've known him all your life? |
| 15:40:57 | 18 | A.   Yes. |
| 15:40:58 | 19 | Q.   How often do you talk these days? |
| 15:41:02 | 20 | A.   I actually talked to Jeff on the phone |
| 15:41:09 | 21 | twice in the last week.  Before that, I hadn't |
| 15:41:14 | 22 | talked to him in ten months, probably.  E-mailed |
| 15:41:17 | 23 | once or twice; probably two or three times, maybe. |
| 15:41:20 | 24 | Q.   What did you e-mail him about? |

FARMER ARSENAULT BROCK LLC

ORIGINAL

260

Volume II, Pages 260-400

Exhibits: 22-47

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - -

DAVID SCOLLINS, individually and

on behalf of BOTTOM LINE

ADVERTISING, a sole proprietorship

              Plaintiff

vs.                    Docket No. 03-12489FH

SENTIENT, f/k/a eBizJets, a

Delaware corporation

              Defendant

- - - - - - - - - - - - - - - - - - - - - - - - - - -

CONTINUED DEPOSITION OF DONALD H. SCOLLINS, JR.

Tuesday, May 24, 2005, 9:00 a.m.

Sullivan, Weinstein & McQuay, P.C.

2 Park Plaza, Suite 610

Boston, Massachusetts

- - - - - - -Reporter:  Joan M. Cassidy, RPR, CRR- - - - - - -

Farmer Arsenault Brock LLC

50 Congress Street, Suite 415

Boston, Massachusetts 02109

617.728.4404  Fax 617.728.4403

273

1    supposed to notify me in time to be able to exercise

2    my rights to the options, which they did not do.

3    They notified me at 5:30 that I had till 5 o'clock

4    to get them.

5        Q.    Is there anything else that eBizJets was

6    required to do in January of 2002 regarding your

7    stock options?

8        A.    Yes, notify me in a timely manner.

9        Q.    Besides what you testified to now, is there

10   anything else that eBizJets was required to do

11   regarding your stock options in January 2002?

12       A.    Not to my knowledge.

13       Q.    Different subject.  You contend that

14   eBizJets breached a contract with you by failing to

15   apply progressive discipline; is that right?

16       A.    Yes.

17       Q.    And you contend, do you not, sir, that

18   eBizJets promised to apply progressive discipline;

19   is that right?

20       A.    Not necessarily promise.  Didn't we go over

21   this already once before?

22            MR. PERLMAN:  This is going to be

23   Exhibit No. 22.

24            (Marked, Exhibit 22, Document.)

1   know, the rules -- they had things in place where if

2   you did something wrong, you'd get a verbal warning

3   and a written warning and then possible termination,

4   or unless the offense was bad enough to terminate

5   you right on the spot.  And I was told by the human

6   resource person that that's how they were going to

7   implement their discipline.

8       Q.   Who told you that?

9       A.   Carol Caliendo.

10      Q.   Did Carol Caliendo ever promise to apply

11  progressive discipline to your employment?

12      A.   I believe she was in the position to be

13  able to promise it, yeah.  When she said it, I

14  believed it.

15      Q.   What I am asking you is, did she promise

16  you to apply progressive discipline?

17      A.   I never asked her to promise anything.

18      Q.   So she didn't, she didn't promise?  I'm

19  just asking a simple question.

20      A.   No.  Yes, she didn't promise.

21      Q.   Did you ever receive a copy of eBizJets'

22  employee handbook?

23      A.   Yes, I did.

24           (Marked, Exhibits 23 and 24; eBizJets

279

1    saw while you were employed --

2        A.    No.

3        Q.    -- by eBizJets?

4              You've got to wait until I finish my

5    question or this is going to take us all day.

6        A.    Go ahead.

7        Q.    Are there any other written policies

8    regarding progressive discipline that you saw while

9    you were employed by eBizJets?

10       A.    No.

11       Q.    You testified in your first day of

12   deposition that you were entitled in 2001 to a 25

13   percent bonus?

14       A.    Correct.

15       Q.    And you called that the customary bonus?

16       A.    I don't remember saying that.

17       Q.    You don't remember calling it a customary

18   bonus?

19       A.    No.

20       Q.    Who promised that bonus to you, sir?

21       A.    John Williams.

22       Q.    And when did he promise it to you?

23       A.    Probably September or August -- probably

24   even before that.  I think it was probably about

FARMER ARSENAULT BROCK LLC

357

1    Q.   Did they buy more than 50 percent of the
2    company, to your knowledge?
3    A.   Eventually they did.  I believe they had
4    more than 50 percent.  I'm not sure.
5    Q.   Did that trigger your right to get paid
6    under this alleged agreement?
7    A.   No.
8    Q.   Why not?
9    A.   Because it was the next level of being
10   sold.  They were -- these guys were investment
11   people just trying to build the company value up so
12   that they could sell it.  That was my understanding.
13   Q.   So you didn't see a Credit Suisse purchase
14   of an interest in eBizJets as triggering your right
15   to get paid?
16   A.   No.
17   Q.   Is it true that after Credit Suisse came
18   in, things were a little less fiscally tight?
19        MR. PARKER:  Object to form.
20   A.   Yeah.
21   Q.   What did you mean when you said that things
22   were fiscally tight?
23        MR. PARKER:  Objection to form.
24   A.   Meaning that, you know, monies were