UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DONALD SCOLLINS, individually and on behalf of BOTTOM LINE ADVERTISING,<br><br>    Plaintiff,<br><br>vs.<br><br>SENTIENT, f/k/a eBizJets,<br><br>    Defendant. | Civil Action No. 03-12478-EFH |

### SENTIENT'S STATEMENT OF UNDISPUTED, MATERIAL FACTS

1.　Sentient Jets, Inc. ("Sentient"), formerly known as eBizJets.com, Inc., is a corporation that brokers charter jets for individuals and companies. (Complaint, ¶ 1; Deposition Transcript of Jeff Creed, volumes I and II, dated May 25, 2005 and July 11, 2005 ("Creed Dep.") (copy of excerpts attached to the Affidavit of C. Max Perlman in Support of Sentient's Motion for Partial Summary Judgment ("Perlman Affidavit") as Exhibit A) at 3)

2.　Sentient was started in 1997 by Jeff Creed. (Creed Dep. at 4)

3.　Plaintiff Don Scollins began working for Sentient in or about March 1999. (Deposition Transcript of Donald Scollins, volumes I and II, dated July 13, 2004 and May 24, 2005 ("Scollins Dep.")(copy of excerpts attached to the Perlman Affidavit as Exhibit B) at 17)

4.　Before he joined Sentient, Scollins had set up an advertising agency, d/b/a Bottom Line Advertising ("Bottom Line"), in Arizona. (Creed Dep. at 18-19; Plaintiff's Answers to Defendant's First Set of Interrogatories ("Scollins Interrog. Answers")(copy attached to Perlman Affidavit as Exhibit D) at No. 7)

5.　By the time Scollins moved to Massachusetts to join Sentient, he was no longer doing any business through Bottom Line. (Scollins Dep. at 72)

6. At some point in 1999, Creed decided that Sentient should begin to place advertisements in the Wall Street Journal. (Creed Dep. at 17)

7. Rather than paying an advertising agency the 15% commission, Creed instead asked Scollins to place the ads with the Wall Street Journal through Bottom Line so Sentient could save the 15% commissions. (Creed Dep. at 19)

8. Scollins agreed to do so, and from approximately August 1999 to the end of 2000, Scollins placed ads for Sentient with the Wall Street Journal at the discounted rate. (Scollins Dep. at 28 (first ad in August 1999), 63 (no longer placed ads by end of 2000))

9. According to Scollins, the following is the entire conversation that constituted the agreement:

> A. The conversation started with Mr. Creed saying that they wanted to expand into the Wall Street Journal, and what did I think about that? And I said, I think it's a good idea; it's definitely a target market for our company. And he said, can you do anything with their pricing? He had their rates. And I said, yes. I could get a discount through my ad agency because it's an accredited agency that's done work. And he said, all right. Well, see what you can do, then. With that, I said, what about compensation for the advertising agency? And he said, well, obviously we're just getting started, so we don't want to spend the money if we don't have to; so can I compensate you at the end when the company is sold or when you leave? And I said, fair enough.
>
> Q. Is that the entire content of the conversation that happened on that day?
>
> A. Yes.

(Scollins Dep. at 30-31)

10. In early 2000, Credit Suisse purchased a percentage of Sentient's stock. (Creed Dep. at 27-28)

2

11.   At some point after that sale, Scollins was granted stock options pursuant to a certain stock option agreement (the "Stock Option Agreement" (copy attached to Perlman Affidavit as Exhibit E)).  (Complaint, ¶ 8)

12.   The "Stock Option Agreement" provided, among other things, that Scollins had to exercise his stock options within 30 days of ceasing to work for the company but that if his employment was terminated for cause, the stock options would terminate on his last day of employment.  (Stock Option Agreement at ¶4(a) & (b)).

13.   At some point after Credit Suisse's stock purchase, Steve Morton, whom Sentient hired in September 2000 to handle the advertising as a full-time job, began to place all of Sentient's advertising, including the Wall Street Journal ads.  (*Id.* at 62)  Once Mr. Morton was hired, Scollins's only role in connection with the Wall Street Journal ads was, for some brief period, to sign the insertion orders, which were still nominally being placed through Bottom Line. (Creed Dep. at 163)

14.   By about February 2001, Scollins ceased doing even that.  (Scollins Dep. at 62-64, 81)

15.   When the agreement with the Wall Street Journal needed to be renewed in 2001, Mr. Morton, not Scollins, renewed it.  (*Id.* at 64)

16.   On November 23, 2001, Sentient terminated Scollins employment without cause. (Complaint, ¶¶ 13-14)

17.   In January 2000, the Board of Directors changed the termination to "for cause," and Scollins was notified of this on January 15, 2002.  (*Id.* at ¶¶ 16)

18.   No one in a position of authority at Sentient ever promised Scollins that Sentient would apply progressive discipline.  During his only conversation with anyone on the subject,

Scollins spoke with Carol Caliendo, an independent contractor who began consulting with Sentient in 2000 concerning their human resources policies and procedures (Deposition transcript of Carol Caliendo, dated July 15, 2004 ("Caliendo Dep.")(copy of excerpts attached to the Perlman Affidavit as Exhibit C) at 4-5), in which she allegedly explained to Scollins that Sentient in general was going to apply progressive discipline. (Scollins Dep. at 275 (sole basis of claim is conversation with Caliendo); *see also id* at 279 (Scollins never saw any written policies concerning progressive discipline other than those in the employee handbooks)) Scollins admitted during his deposition that "she did not promise" that Sentient would use progressive discipline with him. *Id.*; *see also id.* at 273 (Sentient did "[n]ot necessarily promise" to use progressive discipline)

19. Sentient's Employee Handbooks provide that "[a]lthough employment with eBizJets is based on mutual consent and both the employee and eBizJets have the right to terminate employment at will with or without cause or advance notice, eBizJets *may* use progressive discipline at its discretion." *Employee Handbook* (2000) & *Employee Handbook* (2001)(emphasis added)(copy of excerpts attached to Perlman Affidavit as Exhibit F).

|  |  |
|---|---|
|  | SENTIENT JETS, INC., f/k/a eBizJets.com, By its attorneys, |
|  | /s/ C. Max Perlman_____<br>C. Max Perlman (BBO #630395)<br>A. Lauren Carpenter (BBO #551258)<br>SULLIVAN WEINSTEIN & McQUAY, PC<br>Two Park Plaza, Suite 610<br>Boston, Massachusetts 02116 |
| Dated: September 26, 2005 | (617) 348-4300 |

4