UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DONALD SCOLLINS, individually and on
behalf of BOTTOM LINE ADVERTISING,

     Plaintiff,

vs.

SENTIENT, f/k/a eBizJets,

     Defendant.

Civil Action No. 03-12478-EFH

**SENTIENT'S MEMORANDUM IN SUPPORT OF ITS
MOTION FOR PARTIAL SUMMARY JUDGMENT**

This case arises out of defendant Sentient's termination of plaintiff Donald Scollins's at-will employment in November 2001. Scollins claims that Sentient owes him various monies in connection with the termination of his employment, including an amount representing the value of stock options he was denied because he was terminated for cause, an amount representing lost income, and an amount for commissions for advertising Sentient placed in the Wall Street Journal through Scollins while he was a paid employee. The claim for monies due based on his stock options, as pleaded in Count IV for violation of the Wage Act, fails as a matter of law because the wrongs Scollins alleges do not constitute a valid Wage Act claim.[1] The claim for lost income due to Sentient's failure to apply progressive discipline, as pleaded in Counts I and II for breach of contract and breach of covenant of good faith and fair dealing, fails as a matter of law because Scollins himself admits there was never any actual promise by Sentient to apply progressive discipline. And the claim for monies allegedly owed Scollins for his placement of advertising, to the extent it is pleaded in Counts I and II for breach of contract and breach of

---

[1] The Motion for Partial Summary Judgment does not address Scollins's claim for this same money in Counts I and II under theories of breach of contract and breach of covenant of good faith and fair dealing, nor does it address Scollins's quantum meruit claim in Count III.

covenant of good faith and fair dealing, fails as a matter of law because there was no valid
contract and any alleged oral contract is barred by the statute of fraud.  Sentient, accordingly,
moves that this Court grant it summary judgment on Counts I and II of the Complaint for the
claims for lost wages and commissions and on Count IV in its entirety.

### Undisputed Facts

Sentient Jets, Inc. ("Sentient"), formerly known as eBizJets.com, Inc., is a corporation
that brokers charter jets for individuals and companies.  (Complaint, ¶ 1; Creed Dep. at 3[2])
Sentient was started in 1997 by Jeff Creed.  (Creed Dep. at 4)  Plaintiff Don Scollins, Creed's
cousin and close friend, (Creed Dep. at 6; Scollins Dep. at 229[3]), began working for Sentient in
or about March 1999 as a charter representative.  (Scollins Dep. at 17)  He subsequently became
director of charter operations, a position he remained in until the termination of his employment.
(*Id.* at 17, 19)

Before he joined Sentient, Scollins had set up an advertising agency, d/b/a Bottom Line
Advertising ("Bottom Line"), in Arizona through which he placed yellow pages ads for four
clients in 1997 and 1998.  (Creed Dep. at 18-19; Scollins Interrog. Answers No. 7[4])  By the time
Scollins moved to Massachusetts to join Sentient, he was no longer doing any business through
Bottom Line.  (Scollins Dep. at 72)

At some point in 1999, Creed decided that Sentient should begin to place advertisements
in the Wall Street Journal.  (Creed Dep. at 17)  Upon calling to place an ad, however, he learned
that the Wall Street Journal did not accept advertising directly from new companies like Sentient
but instead required that the ads be placed through an agency.  (*Id.*)  The practice was that the

---

[2] Deposition Transcript of Jeff Creed (copy of excerpts attached to the Affidavit of C. Max Perlman in Support of
Sentient's Motion for Partial Summary Judgment ("Perlman Affidavit") as Exhibit A).
[3] Deposition Transcript of Donald Scollins (copy of excerpts attached to the Perlman Affidavit as Exhibit B).
[4] Plaintiff's Answers to Defendant's First Set of Interrogatories (copy attached to Perlman Affidavit as Exhibit D).

Wall Street Journal gave advertising agencies a 15% discount and that 15% was then commission for the advertising agency. (Scollins Interrog. Answers No. 1) Rather than paying an advertising agency the 15% commission, Creed instead asked Scollins to place the ads with the Wall Street Journal through Bottom Line so Sentient could save the 15% commissions. (Creed Dep. at 19) Scollins agreed to do so, and from approximately August 1999 to the end of 2000, Scollins placed ads for Sentient with the Wall Street Journal at the discounted rate. (Scollins Dep. at 28 (first ad in August 1999), 63 (no longer placed ads by end of 2000))

During the time that Scollins placed Sentient's Wall Street Journal ads, Bottom Line acted merely as a pass-through. Scollins passed the invoices through to Sentient, which paid them directly (except for the first invoice or two), and Bottom Line did not incur any expenses in connection with the placement of Sentient's advertising. (*Id.* at 49) Bottom Line did not even have a checking account during this time through which it could have paid for the ads. (*Id.* at 115) It likewise did not maintain any of the documents or files in connection with the advertising; Sentient did. (*Id.* at 72-73) Though Bottom Line nominally had a phone number, Sentient paid all the bills for that number from the time it was established in 1999 until shortly after Scollins ceased working for Sentient in November 2001. (*Id.* at 109-110) Scollins was the only "employee" of Bottom Line, which was not even registered to do business in Massachusetts until after Scollins ceased working for Sentient. (*Id.* at 113, 128) Bottom Line did not perform any services for anyone else during or after Scollins's employment with Sentient. (*Id.* at 147)

