IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

DONALD SCOLLINS, individually and on behalf of)
BOTTOM LINE ADVERTISING, a sole)    Civil Action No. 03-12478-EFH
proprietorship,                               )
                                     )
                Plaintiff,          )
                                   )
v.                                        )
                                   )
SENTIENT, fka eBizJets,               )
                                   )
                Defendant.       )
_____)

**SEPARATE STATEMENT OF FACTS IN SUPPORT OF PLAINTIFF'S
MOTION FOR PARTIAL SUMMARY JUDGMENT ON COUNTS THREE AND
FOUR OF PLAINTIFF'S FIRST AMENDED COMPLAINT.**

Plaintiff, Donald Scollins ("Scollins"), through his attorneys, and pursuant to Fed.

R. Civ. P. 56 and LR, D. Mass. 7.1(b)(1), submits the following Statement of Facts in

Support of Plaintiff's Motion for Partial Summary Judgment on Counts Three (Unjust

Enrichment), and Four (Wage Claim), of Plaintiff's First Amended Complaint.

## SEPARATE STATEMENT OF FACTS

1.      Defendant Sentient is a Delaware corporation, which was known as eBizJets

("eBizJets" or "the Company"), prior to September 2002. (First Amended Complaint ("1st

Amd. Comp."), ¶ 2; Answer, ¶ 2; Scollins' Declaration ("Scollins Decl."), ¶ 1.)

2.      Scollins worked for eBizJets as its Director of Charter Operations and

received a salary, bonuses and commissions, and was granted stock options. (1st Amd.

Comp., ¶ 6; Answer, ¶ 6; Scollins' Decl., ¶ 2.)

3.     Scollins worked as the Director of Charter Operations for eBizJets from approximately June 1999, through November 2001. (Scollins' Deposition ("Scollins' Depo."), Pg. 19, Ln. 14-17; Scollins' Decl., ¶ 3.)

4.     After Scollins began working for eBizJets as its Director of Charter Operations, eBizJets, through its president, Joseph "Jeff" Creed ("Creed") decided to place advertising in *The Wall Street Journal*. (Creed Deposition ("Creed Depo."), Pg. 16, Ln. 10-22; Scollins' Depo., Pg. 27, Ln. 9-11; Scollins' Decl., ¶ 4.)

5.     eBizJets was given a 15% authorized advertising discount by *The Wall Street Journal* because its ads were placed by an accredited advertising agency. (Creed Depo., Pg. 17, Ln. 2-12; Scollins' Depo, Pg. 291, Ln. 16-21; Scollins' Decl., ¶ 5.)

6.     Creed knew that Scollins had operated an advertising business prior to working for the Company. During a meeting between Scollins, Jeff Creed, and another employee, in or about August, 1999, Jeff Creed asked Scollins if he "could do anything with *The Wall Street Journal*'s pricing." Scollins told Creed he could provide the Company a 15% discount if it placed advertising through his ad agency, Bottom Line Advertising, because it was an accredited agency. (Scollins' Depo., Pg. 30, Ln. 11-24: Pg. 31, Ln. 1-3; Scollins' Decl., ¶ 6; Creed Depo., Pg. 18, Ln. 21-23: Pg. 19, Ln. 15-20: Pg. 20, Ln. 5-8.)

7.     Creed decided to place the Company's advertising in *The Wall Street Journal* through Bottom Line Advertising so the Company did not have to pay the fifteen percent (15%) advertising placement fee. (Scollins' Depo., Pg. 31, Ln. 4-5; Scollins' Decl., ¶7.)

2

8.    *The Wall Street Journal* conducted due diligence on Bottom Line Advertising and determined that it was an accredited agency and, therefore, eBizJets was entitled to receive a 15% discount on its advertising fees. (Scollins' Depo., Pg. 291, Ln. 16-21; Scollins' Decl., ¶ 8.)

9.    eBizJets placed print advertising with *The Wall Street Journal* through Bottom Line Advertising from September, 1999 to January, 2002. (Scollins' Decl., ¶9.)

10.    From September 1999 to December 2000, Scollins placed advertising and insertion orders for eBizJets with *The Wall Street Journal*, and was consulted by the Company on the ad content as well. After December 2000, the Company hired another employee to handle Scollins' advertising tasks, but it continued to place its advertising under the name of Scollins' dba "Bottom Line Advertising." (Scollins Depo., Pg. 317, Ln. 8-13; Scollins Decl., ¶ 10.)

11.    Scollins told Creed, on several occasions, that Bottom Line Advertising expected to be paid for its services and the cost savings realized by placing print advertising through Bottom Line Advertising with *The Wall Street Journal*. (Scollins' Decl., ¶ 11.)

12.    Creed told Scollins he would "work something out" when Scollins left eBizJets or when the Company was sold, whichever came first. Scollins understood Creed's statement to mean that Scollins would be paid the 15% cost savings the Company received by placing its ads through Bottom Line Advertising when Scollins left the Company, or when the Company was sold. (Scollins' Decl., ¶ 12.)

3

13.    From September, 1999 through December, 2001, eBizJets placed $2,406,791.00 in advertising in *The Wall Street Journal* through Bottom Line Advertising. After the 15% discount eBizJets received through Bottom Line Advertising was deducted, eBizJets only had to pay $2,045,772.40 for its advertising. eBizJets recognized a savings of $361,018.60 by placing its advertising in *The Wall Street Journal* through Bottom Line Advertising (Scollins' Decl., ¶ 13; Scollins' Decl., Exh. 1.)

