IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

FILED
IN CLERKS OFFICE

2005 SEP 27 A 9: 08

U.S. DISTRICT COURT
DISTRICT OF MASS.

DONALD SCOLLINS, individually and on behalf of)
BOTTOM LINE ADVERTISING, a sole)
proprietorship,                                      )
                                                     )
                    Plaintiff,                       )
                                                     )
v.                                                   )
                                                     )
SENTIENT, fka eBizJets,                              )
                                                     )
                    Defendant.                       )
_____)

Civil Action No. 03-12478-EFH

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT
## ON COUNTS THREE AND FOUR OF PLAINTIFF'S
## FIRST AMENDED COMPLAINT

Plaintiff, Donald Scollins ("Plaintiff" or "Scollins"), submits this Memorandum in

Support of his Motion for Partial Summary Judgment on Counts Three (Unjust

Enrichment), and Four (Wage Claim), of Plaintiff's First Amended Complaint.

### STANDARD FOR MOTION FOR SUMMARY JUDGMENT

A court may grant summary judgment only when the submissions in the record "show

that there is no genuine issue as to any material fact and that the moving party is entitled to

judgment as a matter of law." Fed.R.Civ.P. 56(c). "The inquiry performed is the threshold

inquiry of determining whether there is the need of a trial -- whether, in other words, there

are any genuine factual issues that properly can be resolved only by a finder of fact because

they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

## SUMMARY OF MATERIAL FACTS

Defendant Sentient is a Delaware corporation, which was known as eBizJets ("eBizJets" or "the Company"), prior to September 2002.

Scollins worked for eBizJets as its Director of Charter Operations from approximately June 1999 through November 2001, and received a salary, bonuses and commissions, and was granted stock options.

## A.    FACTS IN SUPPORT OF PLAINTIFF'S UNJUST ENRICHMENT CLAIM.

After Scollins began working for eBizJets as its Director of Charter Operations, eBizJets, through its president, Joseph "Jeff" Creed ("Creed") decided to place advertising in *The Wall Street Journal*.

Creed knew that Scollins had operated an advertising business prior to working for the Company. During a meeting between Scollins, Jeff Creed, and another employee, in or about August, 1999, Jeff Creed asked Scollins if he "could do anything with *The Wall Street Journal*'s pricing." Scollins told Creed he could provide the Company a 15% authorized advertising discount if it placed its advertising with *The Wall Street Journal* through Scollins' advertising agency, Bottom Line Advertising, because it was an accredited agency.

Creed decided to place the Company's advertising in *The Wall Street Journal* through

Bottom Line Advertising so the Company could receive the 15% discount on its advertising

costs.

*The Wall Street Journal* conducted due diligence on Bottom Line Advertising and

determined that it was an accredited agency and, therefore, eBizJets was entitled to

receive a 15% discount on its advertising fees.

eBizJets placed print advertising with *The Wall Street Journal* through Bottom Line

Advertising from September, 1999 to January, 2002.

From September 1999 to December 2000, Scollins placed advertising and insertion

orders for eBizJets with *The Wall Street Journal*, and was consulted by the Company on the

ad content as well. After December 2000, the Company hired another employee to handle

Scollins' advertising tasks, but it continued to place its advertising under the name of

Scollins' dba "Bottom Line Advertising."

Scollins told Creed, on several occasions, that Bottom Line Advertising expected to

be paid for its services and the cost savings realized by placing print advertising through

Bottom Line Advertising with *The Wall Street Journal*.

Creed told Scollins he would "work something out" when Scollins left eBizJets or

when the Company was sold, whichever came first. Scollins understood Creed's statement

to mean that Scollins would be paid the 15% cost savings the Company realized by placing

3

its ads through Bottom Line Advertising when Scollins left the Company, or when the Company was sold.

From September, 1999 through December, 2001, eBizJets placed $2,406,791.00 in advertising in *The Wall Street Journal* through Bottom Line Advertising. After the 15% discount eBizJets received through Bottom Line Advertising was deducted, eBizJets only had to pay $2,045,772.40 for its advertising. eBizJets recognized a savings of $376,744.65 by placing its advertising in *The Wall Street Journal* through Bottom Line Advertising. (See Scollins' Declaration, Exh. 1.)

## B.    FACTS IN SUPPORT OF WAGE CLAIM.

On or about November 8, 2000, eBizJets granted Scollins 280,412 in stock options at an exercise price of $.50 a share.  The Vesting Commencement Date was on or about February 22, 2001. (See Scollins' Affidavit, Exh. 2.)

