UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DONALD SCOLLINS, individually and on
behalf of BOTTOM LINE ADVERTISING,

       Plaintiff,

vs.

SENTIENT, f/k/a eBizJets,

       Defendant.

Civil Action No. 03-12478-EFH

## SENTIENT'S OPPOSITION TO PLAINTIFF'S
## MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiff's Motion for Partial Summary Judgment should be denied because there are genuine issues of fact and plaintiff does not deserve to win as a matter of law. For a plaintiff to obtain summary judgment on any claim, he must prove that there is no genuine issue as to each and every element of his claim, unlike the defendant, who only has to show that the plaintiff's case fails as to at least one element. Plaintiff cannot carry his burden on this motion.

As to plaintiff's Wage Act claim (Count IV), which concerns stock options to which plaintiff claims he is entitled, under existing Massachusetts law such a claim is not cognizable because stock options are not wages under the Act. Furthermore, the claim is barred by the statute of limitations and statute of repose. In addition, there is the undisputed fact that plaintiff never tried to exercise his stock options in the manner prescribed in the parties' agreement governing the options and, seemingly, the factual question of whether he was rightly terminated for cause since there is no dispute that the agreement providing him with stock options unambiguously provides that the options terminate on the same day he is terminated with cause.

On plaintiff's unjust enrichment claim, although there is agreement that plaintiff, then a paid, full-time employee of defendant Sentient Jet, Inc. f/k/a eBizJets ("Sentient"), placed advertising with the Wall Street Journal for Sentient through his nominal advertising agency, there are genuine factual and equitable issues as to whether and what benefit, if any, he conferred on Sentient, whether he was already compensated through salary or bonuses for placing the ads, whether Sentient believed it needed to compensate plaintiff for placing the ads, whether plaintiff actually expected to be paid, whether a reasonable person would have expected compensation under the circumstances, and how to value the benefit conferred, if any – all of which are pure jury questions that are totally inappropriate for determination on a motion for summary judgment.  In addition, there is a important legal fact that plaintiff has pleaded a claim for breach of contract for the same subject matter – he cannot obtain compensation for the same work under both a contract claim and an unjust enrichment claim.

For these reasons, Sentient asks that the court deny Plaintiff's Motion for Partial Summary Judgment.

## **Material Facts**

Sentient Jets, Inc. ("Sentient"), formerly known as eBizJets.com, Inc., is a corporation that brokers charter jets for individuals and companies.  (Complaint, ¶ 1; Creed Dep. at 3[1]) Sentient was started in 1997 by Jeff Creed.  (Creed Dep. at 4)  Plaintiff Don Scollins, Creed's cousin and close friend, (Creed Dep. at 6; Scollins Dep. at 229[2]), began working for Sentient in or about March 1999 as a charter representative.  (Scollins Dep. at 17)  About three months later he became director of charter operations, a position he remained in until the termination of his

---

[1] Deposition Transcript of Jeff Creed (copy of excerpts attached to the Affidavit of C. Max Perlman in Support of Sentient's Motion for Partial Summary Judgment ("Perlman Affidavit") as Exhibit A).
[2] Deposition Transcript of Donald Scollins (copy of excerpts attached to the Perlman Affidavit as Exhibit B).

employment.  (*Id.* at 17, 19)  Throughout this time, he was a full-time employee of Sentient.  (*Id.* at 19-20)

Before he joined Sentient, Scollins had created an advertising agency, d/b/a Bottom Line Advertising ("Bottom Line"), in Arizona through which he placed yellow pages ads for four clients in 1997 and 1998.  (Creed Dep. at 18-19; Scollins Interrog. Answers No. 7[3])  By the time Scollins moved to Massachusetts to join Sentient, he was no longer doing any business through Bottom Line.  (Scollins Dep. at 72)

