UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DONALD SCOLLINS, individually and on behalf of BOTTOM LINE ADVERTISING,<br><br>  Plaintiff,<br><br>vs.<br><br>SENTIENT, f/k/a eBizJets,<br><br>  Defendant. | Civil Action No. 03-12478-EFH |

**SENTIENT'S RESPONSE TO PLAINTIFF'S STATEMENT OF MATERIAL FACTS
AND SENTIENT'S COUNTER-STATEMENT OF MATERIAL FACTS
IN SUPPORT OF SENTIENT'S OPPOSITION
<u>TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT</u>**

Pursuant to Local Rule 56.1, Sentient Jet, Inc. f/k/a eBizJets ("Sentient") hereby submits its Response to Plaintiff's Statement of Material Facts ("Plaintiff's Statement") as well as its own Counter-Statement of Material Facts in Opposition to Plaintiff's Motion for Partial Summary Judgment ("Counter-Statement").

Overall, Sentient disputes 14 of the 26 assertions in Plaintiff's Statement. More importantly, Plaintiff has failed to mention many other material facts in the discovery record that the jury would have to consider to decide the ultimate issues in this case, as set forth in the Counter-Statement.

<u>RESPONSE TO PLAINTIFF'S STATEMENT OF UNDISPUTED FACTS</u>

1. <u>Admit.</u>

2. <u>Deny.</u>  Sentient is not aware of any commissions that plaintiff received as Sentient's Director of Charter Operations, and plaintiff has provided no evidence that he received

commissions. Neither the First Amended Complaint nor the Answer, both of which were cited as support for plaintiff's statement, mention commissions.

3. <u>Admit.</u>

4. <u>Admit.</u>

5. <u>Deny.</u>  The Wall Street Journal gave Scollins d/b/a Bottom Line Advertising ("Bottom Line") a 15% discount after confirming that Bottom Line met whatever criteria it had for being an approved advertising agency, and plaintiff passed that discount onto Sentient. There is no evidence that Bottom Line was an "accredited" advertising agency, whatever that means. In fact, as plaintiff testified, at the time that Bottom Line was given the discount by the Wall Street Journal it was not "accredited" and "that's not probably the proper word." (Deposition Transcript of Donald Scollins, volumes I and II, dated July 13, 2004 and May 24, 2005 ("Scollins Dep.")(copy of excerpts attached to the Affidavit of C. Max Perlman in Support of Sentient's Opposition to Plaintiff's Motion for Partial Summary Judgment ("Perlman Affidavit") as Exhibit B) at 295-296)  There is no evidence other than plaintiff's own, self-serving statements that Bottom Line was an "accredited" advertising agency, which the jury can choose not to believe.  Moreover, Sentient was not given a discount by the Wall Street Journal. The discount was given to Bottom Line, which passed it on to Sentient. (Plaintiff's Answers to Defendant's First Set of Interrogatories ("Scollins Interrog. Answers")(copy attached to Perlman Affidavit as Exhibit D) No. 1 (stating that Bottom Line received the discount); Scollins Dep. at 49 (explaining that Sentient paid the discounted amount directly to the Wall Street Journal))

6. <u>Deny.</u>  Although there is no dispute that Creed and Scollins agreed to have Scollins place the ads with the Wall Street Journal to save Sentient the 15% commission, (Deposition Transcript of Jeff Creed, volumes I and II, dated May 25, 2005 and July 11, 2005

("Creed Dep.")(copy of excerpts attached to the Perlman Affidavit as Exhibit A) at 19; Scollins Dep. at 38; Memorandum of Law in Support of Plaintiff's Motion for Partial Summary Judgment on Counts Three and Four of Plaintiff's First Amended Complaint ("Plaintiff's Memo.") at 2-3 ("Scollins told Creed he could provide *the Company* a 15% advertising discount …. Creed decided to place the Company's advertising with the Wall Street Journal through Bottom Line *so the Company could receive the 15% discount on its advertising costs*."(Emphases added)); Plaintiff's Fact Statement at ¶7 (affirming that Sentient placed its Wall Street Journal advertising through Bottom Line "so the Company did not have to pay the fifteen percent (15%) advertising fee")), there is no evidence that Creed asked Scollins if he "could do anything with the Wall Street Journal's pricing" or that Scollins told Creed he could get a 15% discount because he was "accredited" other than plaintiff's own, self-serving testimony, which a jury can choose not to believe.  There is also a dispute as to when the subject meeting occurred.  In his Answers to Interrogatories, Scollins states that the purported "Advertising Placement Agreement" was negotiated in August 1999.  (Scollins Interrog. Answers No. 3)  In contrast, in a Declaration he signed under oath one year earlier, Scollins stated that he and Sentient reached the purported agreement in February 1999 before he even came to Massachusetts.  Declaration of Donald Scollins (filed in this case in the U.S. District Court for District of Arizona, June 23, 2003) at ¶5. Further clouding the issue, Scollins testified during his deposition that the agreement was made in a meeting that he originally testified was in June or July 1999, (Scollins Dep. at 27), then testified "was actually probably [in] July," (*id*. at 28), and then testified was "either July or August," which he then changed only to August, (*id.* at 29).

