COPY

1

Volume 1, Pages 1 - 259

Exhibits:  1 - 14

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

Civil Action No. 03-12489EFH

-------------------------------------

DONALD SCOLLINS, individually and on behalf of BOTTOM LINE ADVERTISING, a sole proprietorship,

        Plaintiff

vs.

SENTIENT, f/k/a eBizJets, a Delaware corporation,

        Defendant

-------------------------------------

DEPOSITION OF DONALD H. SCOLLINS, JR.

Tuesday, July 13, 2004, 10:00 a.m.

Sullivan, Weinstein & McQuay, P.C.

2 Park Plaza, Suite 610

Boston, Massachusetts

--------- Janis T. Young, RDR, CRR ---------

Farmer Arsenault Brock LLC

50 Congress Street, Boston, Massachusetts 02109

617.728.4404   Fax 617.728.4403

FARMER ARSENAULT BROCK LLC

1   A.   Pretty much.

2   Q.   And figuring out the prices and margins?

3   A.   Yes.

4   Q.   You say three months later you were made

5   director of charter operations.

6   A.   Right.

7   Q.   What responsibilities did you have in that

8   role?

9   A.   We had been doing well, so we expanded;

10  they hired more people. So I was in charge of more

11  or less training them and overseeing that what they

12  did was right, checking that they had priced it

13  right, and also more or less doing the logistics on

14  the trips that we had to maximize the aircraft.

15  Q.   Who was your superior in the director of

16  charter operations position?

17  A.   I'd say Paul Svensen.

18  Q.   Did you report in any way to Mr. Creed?

19  A.   Jeff is a hands-on guy, so I would say yes.

20  I reported to both of them, really.

21  Q.   As a charter representative, who did you

22  report to?

23  A.   Same people.

24  Q.   Same people. And did you have people who

FARMER ARSENAULT BROCK LLC

19

| | | |
|---|---|---|
| 20:08 | 1 | reported to you? |
| 20:09 | 2 | A.  Yes. |
| 20:10 | 3 | Q.  As a charter representative, did you have |
| 20:15 | 4 | people who reported to you? |
| 20:17 | 5 | A.  Not really. |
| 20:19 | 6 | Q.  How about as director of charter |
| 20:21 | 7 | operations?  Who reported to you? |
| 20:22 | 8 | A.  Steve Schofield, Greg Goodwin, Paul |
| 20:27 | 9 | Sullivan -- I don't know how long you want to go. |
| 20:30 | 10 | I mean, it ended up being 20 people, probably, as |
| 20:32 | 11 | time goes on. |
| 20:33 | 12 | Q.  Over the time that you were director of |
| 20:35 | 13 | charter operations. |
| 20:37 | 14 | And were you director of charter |
| 20:39 | 15 | operations from approximately June of 1999 until you |
| 20:42 | 16 | stopped working for the company? |
| 20:44 | 17 | A.  Yes. |
| 20:47 | 18 | Q.  Was that a full-time position? |
| 20:50 | 19 | A.  Yes. |
| 20:53 | 20 | Q.  How many hours did you put in a week, on |
| 20:56 | 21 | average, as director of charter operations? |
| 20:58 | 22 | A.  Ninety. |
| 21:03 | 23 | Q.  What were your regular hours as director of |
| 21:06 | 24 | charter operations? |

27

```
0:29:57   1        Q.   When was that agreement made?
0:29:58   2        A.   It was made in 1999, probably in June of
0:30:03   3   '99.  June or July, yes.
0:30:13   4        Q.   And what happened in June or July to make
0:30:16   5   this agreement?
0:30:20   6        A.   The company decided they wanted to expand
0:30:23   7   their advertising.
0:30:24   8        Q.   How did you know that?
0:30:25   9        A.   There was only five of us there at the
0:30:29  10   time, and they decided they wanted to advertise in
0:30:31  11   the Wall Street Journal.
0:30:32  12        Q.   Before that point, before June of '99, they
0:30:35  13   had never advertised in the Wall Street Journal?
0:30:37  14        A.   No.
0:30:37  15        Q.   So what happened next?
0:30:38  16        A.   Well, at that time, since I had a
0:30:46  17   background in advertising, they more or less put it
0:30:48  18   on my shoulders, that I could handle the
0:30:50  19   advertising.  We had one guy who was pretty good
0:30:57  20   with computers, so he designed the ads as I told him
0:31:00  21   I wanted them designed, and then --
0:31:02  22        Q.   Who was that?
0:31:03  23        A.   That would be Dan Underwood.
0:31:05  24        Q.   Did he have a separate agreement with the
```

30

1     Q.     Where was that meeting held?

2     A.     In Mr. Creed's office.

3     Q.     Where was Mr. Creed's office?

4     A.     At Sharp Street in Hingham, Mass.

5     Q.     72 Sharp Street?

6     A.     Yes.

7     Q.     What time of day was it?

8     A.     4:00 or 5:00 in the afternoon.

9     Q.     Who was present in Mr. Creed's office at
10 the time?

11     A.     Myself, Mr. Creed and Greg Goodwin.

12     Q.     How long did the meeting last?

13     A.     Five minutes.

14     Q.     Were Mr. Creed and Mr. Goodwin there for
15 the entire five minutes?

16     A.     Yes.

17     Q.     How did the conversation start?

18     A.     The conversation started with Mr. Creed
19 saying that they wanted to expand into the Wall
20 Street Journal, and what did I think about that?
21            And I said, I think it's a good idea;
22 it's definitely a target market for our company.
23            And he said, can you do anything with
24 their pricing? He had their rates.

