Volume I, Pages 1-146

Exhibits: 48-49

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

-------------------------------

DAVID SCOLLINS, individually and

on behalf of BOTTOM LINE

ADVERTISING, a sole proprietorship

          Plaintiff

vs.                        Docket No. 03-12489FH

SENTIENT, f/k/a eBizJets, a

Delaware corporation

          Defendant

-------------------------------

DEPOSITION OF JOSEPH F. CREED, JR.

Wednesday, May 25, 2005, 10:00 a.m.

Sullivan, Weinstein & McQuay, P.C.

2 Park Plaza, Suite 610

Boston, Massachusetts

-------Reporter: Joan M. Cassidy, RPR, CRR-------

Farmer Arsenault Brock LLC

50 Congress Street, Suite 415

Boston, Massachusetts 02109

617.728.4404   Fax 617.728.4403

Joseph F. Creed, Jr.
Volume 1 - May 25, 2005

Page 14

1  helped me do the hiring, they helped me with
2  contracts, they helped me with advertising. We
3  always sat down and discussed pricing, which way we
4  were going to go, how we were going to set up
5  computer programs, which is what Dan would do for
6  us.
7  Q. Let's talk about advertising.
8  A. Okay.
9  Q. Who within this original group of six
10 people helped you do the advertising?
11     MR. PERLMAN: Objection.
12 A. Originally, it would be myself and Paul,
13 because I had done advertising in my other business
14 that I had for 20 years. Advertising was a major
15 part of the business. It was originally myself and
16 Paul Svensen that would place ads. Donny was
17 placing ads in the Yellow Pages for us because
18 that's what he did for us in the beginning of the
19 company. And then it went into different types of
20 print advertising, magazine advertising.
21 Q. So the first form of advertising that the
22 company engaged in was Yellow-Page advertising?
23 A. Yes.
24 Q. And you said -- did Donny place those ads

Page 15

1  for the company?
2  A. He placed the Yellow-Page advertising, yes.
3  Q. And you also mentioned print advertising?
4  A. Yes. In the beginning I was putting ads
5  here in Boston for my own jet with Lawyers Weekly, a
6  few of the regular Boston newspapers that I would
7  put them in. And how the business and brokerage
8  thing started is I got a call from a woman in
9  Phoenix Arizona. "Well, how did you hear about me
10 in Massachusetts?" She had picked up Lawyers
11 Weekly, and she said she needed a flight from
12 Phoenix to Costa Rica.
13     Well, I obviously couldn't send my jet.
14 It just wouldn't make sense. I called a carrier in
15 Phoenix. And that's how the whole business started,
16 with a phone call. So the advertising worked, in
17 other words.
18 Q. Right.
19 A. But we had to become nationwide for it to
20 really be effective, so I really started hitting all
21 the high-line magazines --
22 Q. What do you mean by "high-line magazines"?
23     MR. PERLMAN: Objection.
24 A. -- and newspapers too.

Page 16

1     MR. PERLMAN: If you could just wait
2  until he finishes his answer so we can --
3     MR. PARKER: I'm sorry. I thought he
4  had finished.
5  A. Like Four Seasons publishes their own
6  magazines, Elite Magazine, Palm Beach, Ocean Drive,
7  Millionaire Magazine, Robb Report. And then, of
8  course, the biggest newspaper that we advertised in
9  was The Wall Street Journal.
10 Q. Let's talk about The Wall Street Journal.
11 When did the company decide to place ads in The Wall
12 Street Journal?
13     MR. PERLMAN: Objection.
14 A. It would have been probably a year, year
15 and a half after I started, 'cause it was real
16 expensive to get into.
17 Q. Do you remember approximately what month it
18 might have been?
19 A. No.
20 Q. Whose decision was it to start placing ads
21 in The Wall Street Journal?
22 A. My decision.
23 Q. How did the company go about placing ads in
24 The Wall Street Journal?

