```
 1  Exhibits: 15-21          Volume 1, Pages 1-68
 2            UNITED STATES DISTRICT COURT
 3           FOR THE DISTRICT OF MASSACHUSETTS
 4  Civil Action No. 03-12489EFH
 5  ------------------------------
 6  DAVID SCOLLINS, individually and on
 7  behalf of BOTTOM LINE ADVERTISING, a
 8  sole proprietorship,
 9                 Plaintiff
10  v.
11  SENTIENT, f/k/a eBizJets, a Delaware
12  corporation,
13                 Defendant
14  ------------------------------
15          DEPOSITION OF JOHN WILLIAMS
16      Thursday, July 15, 2004, 10:52 a.m.
17        Sullivan Weinstein & McQuay, P.C.
18                 Two Park Plaza
19              Boston, Massachusetts
20  -------Reporter: Susan J. Blatt, RPR-------
21            Farmer Arsenault Brock LLC
22         50 Congress Street, Suite 415
23            Boston, Massachusetts 02109
24          617.728.4404   fax 617.728.4403
```

Page 22

1  Q. Did you prepare this document?
2  A. I don't know what you mean by, did I
3  prepare it?
4  Q. Was it prepared by someone on your behalf?
5      MR. PERLMAN: Objection. I just want to
6  caution the witness not to disclose any attorney-
7  client communications that he had with us.
8  Q. Without asking you about what discussions
9  you may have had with counsel in preparing this
10 document, I just wanted to basically know whether
11 you had prepared this or this had been prepared by
12 counsel?
13     MR. PERLMAN: If I can just, is it
14 critical to find out the preparation? I think he'll
15 stipulate that he signed it.
16     MR. PARKER: That's fine.
17     MR. PERLMAN: Can we get away from the
18 preparation part of it?
19     MR. PARKER: Sure. That's fine.
20 Q. You signed this document?
21 A. It appears to be my signature, yes.
22 Q. Now, did you review it before you signed
23 it?
24 A. I did, yes.

Page 23

1  Q. I'd like to direct -- and by the way, in
2  paragraph 1 you're stating that you were the
3  executive officer of eBizJets and also served as
4  treasurer for a time and it further states, "I was
5  fully familiar with Sentient's business." That's an
6  accurate statement about your involvement with
7  eBizJets; is that correct?
8      MR. PERLMAN: Objection.
9  A. I was familiar with all aspects of the
10 business, yes. At least all of those aspects of
11 which I was aware.
12 Q. That's an interesting point. On page 3 you
13 make a statement here, "I was not aware of Mr.
14 Scollins' 'sole proprietorship'," put that in
15 quotations, "Bottom Line Advertising until after Mr.
16 Scollins' termination." Having signed this under
17 the pains and penalties of perjury, in your view
18 that's a correct statement?
19     MR. PERLMAN: Objection. Is that a
20 question?
21     MR. PARKER: Let me rephrase.
22 Q. Is the statement in paragraph 11, is that a
23 correct statement?
24 A. I believe so, yes.

Page 24

1  Q. So prior to Mr. Scollins' termination, you
2  never heard of Bottom Line Advertising at all?
3  A. I don't recall that I had heard that name
4  of a sole proprietorship by that name. No, I do not
5  recall.
6  Q. Prior to Mr. Scollins' termination, were
7  you aware that he operated an advertising agency?
8  A. I don't recall whether -- the answer to
9  your question is I don't recall to that level of
10 specificity.
11 Q. As the chief executive officer of the
12 company, were you involved with advertising issues
13 relating to the company?
14 A. Yes, I was.
15 Q. What was your level of involvement? Maybe
16 you could describe it.
17 A. Well, I had a vice president of marketing
18 who reported to me who was directly responsible for
19 the creation and development of our advertising
20 program. I interacted with him on a regular basis
21 and provided input and direction to him as
22 appropriate.
23 Q. When you say "input and direction," what
24 types of things do you mean?

