COPY

1

Volume I, Pages 1-146

Exhibits: 48-49

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - -

DAVID SCOLLINS, individually and

on behalf of BOTTOM LINE

ADVERTISING, a sole proprietorship

Plaintiff

vs.                                    Docket No. 03-12489FH

SENTIENT, f/k/a eBizJets, a

Delaware corporation

Defendant

- - - - - - - - - - - - - - - - - - - - - - - - - - -

DEPOSITION OF JOSEPH F. CREED, JR.

Wednesday, May 25, 2005, 10:00 a.m.

Sullivan, Weinstein & McQuay, P.C.

2 Park Plaza, Suite 610

Boston, Massachusetts

- - - - - - -Reporter:  Joan M. Cassidy, RPR, CRR- - - - - - -

Farmer Arsenault Brock LLC

50 Congress Street, Suite 415

Boston, Massachusetts 02109

617.728.4404   Fax 617.728.4403

```
                                                           2

 1   APPEARANCES:
 2       The Parker Law Firm
 3       John D. Parker, II, Esq.
 4       141 East Palm Lane, Suite 111
 5       Phoenix, Arizona 85004
 6       602-257-8100   Fax: 602-257-8110
 7       jparker@ptlaw.net
 8       for Plaintiff
 9
10       Sullivan, Weinstein & McQuay, P.C.
11       C. Max Perlman, Esq.
12       2 Park Plaza, Suite 610
13       Boston, Massachusetts 02116
14       617-348-4300   Fax: 617-348-4343
15       max@swmlawyers.com
16       for Defendant
17
18       Cooley Manion Jones LLP
19       Earle C. Cooley, Esq.
20       21 Custom House Street
21       Boston, Massachusetts  02110
22       617-737-3100   Fax: 617-737-3113
23       for the Witness
24
```

```
                                                            3
 1                      P R O C E E D I N G S
 2                  Joseph F. Creed, Jr., Sworn
 3                      DIRECT EXAMINATION
 4   BY MR. PARKER:
 5        Q.   Sir, please state your full name and
 6   address.
 7        A.   Joseph F. Creed, Jr., 4307 Southeast Bay
 8   View Street, Stuart, Florida.
 9        Q.   And Mr. Creed, for the record, are you
10   represented by counsel today?
11        A.   I am, Earle Cooley.
12        Q.   Mr. Creed, you are the founder of the
13   company that is now known as Sentient Jets; is that
14   correct?
15        A.   Yes, it is.
16        Q.   What was the name of the company when it
17   was originally founded?
18        A.   When it was originally founded, it was
19   called Executive Jet Worldwide Charter.
20        Q.   And when did you found the company?
21        A.   '97, 1997.
22        Q.   And the company underwent a name change
23   from Executive Jet to Worldwide Charter?
24        A.   To eBizJets.
```

4

1    Q.   Would you mind if -- through the deposition
2 I'll refer to either the company or eBizJets, and
3 you'll know what I'm talking about?
4    A.   Yes, absolutely.
5    Q.   Okay.
6         MR. PERLMAN:  And does that -- just for
7 purposes of clarity, that also includes Executive
8 Jet Worldwide Charter?
9         MR. PARKER:  Yes.
10        MR. PERLMAN:  You might want to confirm
11 that with Mr. Creed.
12   Q.   Oh, sure.  And if I refer to eBizJets, I'm
13 also referring to Executive Jet Worldwide Charter as
14 well.  Okay?
15   A.   That's fine.
16   Q.   All right.  I'm just generally curious,
17 where did you get the -- well, what type of services
18 did the company provide?
19   A.   Private jet charter services.
20   Q.   And I'm curious, where did you get the idea
21 for the company?
22        MR. PERLMAN:  Objection.  You can
23 answer.
24   A.   I started as a pilot, and I flew small

```
                                                        6
 1   individuals in the company, setting up contracts for
 2   customers, contracts for carriers.  It went down to
 3   advertising, cleaning floors, everything in that
 4   original start-up.
 5        Q.   As president of the company, were you also
 6   authorized to enter into contracts with vendors --
 7        A.   Yes.
 8        Q.   -- for services that would service the
 9   company?
10        A.   Yes.
11        Q.   How do you know the plaintiff in this
12   action, Donald Scollins?
13        A.   He's my cousin.
14        Q.   How long have you known Don?
15        A.   Forty-seven years.
16        Q.   Did you hire Don to work for eBizJets?
17        A.   I did.  At the time I think it was
18   Executive Jet Worldwide, but yes.
19        Q.   Do you remember when that was?
20        A.   Either '98 or '99.
21        Q.   Did you hire Don pursuant to an interview?
22        A.   Not per se, no.
23        Q.   What went into hiring Don?
24        A.   Don was --
```

```
                                                      17
 1            MR. PERLMAN:  Objection.
 2       A.   Well, originally, we had called The Wall
 3   Street Journal just from the company to try and put
 4   ads in.  We needed an -- you needed an advertising
 5   agency, which was unfamiliar to us at the time,
 6   because we used to put -- like, if you wanted to put
 7   an ad in Lawyers Weekly, you just called them up;
 8   you designed your ad and you put it in.
 9            They required at the time an ad agency
10   to place the ads; and at that time these ad agencies
11   were getting a 15 percent fee, which I wasn't going
12   to pay.
13       Q.   Why not?
14       A.   Because it's a rip-off.
15       Q.   How was your company doing financially at
16   that time?
17       A.   Good.
18       Q.   But your decision not to pay that 15
19   percent fee was more -- it was a cost-saving
20   decision?
21       A.   It was a cost-saving decision.  I figured
22   it would be a negotiation item.  I didn't see why
23   you had to hire a firm, because it wasn't just 15
24   percent.  You hire somebody's -- some of these
```

