1

1   Exhibits: 15-21      Volume 1, Pages 1-68
2           UNITED STATES DISTRICT COURT
3         FOR THE DISTRICT OF MASSACHUSETTS
4   Civil Action No. 03-12489EFH
5        - - - - - - - - - - - - - - - - - - - - - - - - - -
6   DAVID SCOLLINS, individually and on
7   behalf of BOTTOM LINE ADVERTISING, a
8   sole proprietorship,
9                 Plaintiff
10  v.
11  SENTIENT, f/k/a eBizJets, a Delaware
12  corporation,
13                 Defendant
14       - - - - - - - - - - - - - - - - - - - - - - - - - - -
15           DEPOSITION OF JOHN WILLIAMS
16        Thursday, July 15, 2004, 10:52 a.m.
17        Sullivan Weinstein & McQuay, P.C.
18                 Two Park Plaza
19              Boston, Massachusetts
20       - - - - - - -Reporter:  Susan J. Blatt, RPR- - - - - - -
21              Farmer Arsenault Brock LLC
22           50 Congress Street, Suite 415
23            Boston, Massachusetts 02109
24            617.728.4404   fax 617.728.4403

2

```
 1    APPEARANCES:
 2    The Parker Law Firm
 3        John D. Parker, II, Esq.
 4        141 East Palm Lane, Suite 111
 5        Phoenix, Arizona 85004
 6        602.257.8100  Fax: 602.257.8110
 7        jparker@ptlaw.net
 8        for Plaintiff
 9
10    Sullivan Weinstein & McQuay, P.C.
11        Max C. Perlman, Esq.
12        Two Park Plaza
13        Suite 610
14        Boston, Massachusetts  02116-3902
15        617.348.4300  Fax: 617.348.4343
16        max@swmlawyers.com
17        for Defendant
18
19    Also Present:
20        Donald Scollins
21
22
23
24
```

3

1              P R O C E E D I N G S

2                JOHN WILLIAMS, sworn

3                   EXAMINATION

4    BY MR. PARKER:

5         Q.   Would you state your name for the record.

6         A.   John Williams.

7         Q.   Mr. Williams, what's your address?

8         A.   71 Arborway, Jamaica Plain, Massachusetts

9    02130.

10        Q.   What's your birth date?

11        A.   January 7, 1954.

12        Q.   Have you ever been deposed before?

13        A.   I have.

14        Q.   How many times?

15        A.   I only recall once.

16        Q.   Do you remember the name of the case your

17   deposition was taken in?

18        A.   No.

19        Q.   Do you remember the general issues that

20   were involved?

21        A.   It was a commercial case.  It was some time

22   ago.

23        Q.   Was it -- were you working for the eBiz

24   people at that time?

FARMER ARSENAULT BROCK LLC

1      A.   I didn't, that I can recall.

2      Q.   Did you ever have a meeting with Mr.

3   Scollins and discuss the ad placements that he was

4   doing for the company?

5      A.   I'm sorry.  In your previous question --

6   could you restate the question you just asked me?

7           MR. PERLMAN:  Do you want to have it

8   read back, is that what you want?

9           (Read back.)

10     A.   No I don't believe I ever inquired as to

11  that, no.

12     Q.   Did it ever come to your intention that he

13  may be placing ads through a separate company?

14     A.   Yes, it did.

15     Q.   When did that happen?

16     A.   I believe very much later than when I first

17  joined the company.  I don't recall precisely when,

18  but a substantial period thereafter.

19     Q.   Would it have been before he was

20  terminated?

21     A.   I believe so.  But I don't know how long

22  before.

23     Q.   How did it come to your attention?

24     A.   I don't recall.  It may have been through a

25

1          A.    He would from time to time review proposed
2     advertising with me for my approval, reaction to it,
3     my judgment as to how effective it would be.  He
4     would discuss with me the placement of where we
5     would place our advertising and the frequency of
6     that advertising.
7          Q.    When you first joined the company, what
8     types of advertising was the company engaged in?
9          A.    I believe, if memory serves, largely print
10    advertisements and directory advertisements.
11         Q.    Do you know who was placing the print
12    advertisements for the company at that time?
13         A.    At the time I first joined the company, I
14    believe it was Mr. Scollins.
15         Q.    What about the directory advertising?
16         A.    I believe that was done by Mr. Scollins as
17    well.
18         Q.    Was it your understanding that Mr. Scollins
19    was placing these ads as a part of his general
20    duties and responsibilities as an employee of the
21    company?
22         A.    Yes.
23         Q.    So did you ever inquire as to whether or
24    not he was doing it through a separate company?