In early 2000, Credit Suisse purchased a significant percentage of Sentient's stock. (Creed Dep. at 27-28) At some point after that sale, Scollins was granted stock options pursuant to a certain stock option agreement (the "Stock Option Agreement"[5]). (Complaint, ¶ 8) The "Stock Option Agreement" provided, among other things, that Scollins had to exercise his stock

---

[5] Copy attached to Perlman Affidavit as Exhibit E.

options within 30 days of ceasing to work for the company but that if his employment was terminated for cause, the stock options would terminate on his last day of employment. (Stock Option Agreement at ¶4(a) & (b)). Soon after stock purchase by Credit Suisse, Scollins was also given a $100,000 bonus for the work he did for Sentient. (Scollins Dep. at 21)

At some point after Credit Suisse's stock purchase, Scollins ceased having any active role in the placement of the advertising with the Wall Street Journal. Instead, Steve Morton, whom Sentient hired in September 2000 to handle the advertising as a full-time job, began to place all of Sentient's advertising, including the Wall Street Journal ads. (*Id*. at 62) Once Mr. Morton was hired, Scollins's only role in connection with the Wall Street Journal ads was, for some brief period, to sign the insertion orders, which were still nominally being placed through Bottom Line. (Creed Dep. at 163) By about February 2001, though, Scollins ceased doing even that. (Scollins Dep. at 62-64, 81) When the agreement with the Wall Street Journal needed to be renewed in 2001, Mr. Morton, not Scollins, renewed it. (*Id.* at 64)

On November 23, 2001, Sentient terminated Scollins employment without cause. (Complaint, ¶¶ 13-14) After further investigation, the Board of Directors changed the termination to "for cause," and Scollins was notified of this on January 15, 2002. (*Id.* at ¶¶ 16)

## Argument

I. **Count IV for Violation of the Wage Act Fails Because Plaintiff Failed to Plead a Valid Wage Act Claim and the Claim Is Barred By the Statute of Limitations.**

A. *Failure to Pay Stock Options is Not a Violation of the Wage Act.*

Scollins attempts to assert claim under Mass. Gen. L. ch. 149, §§ 148 and 150 (the "Wage Act"), by alleging that Sentient caused him to forfeit his stock options by terminating him with cause. As pleaded and on its face, this claim fails because what Scollins claims Sentient did wrong, specifically, to fire him wrongfully for cause, is not a violation of the Wage Act.

Furthermore, even if his claim could somehow be cast as a Wage Act claim, the failure to pay a stock option that is contingent on not being terminated for cause is not a violation of the Wage Act.

The Wage Act prescribes the timing and intervals for payment of "wages" by Massachusetts employers. Mass. Gen. L. c. 149, §148. Its purpose is to ensure timely payment to employees of money owed for work completed and to protect wage earners from the long-term detention of wages by unscrupulous employers. *Cumpata v. Blue Cross Blue Shield of Massachusetts, Inc*., 113 F. Supp. 2d 164, 167-168 (D. Mass. 2000) (Young, J.). It does not, however, forbid wrongful termination (except in retaliation for filing a claim). As a reading of Count IV makes abundantly clear, the crux of Scollins's Wage Act claim is that Sentient's decision to fire him for cause deprived him of stock options. He does not dispute that under the Stock Option Agreement he was not entitled to stock options if he was fired for cause; rather, he seemingly disputes that he was properly fired for cause. In short, Scollins claims that Sentient violated the Wage Act by wrongfully firing him for cause, not that Sentient failed to pay him something he was owed. Wrongfully firing for cause, even if that Sentient had actually done that, is simply not a violation of the Wage Act.

Even if, somehow, Scollins's claim could be cast as a Wage Act claim, *i.e.* that Sentient violated the Wage Act by failing to allow him to exercise certain stock options, the claim still fails because failing to grant stock options is not a violation of the Wage Act. The Wage Act requires, among other things, that employers pay all "wages" of a discharged employee paid in full on the day of discharge. *Id.* The term "wages" is not defined in the Wage Act. Mass. Gen. L. c. 149, § 148, *et seq.* Courts have, however, generally given the term an extremely narrow construction. *Prozinski v. Northeast Real Estate Services, LLC*, 59 Mass. App. Ct. 599, 603-605

(2003); *Cumpata*, 113 F. Supp. 2d at 167-168.  In fact, in *Prozinski*, the Massachusetts Appeals

Court held that Wage Act Claims are strictly limited to the specific types of employment

compensation enumerated in the statute, namely (1) weekly or biweekly wages having been

earned during a particular pay period, (2) holiday or vacation pay, and (3) definitely determined

commissions which are due and payable.[6]  The court rejected the plaintiff's attempt in that case

to recover severance pay because the statute does not specifically refer to severance pay, and it

refused to look outside the words of the statute to interpret the meaning of "wages."  The

*Prozinski* case should itself justify summary judgment on this claim because the Wage Act does

not mention stock options.  Therefore, just as severance pay is not considered "wages" because it

is not specifically enumerated in the Wage Act, stock options should not be considered "wages."