14.    On or about November 8, 2000, eBizJets granted Scollins 280,412 in stock options at an exercise price of $.50 a share. The Vesting Commencement Date was on or about February 22, 2001. (1 st Amd. Cmp.,  ¶ 8; Answer, ¶ 8; Scollins' Decl., ¶ 14; Scollins' Decl., Exh. 2.)

15.    When Scollins was granted the stock options referred to above, he had to sign a "Stock Option Agreement." (1st Amd. Cmp., ¶9;  Answer, ¶9; Scollins' Decl., ¶ 15; Scollins' Decl., Exh. 3.)

16.    On September 19, 2001, eBizJets then-Chief Executive Officer, John Williams ("Williams), informed Scollins that Williams was recommending to the Board of Directors of eBizJets that Scollins, among others, receive 1,000 additional stock options,  and the Board of Directors approved such recommendation.  (1 st Amd. Cmp., ¶ 10; Answer, ¶ 10; Scollins' Decl., ¶ 16.)

17.    On July 15, 2004, Mr. Williams was deposed and stated under oath that he knew Scollins was placing print and directory advertising for the Company. (Williams' Deposition ("Williams Depo."), Pg. 25, Ln. 11-17.)

4

18.    Mr. Williams also knew that Scollins was placing advertising for the Company through a separate company. (Williams' Depo., Pg. 26, Ln. 12-14.)

19.    Mr. Williams also testified that Scollins' stock options were granted to him, along with other employees, as part of an overall compensation program the Company instituted for its employees. (Williams' Depo., Pg. 45, Ln. 1-4.)

20.    On or about November 23, 2001, Williams informed Scollins that his employment would be terminated. Williams told Scollins he had violated certain company policies and he gave Scollins a "Mutual Termination Agreement" to read and sign. (1st Amd. Cmp., ¶ 13; Answer, ¶ 13; Scollins' Decl., ¶ 17; Scollins' Decl., Exh. 4.)

21.    The Mutual Termination Agreement stated in its recitals: "Scollins is an employee of the Company and also owns or controls an entity that has done advertising business with the Company." (Scollins' Decl., ¶ 18.)

22.    During the November 23, 2001 meeting, Williams informed Scollins that his termination would be "without cause." (1st Amd. Cmp. ¶14; Answer, ¶14; Scollins' Decl., ¶ 19.)

23.    On January 11, 2002, eBizJets' Board of Directors held a special meeting to discuss Scollins' termination. (1st Amd. Cmp., ¶16; Answer, ¶16; Scollins' Decl., ¶20.)

24.    On January 15, 2002, Williams informed Scollins that his termination from eBizJets had been changed to for *"Cause"*. Williams further stated in his letter that pursuant to Section 4(a)(v) of the Stock Option Agreement, Scollins' Option to purchase all or any part of the number of shares of Common Stock terminated on the date Scollins

ceased to be an employee of the Company, and rights Scollins may have had to exercise any unexercised portion of the Option, whether vested or unvested, terminated effective as of 5:00 P.M. on January 15, 2002. Scollins received the letter at 5:20 P.M. on January 15, 2002, after the deadline which he may have exercised any unexercised portion of the Option, whether vested or unvested. (1st Amd. Cmp., ¶17; Answer, ¶17; Scollins' Decl., ¶ 21; Scollins' Decl., Exh. 5.)

25.    eBizJets never disclosed to Scollins, or his attorneys, the reasons his termination was changed from "without cause" to "with cause." (Scollins' Decl., ¶ 22.)

26.    On March 17, 2003, Scollins filed a lawsuit against eBizJets and has incurred costs and attorneys' fees in the prosecution of his claims against the Company. (Scollins' Decl., ¶ 23.)

Plaintiff Donald Scollins, by his attorneys,

John D. Parker, II, *Pro Hac Vice*
Anthony E. Young, *Pro Hac Vice*
PARKER LAW FIRM, P.L.C.
141 E. Palm Lane, Suite 111
Phoenix, AZ 85004

-and-

Edward C. Cooley, BBO #550117
GIARRUSSO, NORTON, COOLEY, ET. AL.
308 Victory Road
Quincy, MA. 02171

Date: September 26, 2005

6

## CERTIFICATE OF SERVICE

I, John D. Parker, II, hereby certify that one the _26th_ day of September, 2005, I caused copies of **PLAINTIFF'S SEPARATE STATEMENT OF FACTS IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON COUNTS THREE AND FOUR OF PLAINTIFF'S FIRST AMENDED COMPLAINT, PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON COUNTS THREE AND FOUR OF PLAINTIFF'S FIRST AMENDED COMPLAINT, MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON COUNTS THREE AND FOUR OF PLAINTIFF'S FIRST AMENDED COMPLAINT, AND DECLARATION OF DONALD SCOLLINS,** to be served by first-class mail, postage pre-paid addressed to Max C. Perlman, Esq., Sullivan, Weinstein & McQuay, P.C., Two Park Plaza, Suite 610, Boston, MA 02116-3902 (Attorneys for Defendant).

John D. Parker, II