When Scollins was granted the stock options, he had to sign a "Stock Option Agreement." (See Scollins' Affidavit, Exh. 3.)

On September 19, 2001, eBizJets then-Chief Executive Officer, John Williams ("Williams"), informed Scollins that Williams was recommending to the Board of Directors of eBizJets that Scollins, among others, receive 1,000 additional stock options, and the Board of Directors approved such recommendation.

On or about November 23, 2001, Williams informed Scollins that his employment would be terminated *"without cause."* Williams told Scollins he had violated certain

company policies and he gave Scollins a "Mutual Termination Agreement" to read and sign. The Mutual Termination Agreement stated in its recitals: "Scollins is an employee of the Company and also owns or controls an entity that has done advertising business with the Company." (See Scollins' Affidavit, Exhibit "4".)

On January 11, 2002, eBizJets' Board of Directors held a special meeting to discuss Scollins' termination.

In a letter dated January 15, 2002, Williams informed Scollins that his termination from eBizJets had been changed to for *"Cause"*. Williams further stated that "pursuant to Section 4(a)(v) of the Stock Option Agreement, your Option to purchase all or any part of the number of shares of Common Stock terminates on the date you cease to be an employee of the Company. Accordingly, any rights you may have had to exercise any unexercised portion of the Option, whether vested or unvested, terminated effective as of 5:00 P.M. today." Scollins received the letter at **5:20 P.M.** on January 15, 2002, after the deadline  which he may have exercised any unexercised portion of the Options, whether vested or unvested. (See Scollins' Affidavit, Exh. 5.)

eBizJets never disclosed to Scollins, or his attorneys, the reasons his termination was changed from "without cause" to "with cause."

. . .

. . .

. . .

5

## C.    OTHER FACTS ESTABLISHED IN DISCOVERY.

On July 15, 2004, Mr. Williams was deposed and stated under oath that he knew Scollins was placing print and directory advertising for the Company through Scollins' own advertising agency.

Mr. Williams also testified that Scollins' stock options were granted to Scollins, along with other employees, as part of an overall compensation program the Company instituted for its employees.

## ARGUMENT

## A.    SCOLLINS UNJUSTLY ENRICHED EBIZJETS TO HIS DETRIMENT ENTITLING HIM TO RECOVER UNDER A QUANTUM MERUIT THEORY.

Unjust enrichment is simply a doctrine of quasi-contract when no written contract applies. Unjust enrichment has been used to address the "unjust enrichment of one party and unjust detriment to the other party" *Bushkin Assocs., Inc. v. Raytheon Co.*, 906 F.2d 11, 15 (1st Cir. 1990). Massachusetts recognizes a claim for quantum meruit, quasi-contract and implied contract, and uses these terms synonymously, to describe a form of action used to recover money damages for any type of unjust enrichment. *Bolen v. Paragon Plastics, Inc.*, 747 F.Supp. 103, 106 (D.Mass. 1990).

There are four elements to the claim. A plaintiff must prove (1) he conferred a measurable benefit upon the defendant; (2) the defendant accepted the services with the expectation of compensating the plaintiff; (3) he actually conferred services which were

6

enjoyed by the defendant; and (4) he provided services with a reasonable expectation of being paid. *Bolen*, 747 F.Supp. at 106-07.

Here, Scollins meets all four elements of the claim.

## *1. Defendant Received and Enjoyed a Measurable Benefit.*

The "measurable benefit" received by the Company, for which Scollins is entitled to be paid, is the cost savings the Company realized by placing advertising through Scollins' business, Bottom Line Advertising.

After Scollins began working for the Company, Joseph "Jeff" Creed, the Company's former president, decided to place advertising in *The Wall Street Journal*. (SOF ¶ 4). *The Wall Street Journal* would have charged eBizJets fifteen percent (15%) more in advertising costs unless the Company placed its advertising through an accredited advertising agency. (SOF ¶ 5).

Creed knew that Scollins had operated an advertising agency prior to coming to work for the Company. (SOF ¶ 6). That is why Creed asked Scollins if Scollins "could do anything with *The Wall Street Journal*'s pricing" which resulted in (1) Scollins placing advertising for the Company through Bottom Line Advertising and (2) saving the Company 15% off its advertising costs. *Id.*

From September 1999 through December 2000, Scollins personally placed advertising and provided input on the advertising content, through Bottom Line Advertising. (SOF ¶ 13). Even after that, the Company continued to place advertising

7

with *The Wall Street Journal*, using Scollins' business name, Bottom Line Advertising, through December 2001, after Scollins was terminated "without cause" and before he was terminated "for cause" a month later, and denied his right to exercise the vested portion of his stock options.