At some point in 1999, Creed decided that Sentient should begin to place advertisements in the Wall Street Journal.  (Creed Dep. at 17)  Upon calling to place an ad, however, he learned that the Wall Street Journal, unlike other companies with whom Creed placed ads himself, did not accept advertising directly from new companies like Sentient but instead required that the ads be placed through an agency.  (*Id.*)  The practice was that the Wall Street Journal gave advertising agencies a 15% discount and that 15% was then commission for the advertising agency.  (Scollins Interrog. Answers No. 1)  Rather than paying an advertising agency the 15% commission, Creed instead asked Scollins to place the ads with the Wall Street Journal through Bottom Line so Sentient could save the 15% commissions.  (Creed Dep. at 19; Scollins Dep. at 38)  The purpose of doing this was to save Sentient money.  (Plaintiff's Memo.[4] at 2-3 ("Scollins told Creed he could provide *the Company* a 15% advertising discount …. Creed decided to place the Company's advertising with the Wall Street Journal through Bottom Line *so the Company could receive the 15% discount on its advertising costs*."(Emphases added)); Plaintiff's Fact Statement at ¶7 (affirming that Sentient placed its Wall Street Journal advertising through Bottom Line "so the Company did not have to pay the fifteen percent (15%) advertising fee"))

---

[3] Plaintiff's Answers to Defendant's First Set of Interrogatories (copy attached to Perlman Affidavit as Exhibit D).
[4] Memorandum of Law in Support of Plaintiff's Motion for Partial Summary Judgment on Counts Three and Four of Plaintiff's First Amended Complaint.

Scollins agreed to do so, and from approximately August 1999 to the end of 2000, Scollins placed one ad per week for Sentient with the Wall Street Journal at the discounted rate. (Scollins Dep. at 28 (first ad in August 1999); *id.* at 63 (no longer placed ads by end of 2000); *id.* at 93, 95 (one per week); Plaintiff's Memo. at 3))

Scollins placed the ads during his regular working hours, using telephone lines paid for by Sentient. (Scollins Dep. at 109) Moreover, during the time that Scollins placed Sentient's Wall Street Journal ads, Bottom Line acted merely as a pass-through and did not act as a typical advertising agency. Scollins passed the invoices through to Sentient, which paid them directly (except for the first invoice or two), and Bottom Line did not incur any expenses in connection with the placement of Sentient's advertising. (*Id.* at 49) Bottom Line did not even have a checking account during this time through which it could have paid for the ads. (*Id.* at 115) It likewise did not maintain any of the documents or files in connection with the advertising; Sentient did. (*Id.* at 72-73) Though Bottom Line nominally had a phone number, Sentient paid all the bills for that number from the time it was established in 1999 until shortly after Scollins ceased working for Sentient in November 2001. (*Id.* at 109-110) Scollins was the only "employee" of Bottom Line, which was not even registered to do business in Massachusetts until after Scollins ceased working for Sentient. (*Id.* at 113, 128) Bottom Line did not perform any services for anyone else during or after Scollins's employment with Sentient. (*Id.* at 147)

In early 2000, Credit Suisse purchased a significant percentage of Sentient's stock. (Creed Dep. at 27-28) At some point after that sale, Scollins was granted stock options pursuant to a certain stock option agreement (the "Stock Option Agreement"[5]). (Complaint, ¶ 8) The "Stock Option Agreement" provides, among other things, that Scollins had to exercise his stock options within 30 days of ceasing to work for the company but that if his employment was

---

[5] Copy attached to Perlman Affidavit as Exhibit E.

terminated for cause, the stock options would terminate on his last day of employment. (Stock

Option Agreement at ¶4(a) & (b)). Soon after stock purchase by Credit Suisse, Scollins was also

given a $100,000 bonus in recognition of the work he did for Sentient. (Scollins Dep. at 21-22)

Not long after Credit Suisse's stock purchase, Scollins ceased having any active role in

the placement of the advertising with the Wall Street Journal. Instead, Steve Morton, whom

Sentient hired in September 2000 as vice-president of marketing, began to place all of Sentient's

advertising, including the Wall Street Journal ads. (*Id*. at 62) Once Mr. Morton was hired,

Scollins's only role in connection with the Wall Street Journal ads was, for some brief period, to

sign the insertion orders, which were still nominally being placed through Bottom Line. (Creed

Dep. at 163) By about February 2001, though, Scollins ceased doing even that. (Scollins Dep. at

62-64, 81) When the agreement with the Wall Street Journal needed to be renewed in 2001, Mr.

Morton, not Scollins, renewed it. (*Id.* at 64)

On November 23, 2001, Sentient terminated Scollins's employment. (Complaint, ¶¶ 13-

14) John Williams made the decision to terminate plaintiff's employment based on plaintiff's

failure to conform to certain expectations and standards with regard to accounting documents

and flight calendars and on the fact that plaintiff took a free flight with a carrier after Sentient

had instituted a company policy prohibiting the taking of gratuities or freebies from companies

with whom Sentient did business. (Williams Dep. at 35-36, 51-58) He did not exercise his stock

options within thirty days after that termination. After further investigation, the Board of

Directors determined that the termination was "for cause," and Scollins was notified of this on

January 15, 2002. (*Id.* at ¶¶ 16) Scollins did attempt to exercise his stock options that day or

ever.