    7.    <u>Admit.</u>

8.　　Deny.  Plaintiff's only support for this statement is his own, self-serving testimony, which a jury can choose not to believe.  In fact, there is no independent evidence as to what investigation, if any, the Wall Street Journal did before determining that Bottom Line could receive the 15% commission on advertising it placed.  Furthermore, nowhere is the word "accredited" defined.  As noted above, plaintiff himself testified that at the time that Bottom Line was given the discount by the Wall Street Journal it was not "accredited" and "that's not probably the proper word."  (Scollins Dep. at 295-296)

9.　　Admit.

10.　　Deny.  There is no evidence that plaintiff was "consulted" on ad content for the Wall Street Journal except his own, self-serving testimony, which a jury can choose not to believe.  Moreover, Sentient hired a new, full-time employee in September 2000.  That employee, the new vice-president of marketing, was responsible for all of Sentient's advertising, including but not limited to the Wall Street Journal ads.  (Deposition Transcript of John Williams ("Williams Dep.")(copy of excerpts attached to the Perlman Affidavit as Exhibit C) at 32)

11.　　Deny.  Creed has testified that Scollins repeatedly *asked* to be paid and said that he wanted to be paid, (Creed Dep. at 24 ("Donny was always look[ing] for money"), but plaintiff has offered no evidence that at the time he placed the ads he *expected* to be paid for doing so other than his own, self-serving testimony, which a jury can choose not to believe.  Furthermore, the legal issue is not just whether plaintiff actually expected to be paid for placing the ads, but whether a reasonable person would expect it under the circumstances.  In this regard, other relevant facts are that that Scollins was a full-time, paid employee of Sentient when he placed the ads with the Wall Street Journal for Sentient during working hours using equipment paid for by

4

Sentient, (Scollins Dep. at 109), that he received salary for his work along with a $100,000 bonus, (*id*. at 21-22), and that Bottom Line was truly nothing more than a name – it had no office, no bank account, no files, and no other clients and did not maintain its own telephone or even file tax returns, (*id.* at 49, 72-73, 109-110, 113, 115, 128, 138-139, 147)

  12. <u>Deny.</u>  There is no evidence other than plaintiff's own, self-serving testimony that Creed ever told Scollins he would "work something out," which a jury can choose not to believe. Creed has testified that he told Scollins that he would "take care of" him, but that he never told Scollins, nor did he ever intend, that Sentient would pay Scollins the 15% cost savings it obtained by placing ads through Bottom Line.  (Creed Dep. at 24-26, 72, 74-75, 77, 97-98, 110-111, 127)  There is likewise no evidence other than plaintiff's own self-serving, *post hoc* statements concerning his beliefs or understanding, which jury can choose not to believe. Importantly, Scollins's alleged subjective "understanding" is contradicted by other, clear evidence that Creed never told Scollins that he would be paid the 15% and never intended to pay Scollins the 15%, all of which could lead a jury not to believe Scollins's own, self-serving testimony.  For example, Scollins clearly understood that Sentient placed the ads through Bottom Line specifically to save Sentient the 15%.  (Creed Dep. at 19; Scollins Dep. at 38; Plaintiff's Memo. at 2-3 ("Scollins told Creed he could provide *the Company* a 15% advertising discount …. Creed decided to place the Company's advertising with the Wall Street Journal through Bottom Line *so the Company could receive the 15% discount on its advertising costs*."(Emphases added)); Plaintiff's Fact Statement at ¶7 (affirming that Sentient placed its Wall Street Journal advertising through Bottom Line "so the Company did not have to pay the fifteen percent (15%) advertising fee"))  As Creed explained, if Sentient were going to have to pay Scollins 15%, it could just have gone with a real advertising agency.  (Creed Dep. at 38-39)

5

This goal of a cost-savings is irreconcilable with paying the 15% discount to Scollins. Furthermore, Creed has testified that he *never* told Scollins that he would pay him 15% of the amount Sentient spent on advertising in the Wall Street Journal, (Creed Dep. at 35-36), and when Scollins asked Creed at some point to sign a document indicating that Sentient would pay him 15%, Creed refused, (*id.* at 155-156) and when Scollins later gave him a bill for 15%, he was quite angry because they never agreed to that amount, (*id.* at 193). As Creed explained, if Sentient were going to have to pay Scollins 15%, it could just have gone with a real advertising agency. (*Id.* at 38-39)

13. Deny. Plaintiff has provided conflicting evidence concerning the amount Sentient paid for the advertising it placed in the Wall Street Journal between September 1999 and December 2001 and the resulting amount he claims Sentient owes him. In his Initial Disclosure, he stated that the 15% discount amounted to $376,744.65. In his responses to interrogatories, he claimed that it is $351,474.77. (Scollins Interrog. Answer No. 1) Now he claims it is $361,018.60.