FARMER ARSENAULT BROCK LLC

31

```
4:29   1            And I said, yes.  I could get a discount
4:37   2   through my ad agency because it's an accredited
4:41   3   agency that's done work.
4:42   4            And he said, all right.  Well, see what
4:45   5   you can do, then.
4:47   6            With that, I said, what about
4:49   7   compensation for the advertising agency?
4:50   8            And he said, well, obviously we're just
4:55   9   getting started, so we don't want to spend the
4:58  10   money if we don't have to; so can I compensate you
5:01  11   at the end when the company is sold or when you
5:03  12   leave?
5:03  13            And I said, fair enough.
5:04  14       Q.   Is that the entire content of the
5:07  15   conversation that happened on that day?
5:09  16       A.   Yes.
5:09  17       Q.   And prior to that conversation, had you
5:11  18   ever discussed advertising-related matters with
5:14  19   Mr. Creed?
5:14  20       A.   Yes.
5:14  21       Q.   What were the contents of those
5:17  22   conversations?
5:17  23       A.   Just my input on whether I thought
5:21  24   something was a good vehicle or not, advertising
```

Volume II, Pages 260-400

Exhibits: 22-47

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

----------------------------------

DAVID SCOLLINS, individually and

on behalf of BOTTOM LINE

ADVERTISING, a sole proprietorship

    Plaintiff

vs.                                    Docket No. 03-12489FH

SENTIENT, f/k/a eBizJets, a

Delaware corporation

    Defendant

----------------------------------

CONTINUED DEPOSITION OF DONALD H. SCOLLINS, JR.

Tuesday, May 24, 2005, 9:00 a.m.

Sullivan, Weinstein & McQuay, P.C.

2 Park Plaza, Suite 610

Boston, Massachusetts

-------Reporter: Joan M. Cassidy, RPR, CRR-------

Farmer Arsenault Brock LLC

50 Congress Street, Suite 415

Boston, Massachusetts 02109

617.728.4404  Fax 617.728.4403

Donald H. Scollins, Jr.
Volume 2 - May 24, 2005

---

**289**

1  A. Meaning that the ads I had drawn up or
2  whatever would be approved by them before I
3  submitted them.
4  Q. Is that the decisions you were talking
5  about?
6  A. Yes.
7  Q. What advertisements would run?
8  A. Right.
9  Q. And how many advertisements would run?
10  A. Yeah.
11  Q. You say, "I'll also work up a tracking
12  sheet so I can issue monthly reports." What's a
13  tracking sheet?
14  A. A tracking sheet is for the phone calls
15  that came in through the Yellow Pages so we could
16  find out which books were effective and which ones
17  weren't.
18  Q. Did you work up a tracking sheet?
19  A. I did.
20  Q. And did you ever issue monthly reports?
21  A. Just verbal. As it says here, it was --
22  these were suggestions I might have. I never really
23  got a lot of feedback from them on it.
24  Q. So you didn't get much feedback on this

**290**

1  document marked --
2  A. I --
3  Q. You have to wait until I finish my
4  question.
5  A. Uh-huh.
6  Q. You never got much feedback on Exhibit
7  26 --
8  A. No.
9  Q. -- from Jeff or from Paul Svensen?
10  A. No, and it was never implemented, my move
11  to the satellite office. It never happened, so it
12  became moot pretty much.
13  Q. Did you actually send this document to Jeff
14  Creed and Paul Svensen?
15  A. Yeah.
16  Q. Now, Bullet Point No. 5 says, "I'll handle
17  the 888-577-4191 calls during working hours."
18  A. Uh-huh.
19  Q. What number was that?
20  A. That was a phone number that I had
21  purchased before I left Phoenix and put in the
22  Yellow Page advertising under the aircraft charter
23  rental, you know, topic in the Yellow Pages.
24  Q. That was your phone number?

**291**

1  A. Yeah.
2  Q. Is that still your phone number?
3  A. It is.
4  Q. You testified the first time we talked that
5  you told Mr. Creed that you could get a discount
6  through your agency because it's an accredited
7  agency. Do you remember testifying to that, sir?
8  A. Yes, I do.
9  Q. What did you mean by "accredited"?
10  A. Meaning that I had done business with --
11  for other -- I had done things for other businesses;
12  and therefore, you know, I had -- you know, I had a
13  listing as an agency that was -- you know, had done
14  this business before.
15  Q. But what does "accredited" mean?
16  A. Meaning at the time that The Wall Street
17  Journal that they wanted to advertise in would not
18  give them a discount without going through an ad
19  agency that was accredited, and they did their due
20  diligence on me and apparently found that that was
21  an accurate statement.
22  Q. How did you know The Wall Street Journal
23  would not give eBizJets a discount?
24  A. Because they told us so.