Page 17

1     MR. PERLMAN: Objection.
2  A. Well, originally, we had called The Wall
3  Street Journal just from the company to try and put
4  ads in. We needed an -- you needed an advertising
5  agency, which was unfamiliar to us at the time,
6  because we used to put -- like, if you wanted to put
7  an ad in Lawyers Weekly, you just called them up;
8  you designed your ad and you put it in.
9     They required at the time an ad agency
10 to place the ads; and at that time these ad agencies
11 were getting a 15 percent fee, which I wasn't going
12 to pay.
13 Q. Why not?
14 A. Because it's a rip-off.
15 Q. How was your company doing financially at
16 that time?
17 A. Good.
18 Q. But your decision not to pay that 15
19 percent fee was more -- it was a cost-saving
20 decision?
21 A. It was a cost-saving decision. I figured
22 it would be a negotiation item. I didn't see why
23 you had to hire a firm, because it wasn't just 15
24 percent. You hire somebody's -- some of these

6 (Pages 18 to 21)

Joseph F. Creed, Jr.
Volume 1 - May 25, 2005

Page 18

1  firms, they want money upfront to represent you.
2  All right? And some of them were really, really
3  high, as we can attest to later on with Credit
4  Suisse. We're paying people $200,000 upfront before
5  they even want to work with you, which was something
6  that I voted against at every board meeting, to pay
7  these people that kind of ransom.
8     Q. *But if you had to have an advertising
9  agency to place ads in The Wall Street Journal --
10    A. Uh-huh.
11    Q. -- I mean, what did you decide to do?
12    A. I used Donny's firm.**
13       MR. PERLMAN: I'm sorry, could you just
14  repeat that question and answer? Is that okay,
15  Joan?
16       (Record read from * to **)
17       MR. PERLMAN: Objection to that
18  question.
19    Q. When you say "Donny's firm," what firm are
20  you referring to?
21    A. Donny had an advertising agency prior to
22  him ever coming into the jet business called Bottom
23  Line Advertising.
24    Q. Were you aware of Bottom Line Advertising

Page 19

1  before he came into the company?
2     A. Yes.
3     Q. You knew it by name?
4     A. I'm not sure if I knew it by name. I knew
5  he had his own advertising company.
6     Q. Did you understand it to be a -- the name
7  Bottom Line Advertising to be a doing-business-as
8  moniker for him?
9        MR. PERLMAN: Objection.
10    A. I'm not sure if -- I'm not sure how he had
11  set it up, if it was an LLC or d/b/a.
12    Q. Okay. So did the company retain Bottom
13  Line Advertising to place ads in The Wall Street
14  Journal?
15    A. I don't know if "retain" is the right word.
16  We sat down and talked about him putting them in
17  because I didn't want to pay an outside firm the
18  so-called finder's fee plus their 15 percent. And
19  we worked it out that Donny was an ad agency that
20  could put those ads in The Wall Street Journal.
21    Q. Let's go back to this -- when you sat down
22  with Donny.
23    A. Uh-huh.
24    Q. Do you remember when that was?

Page 20

1     A. It would have been at the time we started
2  talking about putting ads in The Wall Street
3  Journal.
4     Q. When was that?
5     A. I want to say either '98 or '99. I'm sure
6  the records will reflect whenever we put those first
7  ads in. We needed an ad agency. So whenever those
8  first ads went in, that's when we used Donny.
9     Q. So you're saying sometime before the first
10  ads were actually put into The Wall Street Journal?
11    A. Yes, because it takes a while. You have to
12  format an ad. There was some special way to set
13  those ads up. It wasn't just like we called The
14  Wall Street Journal and faxed over something that we
15  wanted in and they kind of doctored it up a little
16  bit. This was a whole different technique, which
17  Dan used the computer to set it up. He found
18  that -- the format that they needed to set these ads
19  up and he duplicated it. And then we would discuss
20  different types of print we were going to put in the
21  ads, and then they were shipped over.
22       MR. PERLMAN: Just for a point of
23  clarity, you said Dan, not Don?
24       THE WITNESS: Right. Dan Underwood was

Page 21

1  our computer guy, and he would set up the format on
2  how those ads had to be set up.
3        MR. PERLMAN: Right, you don't have to
4  answer my questions. I just want -- I apologize for
5  interrupting, Mr. Parker. I just want to make sure
6  that the reporter --
7        THE WITNESS: Okay. I'll use last
8  names. Maybe that will help.
9        MR. PERLMAN: I want you to testify as
10  you want to or as Mr. Parker asks you to. This is
11  his examination. I just want to make sure the court
12  reporter didn't take down the word "Don" when you
13  said "Dan," because it's close. So I apologize.
14       MR. PARKER: I knew who he was talking
15  about, but that's okay.
16       MR. PERLMAN: I did too, but I just want
17  to make sure the transcript reflects it.
18    Q. Now, again, when you talked about sitting
19  down with Don and discussing Bottom Line placing ads
20  in The Wall Street Journal, do you remember if
21  anyone else was at this meeting?
22       MR. PERLMAN: Objection.
23    A. If anyone else was at the meeting... There
24  probably was. There was only five of us at the