Page 25

1  A. He would from time to time review proposed
2  advertising with me for my approval, reaction to it,
3  my judgment as to how effective it would be. He
4  would discuss with me the placement of where we
5  would place our advertising and the frequency of
6  that advertising.
7  Q. When you first joined the company, what
8  types of advertising was the company engaged in?
9  A. I believe, if memory serves, largely print
10 advertisements and directory advertisements.
11 Q. Do you know who was placing the print
12 advertisements for the company at that time?
13 A. At the time I first joined the company, I
14 believe it was Mr. Scollins.
15 Q. What about the directory advertising?
16 A. I believe that was done by Mr. Scollins as
17 well.
18 Q. Was it your understanding that Mr. Scollins
19 was placing these ads as a part of his general
20 duties and responsibilities as an employee of the
21 company?
22 A. Yes.
23 Q. So did you ever inquire as to whether or
24 not he was doing it through a separate company?

John Williams - July 15, 2004

Page 26

1  A. I didn't, that I can recall.
2  Q. Did you ever have a meeting with Mr.
3  Scollins and discuss the ad placements that he was
4  doing for the company?
5  A. I'm sorry. In your previous question --
6  could you restate the question you just asked me?
7     MR. PERLMAN: Do you want to have it
8  read back, is that what you want?
9     (Read back.)
10 A. No I don't believe I ever inquired as to
11 that, no.
12 Q. Did it ever come to your intention that he
13 may be placing ads through a separate company?
14 A. Yes, it did.
15 Q. When did that happen?
16 A. I believe very much later than when I first
17 joined the company. I don't recall precisely when,
18 but a substantial period thereafter.
19 Q. Would it have been before he was
20 terminated?
21 A. I believe so. But I don't know how long
22 before.
23 Q. How did it come to your attention?
24 A. I don't recall. It may have been through a

Page 27

1  conversation with Mr. Scollins. It may have been
2  through other conversations. We're talking about
3  events that occurred over three and a half years ago
4  now, so my memory is not as clear as I'd like it to
5  be.
6  Q. Might it had been in a separate meeting
7  with Mr. Scollins?
8  A. I don't know.
9  Q. But in learning that he may have been
10 placing ads through a separate company by the name
11 of Bottom Line Advertising, do you remember that
12 coming up?
13 A. I don't remember the name Bottom Line
14 Advertising until after Mr. Scollins' meeting with
15 me in November of 2001.
16    (Marked, Exhibit 16, supplemental
17 declaration.)
18 Q. Mr. Williams, do you recognize this
19 document?
20 A. Yes.
21 Q. You signed this document too, correct?
22 A. Yes, it appears to be my signature.
23 Q. Paragraph 4 of this document states, and I
24 quote, "Prior to Mr. Scollins' termination, neither

Page 28

1  Mr. Creed, who we understand is the president of the
2  company, Donald Scollins, nor anyone else ever said
3  anything to me about paying Mr. Scollins to place
4  advertisements for Sentient." That's an accurate
5  statement?
6  A. That is correct.
7  Q. Of course you had signed this under the
8  pains and penalties of perjury, correct?
9  A. I signed this document.
10 Q. Do you know, and again not having prepared
11 the 2000 budget, but for 2001, was advertising a
12 significant budgeted expense line item for 2001?
13 A. I don't know what you mean by
14 "significant."
15 Q. Well, would it have been a separately
16 listed item on the 2001 budget?
17 A. Yes.
18 Q. I guess what I was getting at was if it's
19 separately listed, it's something -- it would have
20 been a line item that would have been important
21 enough that the users of the budget would need to
22 know how much money was being spent in that
23 particular area?
24 A. It was a separate line item on the budget.