FARMER ARSENAULT BROCK LLC

```
                                                        18
 1    firms, they want money upfront to represent you.
 2    All right?  And some of them were really, really
 3    high, as we can attest to later on with Credit
 4    Suisse.  We're paying people $200,000 upfront before
 5    they even want to work with you, which was something
 6    that I voted against at every board meeting, to pay
 7    these people that kind of ransom.
 8         Q.   *But if you had to have an advertising
 9    agency to place ads in The Wall Street Journal --
10         A.   Uh-huh.
11         Q.   -- I mean, what did you decide to do?
12         A.   I used Donny's firm.**
13              MR. PERLMAN:  I'm sorry, could you just
14    repeat that question and answer?  Is that okay,
15    Joan?
16              (Record read from * to **)
17              MR. PERLMAN:  Objection to that
18    question.
19         Q.   When you say "Donny's firm," what firm are
20    you referring to?
21         A.   Donny had an advertising agency prior to
22    him ever coming into the jet business called Bottom
23    Line Advertising.
24         Q.   Were you aware of Bottom Line Advertising
```

FARMER ARSENAULT BROCK LLC

1  before he came into the company?
2     A.   Yes.
3     Q.   You knew it by name?
4     A.   I'm not sure if I knew it by name. I knew
5  he had his own advertising company.
6     Q.   Did you understand it to be a -- the name
7  Bottom Line Advertising to be a doing-business-as
8  moniker for him?
9        MR. PERLMAN:  Objection.
10    A.   I'm not sure if -- I'm not sure how he had
11 set it up, if it was an LLC or d/b/a.
12    Q.   Okay. So did the company retain Bottom
13 Line Advertising to place ads in The Wall Street
14 Journal?
15    A.   I don't know if "retain" is the right word.
16 We sat down and talked about him putting them in
17 because I didn't want to pay an outside firm the
18 so-called finder's fee plus their 15 percent. And
19 we worked it out that Donny was an ad agency that
20 could put those ads in The Wall Street Journal.
21    Q.   Let's go back to this -- when you sat down
22 with Donny.
23    A.   Uh-huh.
24    Q.   Do you remember when that was?