32

1  ad agency?

2      A.   I don't remember any specific meetings to

3  that effect.  No, I don't remember specific meetings

4  where we discussed that.

5      Q.   Do you recall a specific conversation that

6  might have taken place about his placing ads through

7  his own ad agency?

8      A.   As I said, when I first joined the company,

9  I was aware he was placing print and directory ads

10  at that time, so I was aware from that time that he

11  was placing ads.  At some time after that I hired a

12  vice president of marketing who was responsible

13  directly for the creation and placement of ads, and

14  I had no direct involvement at a tactical level with

15  that activity.

16      Q.   Who was the person you hired?

17      A.   Steve Morton.

18      Q.   Do you know if Mr. Morton is still with the

19  company?

20      A.   I do not know.

21      Q.   Now, going back to when you became aware

22  that Mr. Scollins was placing ads for the company,

23  did you ever ask about whether he was getting paid

24  to do that?

1     MR. PERLMAN:  Objection.

2     A.   No, I haven't spent much time thinking

3  about the general idea of nepotism.

4     Q.   As the CEO of eBizJets did you have the

5  opportunity to observe Mr. Scollins during business

6  hours, working during business hours?

7     A.   Yes, I did.

8     Q.   What did you think of his job performance?

9     A.   I thought it had its pros and cons, there

10  were pros and cons about his job performance.

11     Q.   What were the pros for you?

12     A.   I thought Mr. Scollins put in long hours.

13  I thought he -- he worked both in the office and in

14  his home on behalf of the company with very long

15  hours.

16     Q.   What were some of the cons?

17     A.   He, Mr. Scollins had a chronic issue with

18  paperwork and procedure.

19     Q.   What was that chronic issue?

20     A.   His paperwork was often late and incomplete

21  or had accuracy issues, particularly with regard to

22  the, what we refer to as folders that needed to be

23  delivered to accounting for billing and

24  recordkeeping purposes.

36

1    Q.   I'll preface my question by saying I have

2    an accounting background and I would probably know

3    what the answer to this would be, but for purposes

4    of the record, what would be the impact of

5    submitting these folders late?  What would be the

6    negative impact, I should say?

7    A.   The negative impact of lateness was a

8    dramatic impact on the workload of the people in the

9    accounting department.  People in the accounting

10   department frequently complained to me about Mr.

11   Scollins' work with respect to the folders and the

12   paperwork associated with his bookings of flights

13   and his responsibilities and frequently came to me

14   to complain about his failures in that aspect of his

15   responsibilities.

16   Q.   What people in accounting complained to

17   you, do you remember who they were?

18   A.   I do.

19   Q.   Who were they?

20   A.   Bob Herlihy, Janet Vye, and Donna McEvoy.

21   Q.   Do you recall whether these people ever

22   brought their complaints to the -- let me back up a

23   little bit.  Did eBizJets have a human resources

24   department?

48

1    my own initiative or at the initiative -- or

2    suggested by other senior executives in the company,

3    so I don't recall precisely.

4        Q.   Was it based on any personal observations

5    of Mr. Scollins' job performance during the

6    September 11 crisis?

7        A.   The whole company rallied to work at an

8    extra level of diligence and long hours.  In the

9    wake of the tragedy of September 11th, we had a

10   surge in volume as our clients and people who had

11   never flown with us turned to eBizJets as an

12   alternative to the commercial airlines, so our

13   volume went up to an unprecedented, then-

14   unprecedented level.  We called upon all our

15   employees across the board to make themselves

16   available on nights, on weekends for an extended

17   period.  This letter is dated September 19th, so

18   it's obviously eight days following the tragic

19   events of September 11th.

20       Q.   Do you remember whether there was a uniform

21   award of -- in Don's case he received a thousand

22   stock options.  Were the numbers of options awarded

23   to other employees that received a similar letter,

24   were they identical?