As such, failure to pay them, even if they were due, would not be a violation of the Wage Act.

Moreover, although the Massachusetts state appeals court has not yet addressed the issue,

a Massachusetts federal district court has held specifically that stock options are not recoverable

under the Wage Act.  *See Baptista v. Abbey Healthcare Group, Inc*., 1996 WL 33340740 (D.

Mass. 1996)(Stearns, J.).  In so holding, the Court explained that "the only impression that can

possibly be derived from M.G.L. c. 149, §§ 148, 150, is that its intent is to protect laborers and

casual wage earners who might otherwise be vulnerable to employer intimidation" and not

professionals pursuing stock options.  *Id.*; *see also Cumpata*, 113 F. Supp. 2d at 168 (likewise

noting that legislature did not intend to provide treble damages and attorney's fees and costs to

"professionals enforcing their asserted contract rights").  This holding has been followed by at

---

[6] Notably, each of these categories refer to definitely determined amounts, either expressly for commissions or
implicitly for weekly or biweekly wages and holiday or vacation pay, all of which are readily calculable on the date
of termination.  Stock options, in stark contrast, are not readily calculable on the date of termination.  Indeed, they
are not even immediately remittable.  They are, instead, "a right to buy a designated stock, if holder of option
chooses, at any time within specified period, at a determinable price…"  Black's Law Dictionary, 6th Ed.  Because a
stock option is the holder's "choice," it makes no sense at all to require the employer to somehow "pay" the
employee/option holder.

least two state superior court judges. *See Kohli v. RES Engineering, Inc.*, C.A. No. 00-02458, slip. op. at 4-5 (Mass. Super. Dec. 19, 2000) (Garsh, J.)(stock options are not compensation "encompassed by" the Weekly Wage Law); *Dennis v. Jager, Smith & Stetler*, 2000 WL 782946 (Mass. Super. 2000)(Ball, J.);.

Scollins also cannot maintain this claim because compensation that is contingent upon the employee being terminated "without cause" cannot form the basis of a Wage Act claim. *See Wessling v. Massachusetts Turnpike Authorit*y, C.A. No. 97-3808-E, at *26 (Mass. Super. 2001) (Botsford, J.)(holding that severance pay and benefits pursuant to employment contract were not "wages" under the Wage Act because the contract provided "their availability was wholly contingent on [the plaintiff's] termination without cause"); *Kunzi v. Katzenstein*, 03-11931 (D. Mass. 2004)(Lindsay, J.)(relying upon the holding *Wessling* in dismissing a claim under the Wage Act); *see also Weir v. The Anaconda Company*, 773 F.2d 1073, 1083-1086 (10th Cir. 1985)(stock options not "wages" under analogous Kansas wage statute because plaintiff's right to receive benefits were not absolute and would terminate if plaintiff was terminated for cause). The stock options at issue in this case – like the severance pay and stock options at issue in *Wessling, Kunzi*, and *Weir* – were contingent on Scollins's being not terminated for cause. Therefore, the Wage Act does not apply.

## B. *Because Plaintiff Brought His Wage Act Claim More Than Three Years After it Arose, It is Barred by the Statute of Limitations.*

Not only is plaintiff's claim not cognizable under the Wage Act, it is also barred because Scollins brought the claim more than three years the date of the alleged violation.

Mass. Gen. L. c. 149, § 150 provides in pertinent part:

Any employee claiming to be aggrieved [with regard to wages, hours, or commissions] may … , at the expiration of ninety-days *after the filing of a complaint with the attorney general, or sooner, if the attorney general assents in writing and within three years of such violation*, institute and prosecute in his own

> name and on his own behalf ... a civil action for injunctive relief and any damages
> incurred.…

(Emphasis added.)  The latest that the wrong of which Scollins complains in his Wage Act count

occurred is January 15, 2002, when Sentient informed him that his termination was changed to

"for cause."  Scollins was not, however, permitted to file his Wage Act claim until April 2005

after the Attorney General issued the necessary certificate (his assent in writing); therefore,

Scollins's Wage Act claim was not properly filed until May 2005 when the court accepted the

Attorney General's certificate.[7]  Since this is clearly beyond the three-year statute of limitations,

the claim is barred.  Furthermore, because the three years is also a statute of repose, *Gordon v.*

*Millivision Holdings, LLC,* 2005 WL 705110 (Mass. Super.)(Agostini, J.), the proper filing in

May 2005 (or even April 2005) cannot "relate back" to any earlier filing under rule 15(c), *Tindol*

*v. Boston Housing Auth.*, 396 Mass. 515, 519 (1986)("relation back" doctrine not applicable in

statute of repose context).