From September 1999 through December 2001, the Company realized a cost savings of $376,744.65, by using Scollins' advertising agency, Bottom Line Advertising, to place advertising with *The Wall Street Journal*. One month later Scollins was told he was being terminated "for cause." The classification and timing of his termination is irrelevant for purposes of this claim. What is critical, however, is that his termination triggered an immediate right to be paid $376,744.65.

Given that the Company has never paid Scollins $376,744.65, he has a legal right to recover interest on this unpaid amount from the date of breach. Massachusetts' statutory rate of interest is 12% per annum. Mass. Gen. Laws ch. 231 § 6C. This statute applies to damages in contract actions. A *quantum meruit* claim is a quasi-contract claim. Here, since as of January 15, 2002, the date Scollins was terminated with cause, he was never paid any advertising cost savings, the Company is obligated as a matter of law to pay 12% interest as of the aforementioned date.

. . .

. . .

. . .

8

**2.    *Defendant Accepted the Services with the Expectation of Compensating Scollins.***

It is not necessary that the defendant subjectively have expected to pay the plaintiff; rather, the test is whether a reasonable person would have expected to pay. *Bolen*, 747 F.Supp. at 107. Here, the evidence clearly shows that eBizJets reasonably expected to compensate Scollins.

Scollins told Creed he expected to be paid for the Company's use of Bottom Line Advertising to place ads in *The Wall Street Journal*. (SOF ¶11). In response to Scollins' requests for payment, Creed told Scollins he would "work something out" when Scollins either left the Company, or the Company got sold, whichever came first.   (SOF ¶ 12).

Besides Creed, who was the Company's president, its Chief Executive Officer, John Williams, knew when Scollins was working with the Company that Scollins was placing print and directory advertising with the Company, through a separate company. (SOF ¶¶ 17 & 18). Moreover, when Williams terminated Scollins the first time "without cause" Williams presented Scollins with a "Mutual Termination Agreement", the recitals of which stated: "Scollins is an employee of the Company and also owns or controls an entity *that has done advertising business with the Company.*" (Emphasis supplied.)

Based on the foregoing evidence, it is clear that the Company knew Scollins was not providing his advertising agency services gratuitously.  The Company knew that

9

Scollins expected to be paid for the use of his advertising agency, through its top executives, and

Scollins' claim for payment was no surprise to the company.

### 3.   *Scollins conferred services which were enjoyed by Defendant.*

Creed has testified that without Bottom Line Advertising, the Company would have had to pay 15% more in advertising fees to *The Wall Street Journal*. (SOF ¶¶5-7). Between September 1999 and December 2001, without Bottom Line Advertising, the Company would have had to pay $376,744.65 more in advertising expenses to *The Wall Street Journal*. (SOF ¶ 13).

Clearly, the fact that Bottom Line Advertising saved the Company $376,744.65 in advertising expense conferred valuable services which the Company enjoyed.

### 4.   *Scollins Reasonably Expected to be Paid for the Services.*

Scollins' reasonable expectation of being paid derives from several sources. First, Creed has testified that he told Scollins he would "work something out" for Scollins with respect to Scollins' request to be paid the advertising cost savings. (SOF ¶ 12). Scollins continued to provide advertising services to the Company, expecting that either when the Company was sold, or he left the Company, he would be paid the advertising cost savings as promised by Creed.

Second, Williams recognized in the Mutual Termination Agreement that Scollins had "done advertising business with the Company." The Mutual Termination Agreement

did not say Scollins' job duties were to place advertising, nor did it say that Scollins had provided advertising services gratuitously. The Company's top executives knew that Scollins expected to be paid for the use of Bottom Line Advertising, and he should be paid, based on the Company's promises, and Scollins' expectations therefrom.

Under similar circumstances, Massachusetts courts have allowed Plaintiffs to recover under a *quantum meruit* theory, even where the Plaintiff relied on an oral promise to pay that would be unenforceable under the statute of frauds. See *Hollister v. Old Colony Trust Co.,* 328 Mass. 225, 228 (1952); *Hastoupis v. Garza,* 9 Mass. App. Ct. 27, 35 (1980).

## B.   SCOLLINS IS ENTITLED TO RECOVER TREBLE DAMAGES ON HIS CLAIM FOR UNPAID STOCK OPTIONS.

Pursuant to Mass. Gen. Law ch. 149 § 150, Scollins may recover treble damages for his unpaid wages. Those wages consist of his stock options.