<u>**Argument**</u>

I.    <u>**Plaintiff is Not Entitled to Summary Judgment on Count IV for Violation of the Wage Act Because Not Only Does the Claim Fail as a Matter of Law, but Even if it Did Not, There Would Still Be Factual Issues That Needed to Be Resolved.**</u>

    A.    <u>***Plaintiff's Wage Act Claim Fails as a Matter of Law.***</u>

Plaintiff does not deserve to win as a matter of law because he has failed to state a cognizable claim under the Wage Act and his claim is stale in any event.

    1.    <u>Plaintiff Fails to Plead a Violation of the Wage Act.</u>

The Wage Act requires that regular, periodic wages be within a certain period of time.  A plaintiff brings a valid Wage Act claim when an employer fails to pay wages in a timely fashion. As a plain reading of the complaint shows, however, plaintiff does not claim that Sentient failed to pay him any wages; rather, he complains that he was denied the right to exercise his stock options because he was allegedly wrongfully terminated for cause.  (Complaint, Count IV, ¶40 ("Plaintiff has suffered damages *due to Defendant's breach of his promise and/or the change by Defendant for [sic] Plaintiff's employment* from 'without cause' to 'with cause,' causing him not to be able to exercise his stock options.")(Emphasis added))  Plaintiff's claim, therefore, is not a Wage Act claim.

    2.    <u>Stock Options are Not "Wages" Under the Wage Act; Therefore, Plaintiff Fails To State a Cognizable Claim.</u>

As more fully explained in Section I of Sentient's Memorandum in Support of Its Motion for Summary Judgment and Sentient's Memorandum in Support of Its Motion to Dismiss, both incorporated as part of this Opposition pursuant to Rule 10(c) of the Federal Rules of Civil Procedure, plaintiff has failed to plead a valid Wage Act claim because stock options are not wages under the Wage Act.  Thus, even if plaintiff's claim were somehow recast to assert that

6

Sentient violated the Wage Act by failing to allow him to exercise certain stock options, the claim still fails.

At least one Massachusetts federal district court judges and two state superior court judges have specifically held that stock options are not wages under the Wage Act (cases that plaintiff fails to mention in his moving papers despite being well aware of them). *See Baptista v. Abbey Healthcare Group, Inc*., 1996 WL 33340740 (D. Mass. 1996)(Stearns, J.); *Kohli v. RES Engineering, Inc*., C.A. No. 00-02458, slip. op. at 4-5 (Mass. Super. Dec. 19, 2000) (Garsh, J); *Dennis v. Jager, Smith & Stetler*, 2000 WL 782946 (Mass. Super. 2000)(Ball, J.); *see also Weir v. The Anaconda Company*, 773 F.2d 1073, 1083-1086 (10th Cir. 1985)(stock options not "wages" under analogous Kansas wage statute because plaintiff's right to receive benefits were not absolute and would terminate if plaintiff was terminated for cause). *No* Massachusetts court has *ever* held that stock options are wages.[6] And, given the Massachusetts Appeals Court's holding in *Prozinski v. Northeast Real Estate Services, LLC*, it is highly unlikely one ever will. In that case, the Appeals Court held that wages under the Wage Act are strictly limited to the specific types of employment compensation enumerated in the statute, namely (1) weekly or biweekly wages having been earned during a particular pay period, (2) holiday or vacation pay, and (3) definitely determined commissions which are due and payable. 59 Mass. App. Ct. 599, 603-605 (2003). Stock options do not fall into any of these categories.[7]

---

[6] In this regard, plaintiff's reliance on *Brown v. Nortel Networks, Inc.*, 2002 WL 1290398 (Mass. Sup. Ct.) is wholly misplaced. In that case, the court *clearly did **not*** hold that stock options were wages. Rather, the court stated that it believed "it is premature at this procedural stage for a judicial determination on whether Brown's stock options, whether vested or unvested, are wages for the purposes of Wage Act protection. The issue of stock options as a wage is clearly an emerging issue, and subject to ongoing litigation in many jurisdictions. The appellant courts of Massachusetts have not yet weighed in on this issue …"