14. Admit.

15. Deny. Scollins did not *have* to sign the "Stock Option Agreement." It was his choice whether he wanted to enter into the agreement. Sentient only admits that it entered into a "Stock Option Agreement" with Scollins, both of their free will.

16. Admit.

17. Admit. Williams also testified that he believed "Mr. Scollins was placing these ads as a part of his general duties and responsibilities as an employee of the company." (Williams Dep. at 25)

18.   <u>Deny.</u>  This sentence is unfairly misleading because it fails to identify the relevant time period.  Mr. Williams testified that he learned "very much later" than when he first joined the company that Scollins was placing the Wall Street Journal ads through a separate company, (Williams Dep. at 26), but Williams has testified that he did not know this at the time he started with Sentient in 2000, (*id.*) and there is no evidence that he knew about this arrangement during the time that Scollins was still placing the ads with the Wall Street Journal, which is the relevant time period.

19.   <u>Deny.</u>  The statement is unfairly vague as to what stock options are being discussed.  Scollins received some stock options as part of what Williams described as an "overall compensation program" but also received, along with others in the company, additional stock options as a thank you for rallying during the September 11, 2001 crisis.  (First Amended Complaint ("Complaint"), ¶10; Williams Dep. at 48)  Furthermore, Scollins himself has asserted that the stock options were granted to him "to reward" him after the fact for work already performed, not as a form of his base pay to which he was entitled.  (Complaint, ¶8)

20.   <u>Admit.</u>

21.   <u>Admit.</u>

22.   <u>Admit.</u>

23.   <u>Deny.</u>  The letter does not mention anything about "changing" the termination to "for cause."  Rather, it says that the Board of Directors determined that the termination was for cause.  Furthermore, there is no evidence that he received the letter at 5:30 p.m. other than Scollins's own, self-serving testimony, which a jury can choose not to believe.

25.   <u>Deny.</u>  Sentient has informed Scollins and/or his attorney of the reasons why his termination was "for cause."

26. <u>Deny.</u>  Although Sentient initially brought this lawsuit in March 2003, he wrongly brought it in Arizona, and, importantly, he did not properly bring any claims for which he would be entitled to attorneys fees until May 17, 2005.

SENTIENT'S COUNTER-STATEMENT OF MATERIAL FACTS

1. Sentient Jets, Inc. ("Sentient"), formerly known as eBizJets.com, Inc., is a corporation that brokers charter jets for individuals and companies.  (Complaint, ¶ 1; Creed Dep. at 3)

2. Sentient was started in 1997 by Jeff Creed.  (Creed Dep. at 4)

3. Plaintiff Don Scollins, Creed's cousin and close friend, began working for Sentient in or about March 1999 as an at-will employee.  (Scollins Dep. at 17)

4. From March 199 through November 2001, Scollins was a full-time employee of Sentient.  (*Id.* at 19-20)

5. Before he joined Sentient, Scollins had created an advertising agency, d/b/a Bottom Line Advertising ("Bottom Line"), in Arizona.  (Creed Dep. at 18-19; Scollins Interrog. Answers" at No. 7)

6. By the time Scollins moved to Massachusetts to join Sentient, he was no longer doing any business through Bottom Line.  (Scollins Dep. at 72)

7. At some point in 1999, Creed decided that Sentient should begin to place advertisements in the Wall Street Journal.  (Creed Dep. at 17)

8. Rather than paying an advertising agency the 15% commission, Creed instead asked Scollins to place the ads with the Wall Street Journal through Bottom Line so Sentient could save the 15% commissions.  (Creed Dep. at 19)

9.      The purpose of doing this was to save Sentient money. (Plaintiff's Memo. at 2-3 ("Scollins told Creed he could provide *the Company* a 15% advertising discount …. Creed decided to place the Company's advertising with the Wall Street Journal through Bottom Line *so the Company could receive the 15% discount on its advertising costs*."(Emphases added)); Plaintiff's Fact Statement at ¶7 (affirming that Sentient placed its Wall Street Journal advertising through Bottom Line "so the Company did not have to pay the fifteen percent (15%) advertising fee"))