**292**

1  Q. Who did they tell?
2  A. John Jardin, our rep, said that. They
3  don't just give discounts to everybody; otherwise,
4  why do they have rates. They give discounts to
5  advertising agencies because they can make sure the
6  wrong words aren't in there, that they know the
7  difference between pixels and inches, and that makes
8  it easier for them to implement their ads into The
9  Wall Street Journal.
10  Q. When did John Jardin tell you that?
11  A. He told me that from the very beginning,
12  you know. He said, "If you are accredited, they
13  will give you the discount, but you don't just have
14  a new business and they don't give an in-house
15  discount for an advertising department."
16  Q. So how did that come up in your
17  conversations with Mr. Jardin?
18  A. Because it became apparent to me that I was
19  going to get -- that I was going to be there working
20  for the company and doing the advertising agency
21  stuff for them, and I wanted to make sure he did
22  not -- that that didn't get confused, that they
23  would consider that it was a new company and that I
24  was just working as a marketing person, therefore,

**317**

1  A. Because Paul meddles in everything.
2  Q. Paul meddles in everything?
3  A. Yes. He always wanted to get his fingers
4  in managing everything, so I'm sure he contacted
5  John a bit just like I did.
6  Q. Wasn't it your job to interface with The
7  Wall Street Journal on issues like this?
8  A. It was my job to place the advertising,
9  insertion orders, and save the company the money.
10  That was my job.
11  Q. That was the --
12  A. And I had some input on content, but not
13  the ultimate say.
14  Q. Does that fully describe your duties
15  regarding the advertising?
16  A. At this point in time, I'd say yes.
17  Q. At what point in time?
18  A. I mean, if I think about it more, I can
19  think maybe I did more things than just that.
20      (Marked, Exhibit 34, E-Mail from John
21  Jardin via his assistant Jonathan to witness.)
22  Q. Exhibit 34, sir. Do you recognize this
23  document, sir?
24  A. (Witness reviews document.) Yes, this was

**318**

1  an e-mail from John Jardin to me, from his assistant
2  Jonathan, regarding my concern about where our ads
3  were running, on what pages they were running.
4  Q. I'm just interested in the e-mail address
5  to which Mr. Jardin sent this document. Is that
6  your eBizJets account?
7  A. I had an eBizJets address at that point in
8  time, sure.
9  Q. Did you have any other e-mail address from
10  which you conducted Bottom Line Advertising
11  business?
12  A. Yes.
13  Q. And what was that?
14  A. A1executivejet@aol.com.
15  Q. This e-mail is -- strike that. This e-mail
16  pertains to advertising issues; isn't that right?
17  A. Correct.
18  Q. But you're using your eBizJets e-mail
19  account; isn't that right?
20  A. This is February 23, 2001. Yes.
21  Q. Why do you mention the date, sir?
22  A. Because we had been doing business for so
23  long at that point in time that everybody -- I was
24  getting paperwork back and forth at the location, so

**319**

1  it wasn't a big deal, just as you pointed out
2  earlier.
3  Q. It wasn't a big deal that you were in-house
4  at eBizJets at that point to The Wall Street
5  Journal?
6  A. No, it wasn't.
7  Q. When did you start using your ebizjets.com
8  e-mail account for Bottom Line Advertising business?
9  A. I can't say. I'm not sure exactly.
10  Q. Do you know whether it was prior to
11  February 23, 2001?
12  A. No, I don't know that. This might be the
13  first one. I don't know.
14      (Marked, Exhibit 35, E-Mail between two
15  Wall Street Journal people.)
16  Q. Exhibit 35, sir.
17  A. Uh-huh.
18  Q. It appears to be a e-mail between two Wall
19  Street Journal people. It says, "This is the
20  disastrous account that we have been having some
21  problems with." Do you know what the author means
22  by that?
23  A. (Witness reviews document.) That's the
24  constant ad changes and the late changes and those

**320**

1  things.
2  Q. Do you see where it says, "These ads have
3  been uploaded under material with no run dates"?
4  A. Because the --
5  Q. Do you see where it says?
6  A. Where?
7  Q. It says, "These ads have been uploaded
8  under material with no run dates."
9  A. Yes.
10  Q. Whose job was it to give The Wall Street
11  Journal run dates?
12  A. I got them from Brad and Paul and Jeff, and
13  I had to run them. It just seemed like at the
14  time -- since we were changing things so often, I
15  asked them to give me all the ads that we had
16  developed so that I could have them there at The
17  Wall Street Journal so that they would
18  automatically -- it would be one less step for me
19  with the late changes that they were doing, so
20  that's why there were no run dates. They thought it
21  was a good idea at the time. They had no problem
22  with it.
23  Q. Did The Wall Street Journal ever tell you
24  that they considered the eBizJets account a