Page 29

1  Q. And sitting here today, you don't remember
2  how much was spent on advertising for 2001 or
3  budgeted for 2001, do you?
4  A. I do not recall that number, no.
5  Q. Obviously the budget would be able to tell
6  me that?
7  A. (No response)
8     (Marked, Exhibit 17, listing.)
9     MR. PERLMAN: Off the record.
10    (Off the record.)
11 Q. Mr. Williams, I've handed you what's been
12 marked as Exhibit 17. Have you seen this document
13 before?
14 A. I don't recall this document.
15 Q. Does it look familiar to you?
16 A. The names on it are familiar to me, look
17 familiar to me, but the document -- I don't know
18 whether I've seen this document before.
19 Q. When you say the names look familiar to
20 you, why do they look familiar to you?
21    MR. PERLMAN: Objection. You can
22 answer.
23 A. This appears to be a listing of home
24 numbers of at least some of the employees of

John Williams - July 15, 2004

**Page 42**

1  the opportunity to get perspective and input on his
2  job performance from discussions with them.
3    Q. Some of these procedures you're describing,
4  like the weekly operations review meeting, when did
5  you start doing that?
6    A. I don't recall precisely.
7    Q. Would it have been in early 2001?
8    A. I don't recall precisely.
9    Q. And some of the more personal observations
10 of Mr. Scollins while he was working, do you recall
11 when those might have been?
12   A. Throughout his tenure at the company, I had
13 opportunity to observe his performance. It wasn't a
14 multibillion dollar company where I was separated
15 from him. I had opportunity to observe Don on a day
16 in and day out basis when he was in the office,
17 which was most days.
18   Q. Describe your personal interaction with
19 Don.
20   A. In what respect do you mean?
21   Q. Did you all converse on friendly terms?
22       MR. PERLMAN: Objection.
23   A. I believe so. I believe that I would use
24 the word "friendly." I certainly don't recall being

**Page 43**

1  unfriendly to Don and I don't recall him being
2  unfriendly to me.
3    Q. That wasn't a fair question from the
4  standpoint of I probably need to lock in times,
5  obviously.
6        When you first joined the company, for
7  lack of a better term, did you all get along with
8  each other?
9        MR. PERLMAN: Objection.
10   A. As I understand the term "get along," I
11 believe so, yes.
12   Q. During the time that you worked together,
13 did your personal relationship improve, deteriorate?
14       MR. PERLMAN: Objection.
15   A. I didn't have a personal relationship with
16 Don. I didn't spend time with him outside of the
17 office or outside of the business functions. From
18 time to time I would go out with him, employees, to
19 an after-work dinner or get-together on an informal
20 basis, but that was infrequent occasions. I didn't
21 spend my personal time with Don. I didn't socialize
22 with him outside of a work setting.
23   Q. The relationship was purely a professional
24 one then?

**Page 44**

1    A. I would describe it as such, yes.
2    Q. And it was cordial?
3    A. It was businesslike.
4    Q. OK.
5        (Marked, Exhibit 18, memorandum,
6  November 27, 2000.)
7  BY MR. PARKER:
8    Q. Mr. Williams, the first document I gave you
9  has been marked as Exhibit 13 earlier. I wanted to
10 ask you if you recognize this document?
11   A. I believe so. Yes, I do.
12   Q. And maybe eight pages in, that's your
13 signature about midway down the page?
14   A. It appears to be, yes.
15   Q. Do you recognize this document as an
16 incentive stock option agreement?
17   A. I do.
18   Q. I've also given you Exhibit 18, which is a
19 memorandum. Do you recognize this document too?
20   A. I do.
21   Q. Who would have advised you — let's strike
22 that. Do you know why these stock options that are
23 referenced in these documents were being granted to
24 Mr. Scollins?

**Page 45**

1    A. They were being granted to Mr. Scollins
2  along with other employees as part of an overall
3  compensation program that the company instituted for
4  its employees.
5    Q. Were you involved in instituting that
6  program?
7    A. I was.
8    Q. Why did you institute it?
9    A. I wanted to retain excellent employees.
10   Q. Did other people recommend to you that
11 these options be granted to Mr. Scollins?
12       MR. PERLMAN: I'm going to object. To
13 the extent that a lawyer representing you or the
14 company recommended anything, please do not tell Mr.
15 Parker.
16       MR. PARKER: Sure.
17       MR. PERLMAN: You may answer.
18   A. As I recall, the granting of stock options
19 to employees was a matter I discussed with my senior
20 management team at the time.
21   Q. If I've asked you this already, I
22 apologize. Who was your senior management team?
23   A. That senior management team evolved over
24 time as the company grew.