22

1  time.
2           Just to kind of step back on how I used
3  to do things in my business, just so you can kind of
4  get a feel, even though I made all the decisions, I
5  always included my people in a group, even if I was
6  going to override them.  All right?  I wanted them
7  to always be part of the group and the
8  decision-making that was going on.  I would always
9  do things with a few people around and say, "What do
10 you think, what do you think," even if I knew
11 exactly what I was going to do.  I would give them a
12 sense of why they want to work and why they are
13 going to put 15 hours a day in, because they're part
14 of the deal.  And part of the deal was I was going
15 to take care of these people as I grew the business,
16 which -- they worked for nothing.
17          So I don't know who might have been in
18 the meeting, but it probably would be fair to say it
19 wasn't just me and Don.  Whether Paul was there or
20 Greg was there, somebody had to be there.  Dan was
21 probably there as we set up different things about
22 the ads.
23    Q.   How big were the facilities that you all
24 were working out of?

```
                                                              27
 1   percent fee that it saved by using his ad agency to
 2   place ads in The Wall Street Journal?
 3              MR. PERLMAN:  Objection.
 4       A.   I never used the term "15 percent."  This
 5   is what -- this is how this whole thing came down:
 6   In the beginning I told him that I would take care
 7   of him.  Do you want me to tell a story, or do you
 8   want to ask me questions?  How do you want me to do
 9   this?
10       Q.   Well, no.  I'd like you to describe
11   everything that you recall about the discussions
12   setting up the relationship between the company and
13   Bottom Line Advertising.
14       A.   Okay.  Here's how it all went down.
15              MR. PERLMAN:  Objection.
16       A.   Here's how it all went down:  In the
17   beginning these guys came to work for me for
18   peanuts.  The company really started growing and
19   expanding very, very quickly.  Credit Suisse came
20   into the fold with UBS Capital.  They were both
21   bidding for the business at that time to invest in
22   the company.
23              We ended up choosing -- I ended up
24   choosing Credit Suisse First Boston in -- it was
```

```
                                                            28
 1   sometime in the beginning of 2000.  The deal got
 2   consummated sometime in June of 2000, where at that
 3   time they were coming in with between 10 and 14
 4   million dollars as an initial investment in the
 5   company, at that time 20 some-odd percent of
 6   eBizJets.  Okay?
 7              When that original amount of money came
 8   in, I gave Paul Svensen, who was with me for 18
 9   years in my other business, $2 million.  I gave
10   Donny, Greg, and Dan a hundred thousand each as
11   basically compensation for them earning nothing in
12   the first year, year and a half, they were with me,
13   small change, whatever they made.
14              That money, by the way, did not come
15   from the business.  That came from me.  That hundred
16   thousand dollars came from me.
17     Q.   But the $2 million, that came from the
18   business, the $2 million that went to Paul Svensen?
19     A.   Actually, the way it worked out was that --
20   and things had changed a lot.  It was supposed to be
21   that myself and Paul were taking $2 million off the
22   table which would never have to be paid back.  Long
23   story short, by the time all this paperwork and all
24   of this stuff came out, it ended up being a loan
```

1  Q.  If he was in Arizona -- I notice the
2  address at the bottom has the -- it's on Executive
3  Jet Worldwide letterhead, and the address at the
4  bottom is Hingham, Massachusetts.
5  A.  Uh-huh.
6  Q.  Why would he be sending something from
7  Arizona on a Massachusetts letterhead?
8      MR. PERLMAN:  Objection.
9  A.  (Witness reviews document.) I don't know.
10 Oh, was he going to leave?  I mean, I don't know.
11 This sounds like he was leaving, maybe.
12 Q.  Oh.
13 A.  I don't know.
14 Q.  Okay.  Well, if there wasn't a specific
15 promise to pay Don 15 percent of the savings for
16 advertising, did the company intend on paying
17 anybody that 15 percent?
18      MR. PERLMAN:  Objection.
19 A.  Paying anybody.  The full 15 percent?
20 Q.  Yes.
21 A.  When I said I would work something out, I
22 would work something out that would be fair and
23 equitable to both parties.  And, again, the only
24 thing I can really say in that defense is the same

39

1  thing that I ended up working out with Eddie
2  Johnson, which was a settlement agreement.  When
3  Eddie Johnson asked me, "What would you have given
4  him?  Would you have given him the 15 percent?"  I
5  said, "Eddie, I don't know, probably not."  "Would
6  you have given him half?"  I said, "Well, yeah, I
7  mean, I at least would have given him half," because
8  that was my -- that would be my MO.  I'd make a deal
9  that was good for the company and that's good for
10 him.  But I think, being a businessman, if I had to
11 pay the full 15 percent, I could have used anybody.
12 You know what I mean?  So I would have done a deal
13 that would have been great for me and it would have
14 been great for him.
15         But again, trying to get those stock
16 options was the big deal, because originally if they
17 had got stock options, I felt at that time that
18 would have been a home run, and he would have made
19 much more than the 15 percent.  So I guess you can
20 call it any way you want.  They never gave him the
21 options, they screwed him out of what he was
22 supposed to get, so I can see why he wants his 15
23 percent.  I don't blame him.
24     Q.  I'm going to hand you what's been marked as

```
                                                        155
 1   mean prior to that, I don't believe so, no.
 2       Q.   Let me confine the question.  Prior to the
 3   23rd of November, which I'll tell you thereabouts
 4   was the date that Mr. Scollins was terminated from
 5   the company or informed he was terminated, using
 6   that as a reference --
 7            MR. COOLEY:  What was the date?
 8            MR. PERLMAN:  November 23rd, 2001.
 9       Q.   Did you ever see any document that was
10   created prior to that date that outlines or
11   discusses the terms of any agreement between
12   eBizJets and Scollins regarding advertising?
13       A.   I don't believe so.  However, I think at
14   one time Donny came to me with something that he
15   wanted me to sign or acknowledge at one time.  It
16   would be in the year 2000 or '99 or something, that
17   he wanted to get paid in full for advertising.
18   There may have been something that he wrote up.
19   There was never an agreement between him and me for
20   a specific amount that he was going to get.
21       Q.   So he presented you with a document that
22   had the terms that he wanted to be included in an
23   agreement, right?
24       A.   I believe so, yes.
```