51

1  I saw.

2      Q.   About the second sentence up from the

3  bottom, it says that -- second or third sentence, I

4  should say, "I didn't come out here to put my entire

5  life on hold while I dedicate it to this business

6  only to see all the hard work and expected windfall

7  to go out the window."  Do you know what Mr.

8  Scollins would have meant by "expected windfall"?

9          MR. PERLMAN:  Objection.  Do you want

10  him to guess what Mr. Scollins was thinking about.

11          MR. PARKER:  No.  That's not a fair

12  question.

13          MR. PERLMAN:  Or speculate?

14      Q.   Did you ever talk to Mr. Scollins about

15  this e-mail?

16      A.   I may have.  I don't recall.

17      Q.   To the best of your recollection, was Mr.

18  Scollins still performing his job satisfactorily

19  into the fall of 2001, in your view?

20      A.   In my view, by November of 2001, no.

21      Q.   Why not?

22      A.   Well, I've already referenced the chronic

23  issues with accounting.  Those had not improved.  I

24  had reviewed those issues with Mr. Scollins on more

52

1   than one occasion, on multiple occasions, both

2   individually with him and jointly between him and

3   the individuals within the accounting department.

4   At various times that being Janet Vye and at various

5   just times Bob Herlihy, and in some cases, both of

6   them.

7            There were other issues of performance

8   that were of concern to me.  Mr. Scollins'

9   performance, that is.  Specifically with regard to

10  the -- what we refer to as the flight calendar.  The

11  flight calendar was a document, a system that

12  eBizJets developed over time as a control tool with

13  which we managed the increasingly complex schedule

14  of flights that we needed to deliver to our

15  customers as our business grew.  From day to day the

16  number of flights grew from only about a half a

17  dozen a day to upwards of 20, sometimes even over 30

18  flights a day as I can recall.  So it became a very

19  complicated process, because each one of these

20  flights on average, if memory serves, involved

21  amounts of money, for example, of in excess of

22  $10,000 on average per flight.

23            These were considerable obligations we

24  had to our customers to fulfill their expectations,

FARMER ARSENAULT BROCK LLC

53

1    and we needed a process by which to manage it.  We

2    used the flight calendar in the operational review

3    meetings that I was describing before.  One of the

4    metrics for delivering quality service to our

5    customers was to be able to resolve the issue of

6    which particular carrier and which particular

7    aircraft was going to be assigned to and used to

8    perform a particular flight.  And that would be

9    indicated on the calendar by referencing its tail

10   number, the name of the carrier, and changing the

11   color of that item on the calendar to a particular

12   color.  I can't remember.  I think it may have been

13   green when those flights were all set, if I can use

14   that term.

15        Mr. Scollins had a tendency over time to

16   want to wait or to -- I don't know if he wanted to,

17   but to in fact not resolve the issue of which

18   carrier and which particular plane would be assigned

19   to a flight until a period of time so close to the

20   scheduled departure time that it could result in

21   customer service issues for us.  Specifically, we

22   needed to notify our customers as to what specific

23   aircraft they could expect to be meeting at their

24   departure points so they could put -- usually their

54

1   assistant could put that in their itinerary, and

2   they could make plans for ground transportation and

3   other arrangements they needed to do.  Our

4   commitment was to be able to tell our customers that

5   tail number, if you will, by 24 hours, no later than

6   24 hours before the scheduled departure time.

7           We also had catering issues where we

8   needed to be able to schedule the food and beverage

9   catering arrangements that needed to be placed on a

10  particular aircraft.  We needed to make those

11  arrangements and the individuals in the command

12  center who were charged with that responsibility

13  needed a certain amount of lead time to be able to

14  make those arrangements.

15          So they relied on having a finalized

16  calendar some appropriate amount of time in advance.

17  As best I can recall, I set that time at -- that

18  metric at 48 hours in advance of the departure time.