## II.    Counts I and II for Breach of Contract and Breach of the Covenant of Good Faith and Fair Dealing Fail As a Matter of Law.

In his breach of contract count, Scollins alleges that Sentient breached three different

purported agreements: (1) a purported oral employment agreement that required progressive

discipline, (2) a purported oral "Advertising Placement Agreement" that supposedly required

Sentient to pay Scollins 15% of the amount of the ads Sentient placed in the Wall Street Journal,

---

[7] The procedural history is somewhat convoluted because plaintiff sought to bring his Wage Act claim before satisfying the mandatory statutory requirement of first filing his claim with the Attorney General.  Thus, although plaintiff filed a motion to amend his complaint in November 2004, he did not in fact obtain authority from the Attorney General to file his complaint until April 2005, and the Court did not approve his request to be able to pursue the Wage Act claim until May 17, 2005.  At the very least, the count cannot be considered properly filed until the Attorney General granted permission for plaintiff to file it in April 2005 since his permission is a statutory requirement.  In this way, this case is different from *Nett v. Bellucci*, 437 Mass. 630 (2002), in which the Court held that a claim can be considered commenced for purposes of the statute of repose even in the face of a procedural defect as long as the court accepts the filing of the pleading.  In this case, Scollins did not make a mere procedural error – he attempted to bring his suit before he was entitled to do so under the statute.  Therefore, his filing of the motion to amend and of the amended complaint cannot be deemed "commencement" of the action for purposes of the statute of repose.

and (3) the written Stock Option Agreement.  The breach of covenant of good faith and fair dealing count is simply a recast of the breach of contract count.  The parts of these two counts pertaining to the first two agreements fail as a matter of law.

A.     ***The Only Evidence Indisputably Shows that There Was No Agreement Requiring Progressive Discipline.***

The *sole* basis for Scollins's allegation that there was an oral employment agreement between him and Sentient that required Sentient to apply progressive discipline is a conversation Scollins once had with Carol Caliendo, an independent contractor who began consulting with Sentient in 2000 concerning their human resources policies and procedures (Caliendo Dep. at 4-5[8]), in which she allegedly explained to Scollins that Sentient in general was going to apply progressive discipline.  (Scollins Dep. at 275 (sole basis of claim is conversation with Caliendo); *see also id* at 279 (Scollins never saw any written policies concerning progressive discipline other than those in the employee handbooks[9])).  There are at least three reasons why this claim fails as a matter of law.  First, Caliendo had no authority, actual or apparent, to bind Sentient to any promise she may have made.  Second, there was no consideration for any promise she may have made.  And, third, by Scollins's own, clear, unequivocal admission during his deposition, "she did not promise" that Sentient would use progressive discipline with him.  *Id.*; *see also id.* at 273 (Sentient did "[n]ot necessarily promise" to use progressive discipline).  The absence of any of one of these, *i.e.* a promise, authority to make the alleged promise, or consideration for the alleged promise, is reason to find that there was contract as a matter of law, and without a contract, there can be no breach of contract or breach of covenant claim.  Accordingly, this Court

---

[8] Deposition transcript of Carol Caliendo (copy of excerpts attached to the Perlman Affidavit as Exhibit C).
[9] Sentient's Employee Handbooks provide that "[a]lthough employment with eBizJets is based on mutual consent and both the employee and eBizJets have the right to terminate employment at will with or without cause or advance notice, eBizJets *may* use progressive discipline at its discretion."  *Employee Handbook* (2000) & *Employee Handbook* (2001)(emphasis added)(copy of excerpts attached to Perlman Affidavit as Exhibit F).  As Scollins rightfully recognizes, this language does not create an agreement or promise by Sentient to use progressive discipline.

should grant summary judgment on the parts of Counts I and II that are based on the purported oral employment agreement.

**B.**      ***The Purported "Advertising Placement Agreement" is Unenforceable.***

   1.    The Alleged Terms of the Contract Are Too Vague and Indefinite to Form a Valid, Enforceable Contract.

Scollins claims that Sentient owes him an amount equal to 15% of the dollar value of the advertising that Sentient placed in the Wall Street Journal during the time that Scollins was an employee of Sentient, regardless of whether Scollins or some other Sentient employee placed the advertising. The basis for this claim is a purported oral agreement that Scollins allegedly made with Creed, sometime in 1999 (the exact time of which Scollins cannot identify), that Sentient would compensate Scollins for placing ads for Sentient through Scollins's advertising company. (Scollins Dep. at 27, 44; Complaint, ¶ 11) Even assuming that Creed ever made such a promise, that promise does not constitute a valid oral contract as a matter of law because the alleged terms of the purported contract are too indefinite to be enforceable.