### 1.   Scollins' Options are "Wages" Within the Meaning of the Weekly Wage Law.

Massachusetts' Weekly Wage Law prescribes the timing and intervals for payment of "wages by Massachusetts employers. Mass. G. L. c, 149, § 148. It also provides that all wages of a discharged employee must be paid in full *on the day of discharge.* Id.

On November 23, 2001, the Company, through its Chief Executive Officer, John Williams, terminated Scollisn "without cause" and presented Scollins with a Mutual

Termination Agreement. (SOF ¶ 20-22).

When Scollins was terminated without cause, he held 280,412 stock options. (SOF ¶ 14). Scollins never exercised these options because on January 15, 2002, the Company inexplicably changed his termination from "without cause" to "cause." The termination letter stated that under the Stock Option Agreement, on the date Scollins ceased to be an employee of the Company, Scollins' right to exercise any unexercised portion of the option, whether vested or unvested, terminated. In Scollins' case, the letter indicated his options terminated on January 15, 2002, at 5:00 P.M. Scollins did not receive the letter until January 15, 2002, at 5:20 P.M. Thus, the Company's wrongful conduct prohibited Scollins from exercising the vested portion of his stock options. (SOF ¶¶ 23 & 24).

The Company has never told Scollins why it decided to change his termination to one "for cause." (SOF ¶ 25).

The issue of whether unpaid stock options can be claimed as "wages" as defined under the Weekly Wage Law is unsettled in Massachusetts. See, *Brown v. Nortel*, 14 Mass.L.Rptr. 544 (Mass.Super. 2002). The Court in *Brown* (which was an unpublished decision) refused to dismiss a wage claim for stock options on the defendant's motion to dismiss.

Based on the facts, however, there is no question that Scollins' stock options are "wages" within the meaning of the Weekly Wage Law.

First, as a matter of procedure, the Attorney General gave written authority to Scollins to pursue a civil claim for unpaid wages.

Second, the evidence is clear that the Company gave Scollins his stock options for work he had already performed. According to John Williams, the Company's former Chief Executive Officer, all of the options were given to Scollins pursuant to a written Stock Option Agreement as "part of an overall compensation program that the company instituted for its employees." (SOF ¶ 19). In other words, Scollins' stock options were granted by the Company with the unequivocal intent to pay him for a job well done.

The Court should enter summary judgment on Scollins' wage claim, and declare that the options were wages as a matter of law leaving open for further briefing the value of the options. Plaintiff is also entitled to an award of reasonable attorneys' fees and costs as allowed by the Weekly Wage Law.

The Court should also enter summary judgment on Plaintiff's unjust enrichment claim in the amount of $376,744.65, plus interest thereon at the rate of 12% per annum from January 15, 2002.

## CONCLUSION

For the reasons stated herein, and in the accompanying Motion for Partial Summary Judgment on Counts Three and Four of Plaintiff's First Amended Complaint, Plaintiff respectfully requests this Court grant partial summary judgment on Counts Three and Four of Plaintiff's First Amended Complaint, plus his reasonable attorneys' fees and costs incurred.

13

Plaintiff Donald Scollins, by his attorneys,

John D. Parker, II, *Pro Hac Vice*
Anthony E. Young, *Pro Hac Vice*
141 E. Palm Lane, Suite 111
Phoenix, AZ 85082-3098

-and-

Edward C. Cooley, BBO #550117
GIARRUSSO, NORTON, COOLEY, ET. AL.
308 Victory Road
Quincy, MA. 02171
Attorneys for Plaintiff Donald Scollins

Dated: September 26, 2005

## CERTIFICATE OF SERVICE

I, John D. Parker, II, hereby certify that on this 26th day of September, 2005, I caused copies of **PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON COUNTS THREE AND FOUR OF PLAINTIFF'S FIRST AMENDED COMPLAINT, SEPARATE STATEMENT OF FACTS IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON COUNTS THREE AND FOUR OF PLAINTIFF'S FIRST AMENDED COMPLAINT, AND MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON COUNTS THREE AND FOUR OF PLAINTIFF'S FIRST AMENDED COMPLAINT**, to be served by first-class mail, postage pre-paid addressed to Max C. Perlman, Esq., Sullivan, Weinstein & McQuay, P.C., Two Park Plaza, Suite 610, Boston, MA 02116-3902 (Attorneys for Defendant).

John D. Parker, II

K:\978\021377\memorandumoflaw.wpd