[7] In this regard as well *Brown*, the sole case on which plaintiff relies for his Wage Act argument, which was decided before *Prozinski*, is inapposite. Moreover, plaintiff's attempt to shoehorn his claim into a Wage Act violation by arguing that the stock options were part of an "overall compensation program" for work he already performed is meaningless. The test for whether something is a wage under the Wage Act is not whether it is compensation for work already performed, but rather whether the compensation is regular, periodic, and insubstantial as opposed to

Moreover, not only are stock options not specifically enumerated in the Wage Act, but they are substantively different from the types of compensation enumerated in the Act in that they are contingent and not payable or measurable on the last day of the employee's employment. An employer can "pay" wages. An employer can "pay" definitely determined commissions. An employer can "pay" vacation pay. An employer cannot "pay" stock options. Rather, stock options are "a right to buy a designated stock, if holder of option chooses, at any time within specified period, at a determinable price…" Black's Law Dictionary (6th ed). The holder must exercise stock options before the employer can pay them. Moreover, unlike wages, commissions, and vacation pay, stock options are neither calculable nor remittable on the day of termination. They depend on numerous factors, including the value of the stock on the day that the holder exercises his/her options.

Accordingly, stock options are not wages under the Wage Act.

3.    Plaintiff's Claims are Barred by the Statute of Limitations and Statute of Repose.

In addition, as also more fully explained in Sentient's Memorandum in Support of Its Motion for Partial Summary Judgment, plaintiff's Wage Act claim is barred by the applicable three-year statute of limitations / statute of repose because plaintiff did not properly bring his Wage Act claim until more than three years after his termination. Sentient terminated his employment without cause in November 2001 and "for cause" in January 2002. Plaintiff did not

---

sporadic and substantial. *See Commonwealth v. Savage,* 31 Mass. App. Ct. 714, 716 (1991)(holding that a real estate broker's commission was not a wage because the commission was episodic and substantial); *see also Cumpata v. Blue Cross Blue Shield of Massachusetts, Inc.,* 113 F. Supp. 2d 164, 167 (D. Mass. 2000)(holding that disputed bonus was a contingent payment not covered by the Wage Act, even though the plaintiff had fulfilled the contingency, because it was above and beyond plaintiff's regular salary, and because it was calculated quarterly (as opposed to regularly), and because involvement in the plan was voluntary). Here, the stock options were both sporadic and substantial like the bonus in *Cumpata* and the real estate agent's commissions in *Savage* and not regular and periodic weekly, bi-weekly, or monthly wages.

properly bring his Wage Act claim until April 2005, more than three years later.  Therefore, his claim is barred.

**B.     *There Are Factual Issues That Preclude The Granting of Summary Judgment.***

There are also at least two factual issues that preclude the granting of summary judgment on plaintiff's Wage Act claim: whether Sentient in fact owed plaintiff anything and, based on plaintiff's pleading, whether his termination was properly "for cause."

For Sentient to be liable under the Wage Act, it would have to have failed to pay plaintiff something he was due.  Plaintiff seemingly claims that Sentient failed to pay him stock options.  For these options to be payable, though, plaintiff would have had to have exercised the options.  There is no genuine issue, though, that plaintiff did not properly exercised his stock options such that he would be entitled to them.  The Stock Option Agreement indisputably provides that Scollins had to exercise his stock options within 30 days of ceasing to work for the company but that if his employment was terminated for cause, the stock options would terminate on his last day of employment.  (Stock Option Agreement at ¶4(a) & (b)).  There is no dispute that Sentient terminated plaintiff's employment without cause on November 23, 2001 and that plaintiff did not exercise his stock options within thirty days, i.e. by December 23, 2001.  Accordingly, Sentient did not owe plaintiff anything for which it could be held accountable under the Wage Act.