10.     Scollins agreed to do so, and from approximately August 1999 to the end of 2000, Scollins placed approximately one ad per week for Sentient with the Wall Street Journal at the discounted rate. (Scollins Dep. at 28, 63, 93, 95)

11.     Scollins placed the ads during his regular working hours, using telephone lines paid for by Sentient. (Scollins Dep. at 109)

12.     During the time that Scollins placed Sentient's Wall Street Journal ads, he passed the invoices through to Sentient, which paid them directly (except for the first invoice or two), and Bottom Line did not incur any expenses in connection with the placement of Sentient's advertising. (*Id.* at 49) Bottom Line did not even have a checking account during this time through which it could have paid for the ads. (*Id.* at 115)

13.     It likewise did not maintain any of the documents or files in connection with the advertising; Sentient did. (*Id.* at 72-73)

14.     Though Bottom Line nominally had a phone number, Sentient paid all the bills for that number from the time it was established in 1999 until shortly after Scollins ceased working for Sentient in November 2001. (*Id.* at 109-110)

15. Scollins was the only "employee" of Bottom Line, which was not even registered to do business in Massachusetts until after Scollins ceased working for Sentient. (*Id*. at 113, 128)

16. Bottom Line did not perform any services for anyone else during or after Scollins's employment with Sentient. (*Id*. at 147)

17. Throughout this period of time, Scollins did not file any tax returns for Bottom Line. (*Id*. at 138-139)

18. During the time that Scollins placed ads for Sentient with the Wall Street Journal, many of the upper level employees at Sentient took on more tasks than simply those contained in their job requirement, for no additional pay. For example Dan Underwood, who was Sentient's IT person, designed and performed computer work for Sentient's advertising, including the ads placed in the Wall Street Journal, in addition to the usual computer work he did for Sentient. (Creed Dep. at 157) Like Scollins, he did not receive any other additional compensation. (Scollins Dep. at 27-28)

19. In early 2000, Credit Suisse acquired a percentage of Sentient's stock. (Creed Dep. at 27-28)

20. Soon after stock purchase by Credit Suisse, Scollins was given a $100,000 bonus in recognition of the work he did for Sentient. (Scollins Dep. at 21-22)

21. In addition, at some point after that sale, Scollins was granted stock options pursuant to a certain stock option agreement (the "Stock Option Agreement" (copy attached to Perlman Affidavit as Exhibit E)). (Complaint, ¶ 8)

22. The "Stock Option Agreement" provides, among other things, that Scollins had to exercise his stock options within 30 days of ceasing to work for the company but that if his

employment was terminated for cause, the stock options would terminate on his last day of employment. (Stock Option Agreement at ¶4(a) & (b)).

23. At some point after Credit Suisse's stock purchase, John Williams became CEO of Sentient.

24. John Williams believed that Scollins was placing the Wall Street Journal advertising as part of the general duties of his job. (Williams Dep. at 25) He did not know till much later that Scollins placed the ads through Bottom Line. (*Id.*)

25. In September 2000, Sentient hired Steve Morton as vice-president of marketing, and he began to place all of Sentient's advertising, including the Wall Street Journal ads. (Scollins Dep. at 62)

26. Once Mr. Morton was hired, Scollins's only role in connection with the Wall Street Journal ads was, for some brief period, to sign the insertion orders, which were still nominally being placed through Bottom Line. (Creed Dep. at 163)

27. By about February 2001, Scollins ceased doing even that. (Scollins Dep. at 62-64, 81)

28. When the agreement with the Wall Street Journal needed to be renewed in 2001, Mr. Morton, not Scollins, renewed it. (*Id.* at 64)

29. On November 23, 2001, Sentient terminated Scollins's employment. (Complaint, ¶¶ 13-14)

30. John Williams made the decision to terminate plaintiff's employment based on plaintiff's failure to conform to certain expectations and standards with regard to accounting documents and flight calendars and on the fact that plaintiff took a free flight with a carrier after

11

Sentient had instituted a company policy prohibiting the taking of gratuities or freebies from companies with whom Sentient did business. (Williams Dep. at 35-36, 51-58)

    31.    Scollins did not exercise his stock options within thirty days after that termination.

    32.    In January 2000, the Board of Directors determined that the termination was "for cause," and Scollins was notified of this on January 15, 2002. (Complaint, ¶¶ 16)

    33.    He did attempt to exercise his stock options that day or ever.

SENTIENT JETS, INC., f/k/a eBizJets.com,
By its attorneys,

/s/ C. Max Perlman
C. Max Perlman (BBO #630395)
A. Lauren Carpenter (BBO #551258)
SULLIVAN WEINSTEIN & McQUAY, PC
Two Park Plaza, Suite 610
Boston, Massachusetts 02116
(617) 348-4300

Dated: October 11, 2005