156

1   Q.  And you refused to sign it?
2   A.  At that time, yes.
3   Q.  And you never signed any agreement with
4   Donald Scollins regarding advertising; is that
5   right?
6   A.  True.
7   Q.  But you've contended that there is an
8   agreement between eBizJets and Scollins regarding
9   advertising.
10  A.  Yes.
11  Q.  What were Mr. Scollins' obligations under
12  that agreement?
13  A.  His obligations?  I don't know what his --
14  I don't know what you mean by his obligations.  What
15  he was doing for us was placing the advertising with
16  firms that wanted to charge us a 15 percent fee.  I
17  didn't want to pay the 15 percent fee.  I thought
18  that was outrageous.  He was going to place that
19  with us, and we were going to work something out for
20  him when the time came.
21  Q.  So his obligation was to place the ads?
22  A.  Yes.
23  Q.  The ads were being developed by someone
24  else, right?

1    A.   We had a few people.  Dan Underwood, our
2  computer guy, was helping Donny in the beginning to
3  take different picture ads like NetJets ran.  We
4  knew it was working for them; we wanted something
5  similar.  Dan did it, and I think hired some woman
6  to be able to set up different types of ads.  They
7  will only accept ads in a certain way.  It's not
8  like you print something on a piece of paper and fax
9  it over.  It has to be compatible with their
10 computer programs.  I think there was another woman
11 that Dan hired to help us design the ads.  It
12 couldn't be done without an ad agency.  That's where
13 Donny came in because he had that ad agency from
14 Arizona.
15   Q.   Don's ad agency was instrumental in saving
16 the 15 percent?
17   A.   That's correct.
18   Q.   Don Scollins was not the one putting
19 together the ads, was he?
20   A.   He would do the word copy, verbiage.  We
21 would sit down and say how are we going to word
22 these ads.
23   Q.   You were involved in that too?
24   A.   Yes.

```
                                              163
 1      Q.   Were they paid $500,000?
 2      A.   Yes.
 3           MR. COOLEY:  Was who paid 500,000, the
 4  ad agency?
 5           THE WITNESS:  Yes.
 6           MR. COOLEY:  What was the name of the ad
 7  agency?
 8           THE WITNESS:  I don't remember.  It was
 9  two or three.  I fired one of them when I found out
10  they were stealing.
11      Q.   Do you know the name of the ad agency that
12  Credit Suisse hired or encouraged eBizJets to hire?
13      A.   One of them, I want to say is KSL.  I'm not
14  positive those are the right initials.  That's the
15  one I fired.  And then Bloom.
16      Q.   Bloom or Bloomberg?
17      A.   I think Bloomberg.
18      Q.   Did these ad agencies take on any of the
19  responsibilities that Mr. Scollins had to that
20  point?
21      A.   I think now they did everything.  They
22  would come up with us with different types of
23  creative -- I remember them coming into the office
24  setting up boards.  I remember at one point I was
```

```
                                                           193
 1     A.   I remember this situation, yes.
 2     Q.   Can you give me more details on this
 3  situation?
 4     A.   I think Donny gave me the bill for the full
 5  15 percent.  I think I was pissed off at that.  He
 6  always said he would work something out but never
 7  said what this was going to be.  When he went to
 8  give me the bill with 15 percent at that time, I was
 9  outraged.
10     Q.   Do you remember when that was?  Was it
11  before or after CSFB?
12     A.   I think CSFB was already in the deal.
13     Q.   CSFB had already made the investment?
14     A.   Yeah, I believe so.
15     Q.   Eddie Johnson says to you:  "I am not
16  saying you lied.  If you are referring to the
17  'supposedly,' that word was purposefully used
18  because we had no documentation and it was not
19  disclosed to anyone at our close."
20          Did you respond to Mr. Johnson?
21     A.   I don't know.  I'm sure I did.
22     Q.   Do you know what you said to Mr. Johnson in
23  response to that?
24     A.   No.
```

FARMER ARSENAULT BROCK LLC