19  That's my best recollection of when I established

20  our policy should be for having those flights all

21  set up properly from the carrier operations division

22  or department that Don worked in.  We frequently

23  would come into the operations, review meetings and

24  see flights on the calendar within the 48-hour

FARMER ARSENAULT BROCK LLC

55

1    period that Don or people under whom -- people Don

2    was directing, Mr. Scollins was directing, where

3    those flights had not been established in the way

4    I've just described, within the 48-hour period.

5                I repeatedly fed back my concern to Mr.

6    Scollins about this over time, and it continued to

7    be an issue.  It would continue to be an issue about

8    which I was concerned with his performance.

9        Q.   So you got specific complaints from your

10   clients?

11       A.   I got -- no, the client would not know that

12   Mr. Scollins had done something or not done

13   something.  But our internal quality metric was to

14   have these flights assigned to the extent possible.

15   Because sometimes customers would book within the

16   48-hour period, but to the extent possible to assign

17   aircraft and have appropriate paperwork all signed

18   by the carrier and into accounting by 48 hours

19   before the -- no later than 48 hours before the

20   departure time.

21               It also came to my attention that -- and

22   I can't remember who, but more than one employee

23   brought to my attention that from time to time the

24   calendar had been -- that a flight had been

FARMER ARSENAULT BROCK LLC

56

1    indicated to have been fully solved and had been

2    changed to the green color when in fact in reality

3    it had not been.  And that was something that was of

4    great concern to me.

5         Q.  Did you sit down with Mr. Scollins and

6    raise these concerns with him personally?

7         A.  I certainly raised the 48-hour concern with

8    him on multiple occasions at every week -- every

9    meeting where this occurred, it got raised by me.  I

10   raised it with Mr. Scollins.

11        Q.  Do you remember when these meetings took

12   place?

13        A.  They took place on a regular basis.  My

14   best recollection is that they occurred weekly.  I

15   remember bringing Dunkin' Donuts bagels to the

16   meeting and furnishing them for Don.  I don't recall

17   what his favorite was, but I knew at the time what

18   his favorite kind of bagel was, and cream cheese.

19   And we met in these meetings on a regular basis, and

20   Don was certainly aware of my expectation for the

21   timely performance of his duties in assigning --

22   procuring and assigning aircraft to these flights on

23   a timely basis.

24        Q.  Were these concerns that you're talking

FARMER ARSENAULT BROCK LLC

57

1    about, did they occur before the granting of stock

2    options in September of 2001?

3        A.    They did.    The special award of stock

4    options in 2001 was specifically related to the

5    events coming out of those tragic events on

6    September 11, 2001.    And as I say, they went -- that

7    award went to I think in excess of a dozen

8    employees.    It may have been in excess of 15.    But I

9    don't recall the employees number.    But it was, that

10   period was an all-hands-on-deck period, and we

11   rewarded people for their extraordinary effort in

12   the immediate aftermath of the terrorist activities

13   on September 11, 2001.

14       Q.    Do you recall about when it was decided to

15   terminate Don?

16       A.    I reached the conclusion that we needed to

17   reach a termination in November of 2001.

18       Q.    Was that your decision alone?

19       A.    It was my decision, yes.    It was my

20   decision ultimately.    I was the decision-maker.

21       Q.    I know that was quite some time ago.    Can

22   you tell me procedurally how you went about

23   effectuating the termination?

24       A.    Well, I asked Don Scollins to come to my

58

1    office at eBizJets, and our HR person, Carol

2    Caliendo, was there.  I discussed with Don my

3    disappointment with his performance in some of the

4    respects I've just enumerated.  I also brought to

5    his attention that it had come to my -- brought to

6    his attention it had come to my attention that he

7    had, had in direct and blatant disregard of a

8    written policy I had issued in early November about

9    not taking any gratuities -- gratuitous -- free or

10   discounted flights by any of the carriers we did

11   business with, that it had come to my attention that

12   Don had done just that, had taken a free or -- I

13   believe a free flight from either Scottsdale or

14   Phoenix to Las Vegas on an aircraft operated by one

15   of our carriers, and that was something told to me

16   directly by the carrier.

17       Q.   Didn't you institute this policy against

18   free rides when Don was on vacation?

19       A.   No.  Don was in the office at the time.  To

20   the best of my recollection, Don was in the command

21   center at the time.

22       Q.   How would this have been communicated to

23   him?

24       A.   I sent an e-mail to all employees in the

FARMER ARSENAULT BROCK LLC