To prevail on a claim for breach of contract, a plaintiff must establish that there was a valid and enforceable contract between the parties. *Lafayette Place Assoc. v. Boston Redevelopment Auth.,* 427 Mass. 509, 517 (1998). To create an enforceable contract, "[i]t is a necessary requirement that [the] agreement ... be sufficiently definite to enable the courts to give it an exact meaning." Williston on Contracts § 4:18 (4th ed.1990); *see also Caggiano v. Marchegiano*, 327 Mass. 574, 579 (1951)("it is essential to the existence of a contract that its nature and the extent of its obligations be certain"). Whether an alleged contract is legally enforceable in light of indefinite terms is a question of law for the court. *Ross v. Raytheon,* 2001 WL 1455863 at *4 (Mass. Super.)(Brassard, J.).

10

Massachusetts state and federal courts have repeatedly found contracts in the context of employment or services provided unenforceable where the terms were too vague or indefinite. For example, the Massachusetts Appeals Court in *Held v. Zamparelli* ruled as a matter of law on a motion to dismiss that the alleged promise by the defendant to pay the plaintiff one-fourth of the profits from leased land if the plaintiff would refrain from exercising her option to repurchase the land was too vague and indefinite to be enforced and thus dismissed the complaint. 13 Mass. App. Ct. 957 , 958-59 (1982). In that case, the plaintiff claimed to have refrained from repurchasing the land in reliance on the defendant's alleged promise. *Id.* The court explained that the purported oral agreement, as set forth by the plaintiff, was unenforceable, however, because it was silent as to essential terms, such as when and how plaintiff's share of the profits was to be calculated and paid, the duration of the agreement, the effect of a sale of the property, and the plaintiff's responsibilities should there be a claim against the owners of the property. *Id.* Under these conditions, the court held, "[c]onstruction and enforcement of the agreement … would be futile, … and we cannot supply these provisions without writing a contract for the parties which they themselves did not make." *Id.* (citations omitted).

Likewise, in *Ross v. Raytheon Co.*, a Massachusetts Superior Court refused to find that there was a valid contract where the plaintiff alleged that the president of the company promised to find him another job in the company if he continued to work on the close-out of the project on which he had been working due to the "uncertainty and ambiguity" of the terms. 2001 WL 1455863, *5 (Brassard, J.). In granting summary judgment on plaintiff's breach of contract claim, the court explained that "[t]he promise of an unspecified position on unspecified terms is too indefinite and ambiguous to be enforceable as a matter of law." *Id.* at *4. In so holding, the court emphasized that one of the fatal ambiguities in the purported contract was the lack of

"specified formulae and procedures that can narrow any uncertainties to the point that an agreement is binding." *Id.*

Following this law, the Massachusetts federal district court held in granting a motion to dismiss in a recent case that a company's alleged promise to two former employees that it would provide them "all the work" they could handle if they left the company and formed their own company was too vague to be enforceable. *Armstrong v. Rohm & Haas Co., Inc.*, 349 F. Supp. 2d 71, 79 (D. Mass. 2004). In that case, the plaintiffs claimed that they left their employment with the company and in turn set up their own company based on their former employer's alleged promise to provide them with all their ceramic work. The Court explained its decision as follows:

> Here, defendant's alleged promise is too vague for this Court to ascertain a reasonably certain basis for providing an appropriate remedy. … What was the nature and scope of the work? Was it all of the ceramic grinding work of the company? Only that work which had formerly gone to [another company]? … What price would be paid for the work? Were there different prices for different types of work? … What would be the duration of the contract? If it was terminable at will, how can plaintiffs make out a claim for breach? If it was not, what is its term? Not all of these issues are insurmountable for plaintiff, taken separately. … Taken together, however, the omissions are fatal. This Court cannot supply the missing terms without "writing a contract for the parties which they themselves did not make." *Held,* 13 Mass. App. Ct. at 958 ….

*Id.* at 79-80.

In a case with similarities to the one at bar, the Court of Appeals for the First Circuit, applying analogous Texas law that provides that "to be legally binding, a contract must be sufficiently definite in its terms so that a court can understand what the promisor undertook," granted summary judgment to the defendant on the plaintiff's breach of contract claim on the ground that the alleged oral modification to plaintiff's employment agreement, which was the basis of his claim, was too vague to be enforceable. *Catex Vitol Gas, Inc. v. Wolfe*, 178 F.3d

572, 577 (1st Cir. 1999).  The plaintiff claimed that the former president of the company entered

into an agreement with him whereby the company would calculate his compensation in a

different way that included in a bonus package in exchange for his devoting his time to

developing new business.  The court rejected this claim, noting that "[e]ven giving all reasonable

inferences to [the plaintiff], as we must do on summary judgment, the terms of the alleged oral

modification are so indefinite and uncertain that [the plaintiff] himself was unable to articulate

exactly what he was owed and under what formula the extent of the deficit could be calculated."

*Id.*  After reviewing the relevant portions of the deposition transcripts, the court stated:

> In order to enforce the oral modifications, [plaintiff] asks us to fill in
> critical details.  We would have to decide, for example, what percentage of
> [the company's] net income between 10 and 20 percent would be allocated
> to the bonus program and, based on his "contribution to the company,"
> what part of that allotment [the company] owed [plaintiff].  This we
> cannot do.  In the end, all of the sources which might flesh out the terms of
> his alleged oral contract – [plaintiff's] recollection of the specifics of his
> agreement with [the president of the company], the [bonus plan] memo,
> minutes from Board of Directors meetings, etc. – provide nothing more
> than general and indefinite comments.  [Plaintiff] cannot forge a contract
> out of such hazy materials

*Id.* at 579.