Plaintiff does not, in fact, offer any explanation or justification for his failure to exercise his stock options after he was terminated for cause.  Rather, all he says in his Memorandum is that he "never exercised these options *because* on January 15, 2002, the Company inexplicably changed his termination from '"without cause' to 'cause.'"  (Plaintiff's Memo. at 12 (emphasis added))  This is a non-sequitur – the change from "without cause" to "cause" *two months* later does not have anything do with plaintiff's failure to exercise his options *within thirty days*.  The only relevant fact is that plaintiff did not exercise his options within thirty days after his

termination without cause. That in and of itself ended his right to the options such that Sentient could not be liable for not paying them.[8]

In addition, insofar as plaintiff seems to argue that it was Sentient's change from "without cause" to "cause" that triggered its liability under the Wage Act, there are factual issues concerning whether Sentient properly changed plaintiff's termination to "for cause" in January 2002. Plaintiff's sole argument as to why Sentient's termination of his employment was not "for cause" was that Sentient did not tell him the reasons at the time. (Plaintiff's Memo. at 5) Whether or not Sentient did tell him, the issue is not his notice, but the facts concerning the termination of his employment. John Williams has testified that he made the decision to terminate plaintiff's employment based on plaintiff's failure to conform to certain expectations and standards with regard to accounting documents and flight calendars and on the fact that plaintiff took a free flight with a carrier after Sentient had instituted a company policy prohibiting the taking of gratuities or freebies from companies with whom Sentient did business. (Williams Dep. at 35-36, 51-58) To the extent plaintiff seeks to argue that these were not the real reasons, he has raised genuine issues of fact that preclude a grant of summary judgment.

## II.      Plaintiff is Not Entitled to Summary Judgment on Count III for Unjust Enrichment.

### A.      *Plainitiff Cannot Obtain Judgment on An Unjust Enrichment Claim While Simultaneously Claiming That There is a Contract Governing The Same Subject Matter.*

Plaintiff cannot prevail on summary judgment on his unjust enrichment claim given that he has simultaneously pleaded an express contract claim governing the same subject matter in Count I. It is basic black letter law that a plaintiff is not entitled to unjust enrichment damages where a valid contract covers the subject matter of dispute. *Zarum v. Brass Mill Materials*

---

[8] To the extent that plaintiff does seek to offer a reason, simply doing so would raise factual issues that would have to go to the jury, including whether the reason was real, whether it excused his failure, and what the contract permitted.

*Corp.,* 334 Mass. 81, 134 (1956)(holding that "[t]he law will not imply a contract where there is

an existing express contract covering the same subject matter" and noting that an express

contract leaves "no room ... for recovery on principles of unjust enrichment"); *see also Boswell*

*v. Zephyr Lines, Inc.,* 414 Mass. 241, 250 (1993)(holding that oral agreement precluded finding

of quantum meruit in case); *Marshall v. Stratus Pharms., Inc.,* 51 Mass. App. Ct. 667, 670 n.6

(2001)("If the plaintiff is entitled to recover on a contract, he cannot recover in quantum

meruit."); *Okmyansky v. Herbalife Intern. of America, Inc.,* 415 F.3d 154, 161 (1st Cir.

2005)(applying Massachusetts law and denying plaintiff's quantum meruit claim due to

existence of written contract).[9]  In Count I of his complaint, plaintiff claims that there is an

express, oral "Advertising Placement Agreement" that governs the services he provided in

placing advertising for Sentient in the Wall Street Journal.  Though he can *plead* contract and

unjust enrichment in the alternative, plaintiff cannot *recover* on both theories.  As such, as long

as plaintiff's breach of contract claim exists, plaintiff cannot obtain judgment on his unjust

enrichment claim.

> **B.    *There Are Genuine Issues as to Various Material Facts.***

To prove his claim for unjust enrichment, plaintiff has to prove that (1) he conferred a

measurable benefit upon Sentient, (2) Sentient accepted the services with the reasonable

expectation of compensating the plaintiff, and (3) he provided the services with the reasonable

expectation of receiving compensation from the defendant.  *Mass. Cash Register, Inc. v. Contrex*

*Systems Corp.,* 901 F. Supp. 404, 423 (D.Mass.1995); *Bolen v. Paragon Plastics,* 747 F. Supp.

103, 106-07 (D.Mass.1990); *Salamon v. Terra,* 394 Mass. 857, 859 (1985).[10]  All of these issues

---

[9] Massachusetts cases often use the terms quantum meruit, quasi-contract, and implied-in-fact interchangeably and do not distinguish among them.  *Bolen v. Paragon Plastics, Inc.,* 747 F. Supp. 103, 106 (D. Mass. 1990).