Courts have decided similarly in other cases applying Massachusetts law, as well as in

other jurisdictions applying analogous law from other jurisdictions.  *See, e.g., Lieberman v.

Storagenetworks, Inc.,* 2004 WL 360489, at *2-3 (Mass. App. Ct.)(affirming grant of summary

judgment on breach of contract claim on basis that oral promise to grant plaintiff stock options

was too vague and indefinite to be enforced because it did not contain essential terms and court

could not supply terms "without writing the parties' contract itself"); *Buker v. Nat'l Mgmt.

Corp.,* 16 Mass. App. Ct. 36, 42 (1983) (affirming grant of summary judgment on breach of

contract claim on basis that defendant's purported oral promise to "work things out" was too

vague to constitute the basis of a contract); *Realty Central LLC v. ReMax*, 2005 WL 235932

(Mass. App. Ct.)(affirming grant of summary judgment on contract claim on basis that, among other things, oral agreement was too indefinite as to duration to enforce and explaining that parties' disagreement as to duration prevented formation of oral contract because parties did not agree on essential term); *Mass Cash Register, Inc.  v. Comtrex Systems Corp.*, 901 F. Supp. 404, 417-418 (D. Mass. 1995)(granting summary judgment on contract claim on ground that parties had failed to come to agreement on certain essential terms, including how they would share income); *Douglass v. Panama, Inc.*, 487 S.W.2d 228 (Tex. Civ. App. Houston 14th Dist. 1972), and judgment aff'd, 504 S.W.2d 776 (Tex. 1974)(employer's promises of a "good bonus next year" held indefinite); *Petersen v. Pilgrim Village*, 256 Wis. 621 (1950) (promise to pay employee unspecified percentage of profits deemed too indefinite to create valid contract); *Butler v. Kemmerer*, 218 Pa. 242 (1907) (employer's promise to split profits on "very liberal" basis insufficiently definite to merit enforcement).

As in these cases, the terms of the alleged oral contract in this case are too indefinite and vague to form a valid and enforceable contract.  The alleged oral agreement, as set out by Scollins himself, does not specify, among other essential terms of a contract, the percentage that Sentient was to pay Scollins for his placement of advertising, the form of the payment, what triggered Sentient's obligation to pay Scollins, whether Sentient would be obligated to pay Scollins even if not Scollins but some Sentient employee placed the advertising, whether the contract would terminate when Scollins' duties were assumed by another Sentient employee, and whether Scollins was obligated to obtain discounted pricing directly for Sentient at some point.[10]

---

[10] Indeed, Scollins cannot even give consistent testimony as to when the contract was formed or how long the conversation creating the contract was.  In his Answers to Interrogatories, Scollins states that the purported "Advertising Placement Agreement" was negotiated in August 1999 at one twenty-minute meeting in Creed's office. (Scollins Interrog. Answers No. 3)  In contrast, in a Declaration he signed under oath one year earlier, Scollins stated that he and Sentient reached the purported agreement in February 1999 before he even came to Massachusetts. Declaration of Donald Scollins (filed in this case in the U.S. District Court for District of Arizona, June 23, 2003) at ¶5.  Further clouding the issue, Scollins testified during his deposition that the agreement was made in a five-minute

In this regard, the purported oral contract was indefinite on both sides, i.e., it specified neither what, how, or when Scollins would be paid nor what he had to do to earn payment.

Like the agreements found to be unenforceable in *Held, Armstrong,* and *Catex*, the purported agreement in this case does not specify the percentage or amount that Scollins was to be paid. Both Scollins and Creed, the only two people involved in making the purported agreement, offered unequivocal testimony that they did not discuss at the time of the making of the purported agreement how much of the 15% commission savings Sentient would pay Scollins. According to Scollins, the following is the entire conversation that constituted the agreement:

> A. The conversation started with Mr. Creed saying that they wanted to expand into the Wall Street Journal, and what did I think about that? And I said, I think it's a good idea; it's definitely a target market for our company. And he said, can you do anything with their pricing? He had their rates. And I said, yes. I could get a discount through my ad agency because it's an accredited agency that's done work. And he said, all right. Well, see what you can do, then. With that, what about compensation for the advertising agency? And he said, well, obviously we're just getting started, so we don't want to spend the money if we don't have to; so can I compensate you at the end when the company is sold or when you leave? And I said, fair enough.
>
> Q. Is that the entire content of the conversation that happened on that day?
>
> A. Yes.