[10] Although it is not wholly clear from the First Amended Complaint or Plaintiff's Memorandum in Support of Its Motion for Summary Judgment whether plaintiff is claiming damanges under a theory of quantum meruit, implied-

are inherently issues of fact for the jury. *See, e.g., Bushkin Assoc., Inc. v. Raytheon Co.,* 815 F.2d 142, 150 (1st Cir.1987). They are, therefore, in general inappropriate for resolution on summary judgment. Furthermore, in this case plaintiff cannot show that there is no genuine issue as to any of these issues. Summary judgment is also, therefore, specifically inappropriate in this case.

First, there is a question of fact concerning what benefit, if any, plaintiff conferred on Sentient. The pleadings are not clear as to whether plaintiff is claiming that the benefit was the service plaintiff provided in placing the ads or the 15% discount Sentient received by placing the ads through Bottom Line. Either way, the case cannot be resolved in plaintiff's favor on summary judgment.

If plaintiff's claim is that the actual placement of the ads was the benefit, then there is a genuine factual question of whether he was already compensated for that through his salary and/or the $100,000 he received after the acquisition by Credit Suisse. Alternately stated, there is a question whether the "benefit" Scollins allegedly conferred was simply part of the job for which he was already being paid. In determining this issue, a jury could consider that Scollins was a full-time, paid employee of Sentient when he placed the ads with the Wall Street Journal for Sentient through equipment paid for by Sentient during working hours. The jury could also consider that Scollins performed various other advertising duties in the course of his job for which he is not claiming compensation. The jury could additionally consider that Bottom Line was truly nothing more than a name – it had no office, no bank account, no files, and no other clients and did not maintain its own telephone or even file tax returns – and that it incurred no

---

in-fact contract, implied-in-law contract, or quasi-contract, for purposes of this Opposition and plaintiff's Motion, it does not matter. "Generally quantum meruit is the form of action used to recover for services rendered, whereas the term quasi-contract, or implied contract, is a form of action used to recover money damages for any type of unjust enrichment," *Bolen*, 747 F. Supp. at 106, but all claims share the same basic elements, *id.*

expenses in connection with Scollins's placement of the ads. And, the jury could consider that John Williams, who became CEO of Sentient in 2000 in connection with the Credit Suisse acquisition, believed that Scollins was placing the Wall Street Journal advertising as part of the general duties of his job. (Williams Dep. at 25) Furthermore, the jury could consider the undisputed fact that during the period of time that Scollins placed the Wall Street Journal ads, all the senior managers were working long hours and undertaking tasks beyond those in their narrow job description. Thus, for example Dan Underwood, who was Sentient's IT person, designed and performed computer work for Sentient's advertising, including the ads placed in the Wall Street Journal, in addition to the usual computer work he did for Sentient. (Creed Dep. at 157) Like Scollins, he received a $100,000 bonus when Credit Suisse acquired Sentient, but he did not receive any other additional compensation. (Scollins Dep. at 27-28) In this way, Scollins was not an entity apart from Sentient – he was a high level employee who was working hard, along with the rest of the senior staff, to make Sentient successful. As such, the jury could determine that Scollins placed the ads at least in part for his own benefit. Furthermore, the jury could decide that to the extent these efforts succeeded, Scollins was already compensated for his efforts – Sentient grew such that Scollins continued to receive his salary and, significantly, such that Sentient could be acquired by Credit Suisse, a transaction that redounded to Scollins's benefit when he received a $100,000 bonus. Thus, if the benefit Scollins conferred was his services, a jury could determine that he did so within the context of his employment and was already compensated for it.

If, alternately, the claim is that the benefit was the 15% savings to Sentient, as the pleadings suggest,[11] then the claim makes no sense. In the usual unjust enrichment case, the defendant retains the benefit and the plaintiff is compensated for it. Here, if the benefit is the

---

[11] Plaintiff argues in his Memorandum that the "measureable benefit" is the "cost savings." (Plaintiff's Memo. at 7)