(Scollins Dep. at 30-31) Creed , who is no longer with Sentient, likewise testified that no amount was discussed during that conversation. (Creed Dep. at 24-25) Creed testified, in fact, that he never made any promises about how much, if anything, he would pay Scollins for placing the ads in the Wall Street Journal. (*Id*. at 24-25, 74-75, 77, 127) In his view, "[t]here was never

---

meeting, *Scollins Dep.* at 30, that he originally testified was in June or July 1999, *id.* at 27, then testified "was actually probably [in] July," *id*. at 28, and then testified was "either July or August," which he then changed only to August, *id.* at 29. He later added that the first time Creed ever spoke with him about Bottom Line Advertising placing ads for Sentient was in August 1999. *Id.* at 32. These inconsistencies do not raise genuine issues of fact that would preclude the granting of summary judgment because the date of the formation of the contract is not material to any claim, but Scollins's lack of ability even to identify when the purported contract was made does sharply highlight the vagueness and indefiniteness of the purported contract.

an agreement – there was never an amount attached to it other than that [Scollins] would be taken care of." (*Id*. at 110-111; *also id*. at 25-26, 72, 97-98 ("there was never an actual amount of money that he was going to be paid"); *id.* at 126 (stating that the alleged amount owed was never reflected in the accounting records as an amount payable "because there wasn't an amount they could probably put in … [b]ecause there was never an agreed-upon amount").  No formula or method of computation was ever discussed.  (*Id.* at 75)  Scollins has failed to offer any contrary evidence or testimony that Scollins ever promised him the full 15% commission.[11]  To the extent that payment to Scollins was ever discussed, Scollins agrees that Creed simply told him that he would "work something out," but he never explained what the amount would be:

> Q.  Did Mr. Creed say to you that he would quote, "work something out" for you?
>
> A.  Yes.  Then I asked him more about, what would "work something out" be? And he said, well, we'll compensate you when the company is sold or when you leave.  I said, good enough for me.

(Scollins Dep. at 42)  The promise "to work things out" is, however, too vague to be enforceable.  *See Buker*, 16 Mass. App. Ct. at 42.[12]  The absence of any specificity concerning the percentage that Scollins was to receive makes the contract unenforceable because the court would be required to decide on the percentage itself, in the absence of any definiteness from the evidence, which is something it cannot do.  *Cf. Catex*, 178 F.3d at 579; *see also Mass. Cash Register*, 901 F. Supp. at 417-418 (failure to agree on how to share income fatal to finding existence of contract).

---

[11] In fact, Creed is clear that he *never* told Scollins that he would pay him 15% of the amount Sentient spent on advertising in the Wall Street Journal, (Creed Dep. at 35-36), and when Scollins asked Creed at some point to sign a document indicating that Sentient would pay him 15%, Creed refused, (*id.* at 155-156) and when Scollins later gave him a bill for 15%, he was quite angry because they never agreed to that amount, (*id.* at 193).  As Creed explained, if Sentient were going to have to pay Scollins 15%, it could just have gone with a real advertising agency. (*Id.* at 38-39)

[12] Insofar as Scollins might argue that the contract was formed but that the parties intended to negotiate the amount of the commission at some later time, his claim still fails.  *See, e.g. Caggiano*, *Comets*, *Lucey*.

Likewise, the parties never discussed, determined, or agreed what the form of payment would be and never specified what triggered Sentient's obligation to pay. Thus, though Scollins now claims that he was owed a straight cash payment of 15% of the amount of the advertising Sentient placed with the Wall Street Journal, he testified in his deposition that it was not clear to him even at the time he left Sentient whether the payment would be a straight cash payment or stock and cash. (Scollins Dep. at 54-57) Creed also was unclear on whether there would be a straight cash payment to Scollins – even as Scollins's employment was being terminated, Creed was trying to work out a deal involving stock options, not cash [and he testified that his plan all along was some stock and maybe some cash]. (Creed Dep. at 53-54, 72) Along the same lines, though Scollins claims he was to be paid when Sentient "was sold to another entity" or his employment "ended," he admitted in his deposition testimony that he and Scollins never fleshed out what triggered Sentient's payment obligation. (Scollins Dep. at 53-54) For example, the parties never discussed whether a merger would trigger Sentient's payment obligation or how much of the stock another company had to buy to constitute a "sale" of the company. (Scollins Dep. at 54-57) *Cf. Held*, 13 Mass. App. Ct. at 958-59 (failure to establish the effect of a sale made agreement too indefinite to enforce) Thus, for example, did Credit Suisse's purchase of Sentient in 2000 trigger Sentient's obligation to pay? Though Scollins does not believe it did, he cannot offer any basis other than his wholly subjective belief that it did not since the subject was never discussed. (Scollins Dep. at 357)

A primary example of the indefiniteness of the purported contract in this case is Scollins's inability to explain how additional discounts that the Wall Street Journal granted Sentient would be treated. Apparently, at the end of each year, the Wall Street Journal gave Sentient certain retroactive discounts based on Sentient's volume of advertising because Sentient

17

placed more ads than it was required to do under the contract with the Wall Street Journal. Sentient and Scollins never discussed, however, whether Sentient was entitled to a discount for these retroactive credits. When asked during his deposition about how the credits affected the amount Sentient allegedly owed him and in the various calculations Scollins has given Sentient, Scollins provided different answers, sometimes agreeing that Sentient gets the benefit of the credits and sometimes not agreeing. (Scollins Dep. at 157-158; [docs]) As the court found in *Catex* with regard to the plaintiff's failure to articulate the specific terms of the contract, here Scollins's failure to articulate the terms of the purported agreement proves its vagueness and indefiniteness, and therefore unenforceability.