15% savings, then plaintiff's claim is not just compensation for the benefit, but instead total disgorgement of the benefit. In other words, if plaintiff were to obtain the 15% discount, as he demands, and the sole benefit conferred is the 15% discount, as he contends, then Sentient will have received no benefit. In that case, Sentient would be in exactly the same position it would have been had it paid an outside firm – it would have had ads placed with the Wall Street Journal for a commission – and the result would be the illogical conclusion that Sentient placed the ads through Scollins for the mere purpose of benefiting Scollins. As Creed explained, if Sentient were going to have to pay Scollins 15%, it could just have gone with a real advertising agency. (Creed Dep. at 38-39)  Another way to understand this is that if Scollins's view is accepted, then *he*, not Sentient, obtained benefit – Sentient will have placed ads placed for a 15% commission, as it would have had an agency placed them, and Scollins will have gotten the 15% commission. This is a particularly salient point given that at some point Scollins was not even placing the ads himself and instead another employee, whom Sentient was paying a salary, was placing the ads. This is a ludicrous result, especially since both parties agree that the purpose of placing the ads through Bottom Line was so that Sentient could realize the 15% savings. More to the point, it is the province of the jury, not the court, to decide whether simply generating a commission for Scollins by going through Bottom Line instead of another agency was a benefit conferred on Sentient.

Second, there is a genuine issue of fact as to whether Sentient reasonably expected to pay Scollins for his placement of the ads. As plaintiff recognizes, (Plaintiff's Memo. at 9), the test for whether the defendant expected to pay is not just whether defendant subjectively expected to pay but whether a reasonable person would have expected to pay under the circumstances. *Bolen*, 747 F. Supp. at 107. This is inherently a factual question for the jury. In deciding this

issue, a jury could consider that everyone agrees that the purpose of placing the ads through

Bottom Line was to save Sentient money.  (Creed Dep. at 19; Scollins Dep. at 38)  Indeed,

Scollins himself admits that the plan was to save Sentient money. (Plaintiff's Memo. at 2-3)

Since that purpose would be defeated by disgorging the discount and giving it to Scollins, a jury

could find that Sentient did not expect to pay Scollins for placing the ads.  In determining

whether a reasonable person would have expected to compensate Scollins for placing the ads, the

jury could also consider that Sentient was already paying Scollins, who placed the ads while

being a paid, full-time Sentient employee, with equipment paid for by Sentient, as discussed

above, and that Creed had initially attempted to place the ads himself but did not because the

Wall Street Journal would not permit him to do so.

        Scollins relies entirely on a vague statement by Creed sometime after Scollins began

placing the ads that he would at some point "work something out" for Scollins as proof that

Sentient expected to pay Scollins for his advertising work.  (Plaintiff's Memo. at 5)  Not only

could a jury reject this thin, vague statement as a basis for finding that Sentient subjectively

expected at the time that Scollins was placing the ads to pay Scollins for placing the ads, but a

jury could also find that even if Creed made the alleged statement, it did not indicate an intention

to compensate Scollins, but instead a general hope that if the company were successful, Scollins

would be rewarded, along with the rest of Sentient's management team, for *all* their hard work in

growing the business to the point that Credit Suisse wanted to invest in it.  This view is

supported by Creed's deposition testimony concerning his intentions.  Specifically, Creed

explained that his view was that he was "going take care of these people [his original senior

management] as I grew the business."  (Creed Dep. at 22)  He added, "[W]ith all these guys that

I brought on, when I started them out on their pay, it was basically verbal:  "I'm going to take

care of you, this is how it's going work." (*Id.* at 24)  Indeed, throughout his deposition Scollins

spoke of "taking care" of "the original five guys," which included Scollins as well as the other

original senior management.  (*See, e.g., id.* at 74)  In other words, to Creed's thinking, he hoped

to compensate, reward everyone who started with him for all the things they did to help grow the

business.  But a jury could reasonably find that this hope was not an expectation.  Furthermore, a

jury could find that Creed did not expect to pay Scollins directly for the ad placements from his

and Scollins's testimony that Creed refused to sign a document indicating that Sentient would

pay Scollins 15%, (Creed Dep. at 155-156) and that Creed got quite angry when Scollins tried to

give him a bill for the 15% commission, (*id.* at 193), both of which suggest that Creed did not

have an intention to compensate Scollins for his placement of the ads.

There is also the factual question of whether, even if Sentient expected to pay for the

services, it expected to compensate Scollins for the ads that were placed through Bottom Line

Advertising that he did not place.  There is no dispute that after December 2001, Scollins did no

work to place the ads.  By then, Sentient had hired a full-time, paid employee who placed the ads

as part of his job.  Scollins claims that he is entitled to payment for ads placed through Bottom

Line through that period, but there is nothing in the record, and certainly nothing offered in the

summary judgment papers, that definitively shows that Sentient expected to pay Scollins for the

ads that another employee placed.  Moreover, if the benefit he conferred was his actual

placement of the ads, then he conferred no benefit during this period.