What happened in this case is not that there was a failure to agree on many essential terms of the agreement; there simply was not even any discussion of them. Thus, there is not a disagreement as to the terms of the purported agreement in this case that would preclude summary judgment; rather, there is simply no evidence of what the terms were because they were not, in fact, even ever discussed. *Cf. Realty Central LLC.* At best, both Scollins and Creed had their own subjective, personal intentions, but neither ever shared with them with the other, so there certainly cannot be any meeting of the minds necessary to form a contract.

For example, there was no agreement as to whether Scollins got paid for *all* advertising that went through Bottom Line or only that advertising that he himself placed through Bottom Line. This is not simply an academic issue. At some point, Scollins in fact ceased placing the advertising, even though he still worked at Sentient, and another employee, Mr. Morton, took over that responsibility. Is Scollins entitled to 15% of the amount of *all* advertising that went through Bottom Line or is he entitled only to some lesser amount, or nothing, for the time that he

was not placing the ads but some other employee to whom Sentient was paying salary was?

There simply is no answer to these questions because the parties *never* discussed the issue.

Similarly, at some point Sentient was able to place the advertising directly with the Wall Street Journal without going through a broker, thus directly saving the 15% broker commission. Was Scollins obligated to ask the Wall Street Journal when that time was and thus obtain the 15% savings for Sentient directly? *Cf. Held*, 13 Mass. App. Ct. at 958-59 (failure to specify plaintiff's obligations part of fatal indefiniteness of purported contract). Scollins in fact never inquired whether Sentient could qualify for the discount directly itself. (Scollins Dep. at 126) Could someone at Sentient have contacted the Wall Street Journal directly to find out whether Sentient could place the advertising directly without Scollins as the middleman? If Sentient had done that, would it still be obligated to go through Scollins? Would Scollins still be entitled to some payment if Sentient had started going directly to the Wall Street Journal? Scollins claims that he was to be compensated even if Sentient qualified for discount on its own, but the reality is that the term was never discussed. (Scollins Dep. at 125)

As in *Held* and *Armstrong*, in this case the court cannot answer these questions without writing the contract for the parties, which it cannot do. And, as the court explained in *Armstrong*, even if one of these indefinite terms alone would not make the contract unenforceable, taken together, they are insurmountable. Accordingly, because there was no enforceable contract in this case, the court should grant summary judgment on this part of Counts I and II.[13]

---

[13] The Court's words in *Armstrong* are instructive:

> It should be obvious that there is not perfect congruence between the result that fairness might seem to dictate and the result dictated by law. The law strongly favors certainty and precision of contracts, even at the expense of occasional injustice, on the theory that a contrary rule would lead to even greater injustices. Thus, the law will refuse to enforce a simple and direct promise if it is unduly vague (e.g., "Don't worry, we'll take care of

      2.    <u>Because the Alleged Agreement is Oral, it Violates the Statute of Frauds.</u>

The Massachusetts Statute of Frauds provides that "[a]ny agreement to pay compensation for service as a broker … shall be void and unenforceable unless such agreement is in writing, signed by the party to be charged therewith, or by some other person authorized."  Mass. Gen. L. c. 259 § 7.  Because Scollins's view is that he was acting as a broker in placing advertising for Sentient in the Wall Street Journal, (Scollins Dep. at 131), and because the agreement that Scollins alleges he had with Sentient in connection with that placement of advertising was, by his own admission, at best an oral agreement, (*id.* at 27, 44), it is barred by the Statute of Frauds.

## <u>Conclusion</u>

For the foregoing reasons, Sentient requests that this Court grant summary judgment for Sentient on all counts of the Amended Complaint.

                          SENTIENT JETS, INC., f/k/a eBizJets.com,
                          By its attorneys,

                          /s/ C. Max Perlman_____
                          C. Max Perlman (BBO #630395)
                          A. Lauren Carpenter (BBO #551258)
                          SULLIVAN WEINSTEIN & McQUAY, PC
                          Two Park Plaza, Suite 610
                          Boston, Massachusetts 02116
Dated:  September 26, 2005          (617) 348-4300

---

you") but insist on enforcing boilerplate contract language that neither party even read or understood.  Of course, a person of principle and character would keep his word; but if his word is sufficiently imprecise, the law will not force him to do so.

*Armstrong*, 349 F. Supp. 2d at 79.  Scollins had ample opportunity to clarify his purported agreement and to reduce it to a clear writing.  That he did not should not and cannot be remedied by the Court.  In any event, there is in fact no injustice in this case.  Scollins was a paid employee, plus he received a $100,000 bonus upon the sale of Sentient to compensate him for the small amount of work he did placing ads in the Wall Street Journal for Sentient.