Third, there is a genuine issue of fact as to whether Scollins *reasonably expected* to be

paid.  The question is *not* whether he wants to be paid – clearly he does since he brought this

lawsuit.  The question is whether *at the time he placed ads* he *actually expected* to be

compensated for doing so and whether a reasonable person would have expected compensation

under the circumstances. *Bolen*, 747 F. Supp. at 107 ("Massachusetts law requires that the plaintiff demonstrate that he provided the services with the reasonable expectation of receiving compensation from the defendant. … As stated by one court: '[t]he mere performance of services in association with the defendant does not justify a cause of action in contract or quasi-contract based on an alleged expectation of compensation formed after the services are completed.'"(internal citation omitted))  Although Scollins baldly asserts that he expected compensation when he first began placing the ads, the jury has the role of determining his credibility and also deciding whether his averments are after-the-fact, self-serving statements or actual statements of fact concerning his previous expectation.  In this regard, the jury can consider the basis for Scollins's alleged expectation.  He claims that he expected that he would be compensated simply because he told people that he wanted to be compensated and that Creed told him that he would "work something out" for him.  (Plaintiff's Memo. at 9)  The jury can determine that these are not sufficient evidence that Scollins to expect to be compensated, and not a reasonable basis for Scollins to expect to be compensated, especially in light of the entire course of Creed's discussions with him on this issue and the fact that he performed this work on company time, using company-paid equipment, and was paid for that work both in salary and a generous bonuses, as discussed above.

In addition to the factual issues concerning the three primary elements of the claim, there is also a factual issue of how to value whatever benefit plaintiff proves he conferred on Sentient. Determination of reasonable compensation is wholly a factual determination to be made by trier of fact. *Fraser and Wise, P.C. v. Primarily Primates, Inc.*, 966 F. Supp. 63, 78-79 (D. Mass. 1996)(holding that under Massachusetts law, question of what is fair and reasonable compensation for services rendered on claim based in quantum meruit is question of fact and

denying summary judgment to plaintiff on that basis); *see also J.A. Sullivan Corporation v. Commonwealth,* 397 Mass. 789, 797 (1986); *Boston Athletic Association v. International Marathons, Inc.,* 392 Mass. 356, 367 (1984).  In assessing the fair and reasonable value of the services rendered, there are "numerous factors for the fact finder to consider in making this assessment." *Boston Athletic Association*, 392 Mass. at 367.  Among the things the trier of fact could consider in determining what a fair amount of compensation would be in this case are the value of the services that plaintiff purportedly conferred, how much work he performed, and how he performed the work.  Among the facts that a jury could consider are that unlike an outside advertising agency, Scollins d/b/a Bottom Line did not have his own place of business, created and placed the orders using Sentient equipment (such as fax machines and telephones that Sentient paid for), did not keep his own filing, did not pay the bills, and did not even keep records of the work he performed.  The jury could also consider that Scollins placed the ads on company time while being paid as a full-time employee.  In addition, the jury could consider that at some point Scollins himself had nothing to do with the placement of the ads, which were being placed by another paid, full-time employee of Sentient.  Furthermore, the jury could consider the fact that Scollins never explored the possibility that the ads no longer had to be placed through his company but instead could be placed directly by Sentient such that it realized the 15% savings directly.  (Scollins Dep. at 145-146)  In this regard, the jury could decide that Scollins should receive nothing since he did not fulfill his fiduciary duty to Sentient.  Additionally, the jury can consider that Scollins's credibility as to how much time and effort he expended in placing the ads and the fact that he kept no records of such time, as well as Scollins's own testimony that he considered some amount less than the full 15% to be fair, (Scollins Dep. at 228).

In short, there are simply too many factual issues for the court to grant summary judgment on Scollins's claim of unjust enrichment.

**<u>Conclusion</u>**

For the foregoing reasons, the Court should deny Plaintiff's Motion for Partial Summary Judgment.

<div style="margin-left: 40%;">

SENTIENT JETS, INC., f/k/a eBizJets.com,
By its attorneys,

/s/ C. Max Perlman
C. Max Perlman (BBO #630395)
SULLIVAN WEINSTEIN & McQUAY, PC
Two Park Plaza, Suite 610
Boston, Massachusetts 02116
(617) 348-4300

</div>

Dated:  October 11, 2005