IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

DONALD SCOLLINS, individually and on behalf of )
BOTTOM LINE ADVERTISING, a sole )   Civil Action No. 03-12478-EFH
proprietorship, )
)
               Plaintiff, )
)
v. )
)
SENTIENT, fka eBizJets, )
)
               Defendant. )
)

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiff, Donald Scollins ("Plaintiff" or "Scollins"), submits this Memorandum of Law in Support of Plaintiff's Response to Defendant's Motion for Partial Summary Judgment.

For the most part, the material facts in this case are not in dispute. Plaintiff Donald Scollins ("Scollins") worked for Defendant as an "at-will" employee. When Scollins first started working for Defendant, it was a small "start up" company, with only six employees. To build its business, Defendant decided to advertise in *The Wall Street Journal*. As a start up, however, *The Wall Street Journal* required Defendant to pay 15% more in advertising costs than established companies, unless it placed the ads through an "accredited" advertising

agency. (Statement of Facts in Support of Plaintiff's Motion for Partial Summary Judgment ("SOF"), ¶¶ 4-5; Scollins' Declaration ("Scollins' Decl., ¶¶ 4-5.)

Scollins had an accredited advertising agency, and he agreed to allow Defendant to place advertising pieces with *The Wall Street Journal*, through his advertising agency, Bottom Line Advertising. By using Bottom Line, Defendant realized a 15% savings on its advertising costs. (SOF, ¶ 5; Scollins' Decl., ¶ 5.)

Scollins expected he would be paid this 15% savings, as deferred compensation, when Defendant was sold, or his employment ended, whichever came first, because that is what Defendant's former president, Jeff Creed, told him ("Advertising Placement Agreement".) Scollins made it clear he expected to be paid for allowing Defendant to use his advertising agency, and Creed told Scollins he "would work something out." (Scollins' Decl., ¶¶ 11-12; SOF, ¶ 11-12.)

The actual amount of the cost savings was easily determined by resorting to *The Wall Street Journal*'s billing records. (Scollins' Decl., ¶ 13; Exh. 1; SOF, ¶ 13.)

On September 19, 2001, eBizJets then-Chief Executive Officer, John Williams ("Williams), informed Scollins that Williams was recommending to the Board of Directors of eBizJets that Scollins, among others, receive 1,000 additional stock options, and the Board of Directors approved such recommendation. (Second Supplemental Declaration of Donald Scollins ("Second Supp. Decl."), ¶ 16; Exh. 6; SSOF, ¶ 27; Scollins' Decl., ¶ 16; Exh. 2; SOF, ¶ 16.)

Scollins signed a contract setting forth the terms and conditions under which he could exercise those options. (Scollins' Decl., ¶ 15; Exh. 3; SOF, ¶ 15.)

In November 2001, Scollins was fired. He was told at that time he was being fired "without cause." At the time, Defendant acknowledged it knew Scollins "owns or controls an entity that has done advertising business with the Company." Defendant offered Scollins a Mutual Termination Agreement, that included a severance package, which Scollins declined to accept, but he continued to negotiate with Defendant as to the financial terms

and conditions of his separation. (Second Supp. Decl., ¶24; Exh. 7; SSOF, ¶28; Scollins' Decl., ¶¶ 17-18; SOF, ¶¶ 20-21.)

During that negotiation period, Scollins refrained from exercising his vested stock options, because Creed and Earle Cooley, who were on Defendant's Board of Directors, assured Scollins that Defendant would in good faith resolve all outstanding issues concerning severance pay, Bottom Line Advertising money, and his vested stock options. (Second Supp. Decl., ¶ 25; Exh. 8.)

On January 15, 2002, Defendant told him he was being terminated *for cause*. Scollins has never been told why his termination was changed from "without cause" to "cause."

Now, Defendant claims that Plaintiff Donald Scollins' Wage Act claim should be denied because (1) stock options are not recoverable under the Wage Act; and (2) the claim is time-barred. Based on the articulated purpose of the Wage Act, and the undisputed facts in this case, Scollins' stock options are "wages." Also, per the Massachusetts Attorney General's *Advisory 98/2*, and *Bowen v. Eli Lilly & Co., Inc.*, 408 Mass. 204, 205 (1990), Scollins claim survives because he did not discover or reasonably discover his Wage Act claim until July 15, 2004, the day Defendant's former chief executive officer, John I. Williams, was deposed and testified that the stock options that were wrongfully denied Scollins were to compensate him for his job performance.

Defendant also moves for dismissal of Scollins' breach of contract claim, and breach of the covenant of good faith and fair dealing, because the material terms were too indefinite to form a valid contract. That is simply not true. At the very least, there are fact issues with respect to the terms of the contract, which preclude summary judgment.

. . .

. . .

. . .

. . .

## LEGAL ARGUMENT

**I. Count IV Survives Because (A) Stock Options are "Wages" in this Case; (B) Scollins' Stock Options Were Not "Triggered by Contingencies"; and (c) Count IV is Not Time Barred.**

### A. *Under the Facts of This Case, Scollins Stock Options Are "Wages."*

The parties agree that the purpose of Massachusetts' Wage Act is to ensure timely payment to employees of money owed for work completed and to protect wage earners from the long-term detention of wages by unscrupulous employers. *Cumpata v. Blue Cross Blue Shield of Massachusetts, Inc.*, 113 F. Supp. 2d 164-167-68 (D. Mass. 2000) (Young, J.) The undisputed evidence clearly shows that (a) Scollins stock options were "money owed for work completed" and Scollins qualifies as a worker that needed protection from Defendant's "unscrupulous" conduct.

Recall that Defendant's former chief executive officer, John Williams, characterized Scollins' stock options as "part of an overall compensation program that the company instituted for its employees." (Scollins' SOF ¶ 19). This is further evidenced by two documents - - Mr. Williams' November 27, 2000 memorandum to Scollins that accompanied the grant of 280,412 shares of stock "in recognition of [Scollins'] *outstanding performance*" (emphasis supplied) (Exhibit 2 to Scollins' Supplemental Declaration ("Supp. Decl.") filed Oct. 7), and Mr. Williams' September 19, 2001 letter to Scollins, where he awarded Scollins 1,000 stock options for his efforts following the September 11, 2001 terrorist attacks. (Second Supp. Decl., ¶ 16; Exh. 6; Supp. Decl., ¶ 5; Scollins' Decl., ¶ 14.) Clearly, Scollins' stock options were, by Defendant's own admission, meant to compensate him for "a job well done" and therefore his stock options *in this case* were "for work completed."

Moreover, in handing Scollins' stock options, the undisputed facts show Defendant has proven itself to be "unscrupulous." Scollins does not dispute Defendant's right to fire him for cause, without cause, or for any lawful reason. However, after it informed Scollins it was firing him without cause, it lulled him into believing it would negotiate his separation

(including the disposition of his stock options) in good faith. Then, nearly two months later, without any explanation *to this day*, changed his termination from "without cause" to "cause." Finally, to add insult to injury, it did not notify him of its "about face" until 5:20 p.m., twenty minutes *after* his stock options expired!

Nevertheless, Defendant contends that Scollins' stock options are not wages because the Wage Act does not cover compensation "triggered by contingencies." Had Defendant maintained Scollins was terminated *without cause* to this day, the *Wessling* and *Kunzi* decisions cited by defendant might well control the issue. The fact that Defendant changed Scollins' termination to *cause* also changes, as a matter of fact and law, his compensation from a contingent to a fixed obligation.

At first glance, Defendant may argue that Scollins' termination for cause is akin to the *Weir* case it cited but, unlike the plaintiff in *Weir* whose options automatically terminated when the plaintiff was terminated for cause, Scollins' options did not immediately terminate. Section 4(a)(v) of the Stock Option Agreement gave Scollins until 5:00 p.m. the day of his termination to exercise his options. Even if Defendant had communicated to Scollins he was being fired for cause at 4:59 p.m., he still would have had a narrow time frame within which to exercise his options.

This distinction is critical because on January 15, 2002, Scollins' stock options had a determinable, calculable value. What Defendant did here was (a) make Scollins' termination effective at the same time his options expired; and (b) keep Scollins from exercising his right to exercise these options, by delivering the termination letter late, thus denying him compensation (the value of the options) for work already performed. Thus, even though Scollins has never been informed of the alleged reasons he was fired for cause, he is excused from his alleged non-performance as a matter of law because Defendant failed to timely deliver notice that he was being fired for cause, thus denying him his right to exercise his stock options. *See Fortune v. National Cash Register Co.*, 364 N.E.2d 1251, 1258-59 (Mass. 1977) (Abrams, J.)

Along these same lines, the *Baptista* decision cited by Defendant is distinguishable because the *Baptista* court analyzed contingent compensation ("The distinction between assured and contingent compensation is a sound one.") *Baptista*, 1996 WL 33340740 at p. 3. But *Baptista* is also distinguishable *on its facts*. Judge Stearns observed:

> There is no reason to extend the protections of a wage earner's statute to cover bonuses potentially owing to highly paid executives, who were confident enough to resign their employment if their demands for accelerated (and contingent) stocks options were not met. There is even less reason to extend the opportunity to collect "treble damages for any loss of wages and other benefits ... [and] an award of the costs of the litigation and reasonable attorney fees. [statutory citation omitted]. *Id.*

Here, Scollins did not resign. He was fired. In fact, he was fired in such a way that it became *impossible* for him to exercise his stock options, the value of which became *fixed* on the day his termination was changed from "without cause" to "cause." Thus, there is every reason for this Court to (a) find his options were "wages" within the meaning of the Wage Act; and (b) award him treble damages, costs and attorney fees for prosecuting his Wage Act claim.

### B.   *Scollins' Wage Act Claim is Not Time Barred.*

In Massachusetts, a cause of action accrues when a plaintiff has (1) knowledge or sufficient notice that he was harmed; and (2) knowledge or sufficient notice of what the cause of harm was. *Bowen v. Eli Lilly & Co., Inc.*, 408 Mass. 204, 205 (1990). While Scollins knew, back in January 2002, he had been fired (i.e. the cause of harm) he had no way to know that his stock options might be "wages" within the meaning of the Wage Act.

Scollins is not an attorney. As Defendant concedes, the term "wages" is not defined in the Wage Act. Thus, Scollins cannot be held to a standard of knowing that Defendant's wrongful denial of his stock options constituted a claim under the Wage Act. *See e.g. Riley v. Presnell*, 409 Mass. 239, 245-46 (1991) (Nolan, J.) (only if a reasonable person in the plaintiff's position would have been able to discern the harm or cause of harm will the cause of action accrue and the limitations period begin to run).

At a minimum, the statute of limitations began to run on July 15, 2004, when Defendant's former chief executive officer, John Williams, testified that Scollins' stock options were meant to compensate him for his job performance.

Assuming the period began to run January 15, 2002, the date Scollins was fired for cause, Scollins' wage claim is very similar to the situation presented in *Nett v. Bellucci* (cited in Defendant's supporting memorandum). Here, the Court granted leave for Scollins to file his First Amended Complaint (without any opposition having been filed by Defendant to the motion) on December 28, 2004, eighteen days before the statute might have run. Thus, even though Scollins' Wage Act claim may have suffered from a "procedural defect," the Court accepted the pleading well before the January 15, 2005 cutoff Defendant proposes.

Defendant's motion to dismiss Count IV should be denied.

## II. There Are Fact Issues As to Whether the Terms of the Advertising Placement Agreement Between Scollins and Defendant were "Indefinite" and "Vague."

Defendant contends that the Advertising Placement Agreement fails on its essential terms. Deposition testimony from Defendant's former president, Jeff Creed, plus other documentary evidence in this case, demonstrates otherwise.

First, there is no question that an agreement was formed as is evidenced by the following deposition testimony:

**Examination of Jeff Creed:**

> Q. Prior to Credit Suisse coming into the company, had you reached an agreement with Mr. Scollins about him being paid for advertising services?
>
> A. I reached an agreement that he'd get paid, but not to what amount.

*(Creed Deposition ("Creed Depo."), 5-25-05, Pg. 75-76.)*

\* \* \* \* \* \* \* \* \* \* \*\*

> Q. And not only is there not a written agreement, but there's also no reference, to your knowledge, to this alleged agreement between Mr. Scollins and eBizJets in papers?
>
> A. Not that I'm aware of.
>
> Q. Okay.

7

> A. Nor is there any agreements, written or oral, that my guys would get raises; but I think that was understood, they would get raises. I think also in the documents it doesn't say that they were going to get more than the $300 or $400 or $500 a week they were getting, but it was sure understood that three guys weren't going to just stay at that pay structure. So its really very ambiguous, Max, to really say that. I can only tell you what the truth is. The truth is, there was a deal. And I am being straightforward. I could come out and say it was 15, it was 20 percent. I am not going to lie. It wasn't. But there was a deal there, and that's the honest-to-God truth.

*(Creed Depo., 5-25-05, Pg. 116-117.)*

\* \* \* \* \* \* \* \* \* \* \*\*

> Q. I'm only asking you about the conversations. I want to know, did you negotiate this agreement with Mr. Scollins?
>
> A. I mean, I negotiated it by - - it's like someone saying, "I want a raise." It's like someone coming to you, Max, in your firm saying, "Look, can you give me a raise?" "Yeah, we'll talk about it next month. I'm going to work something out for you."

*(Creed Depo., 5-25-05, Pg. 80.)*

\* \* \* \* \* \* \* \* \* \* \*\*

Second, the Agreement was formed at a particular time, i.e. when Bottom Line Advertising first placed ads with *The Wall Street Journal*:

> Q. When were the conversations between you and Mr. Scollins that you would contend would have been the negotiations for the agreement regarding advertising services?
>
> A. I would say they would have started around the placement of the first ad, right through the merger with the bank and talking about "can we get more."

*(Creed Depo., 5-25-05, Pg. 80.)*

\* \* \* \* \* \* \* \* \* \* \*\*

Third, the parties discussed how Bottom Line Advertising would be paid. Scollins wanted to be paid in cash:

> Q. Did you discuss how the company would compensate Bottom Line Advertising for its services?
>
> A. Donny was always looking for money.

*(Creed Depo., 5-25-05, Pg. 24.)*

8

\* \* \* \* \* \* \* \* \* \* \*\*

Q.   Okay. Did Don ever ask you whether Bottom Line Advertising would be compensated for the advertising services?

A.   All the time. Don always wanted money.

*(Creed Depo., 5-25-05, Pg. 33.)*

\* \* \* \* \* \* \* \* \* \* \*\*

Q.   And do you know when those conversations- - strike that. Was that one conversation you had with Mr. Scollins, or was it a series of conversations you had with Mr. Scollins?

A.   It happened all the time.

Q.   Okay.

A.   He was always looking for money.

*(Creed Depo., Pg. 79.)*

\* \* \* \* \* \* \* \* \* \* \*\*

Q.   Right. Do you remember specifically any of the conversations that you contend led to the agreement between eBizJets and Mr. Scollins regarding advertising compensation?

A.   Max, it was ongoing. I mean, this fight- - you could say this was probably one of the bigger ones, where he really wanted the money.

*(Creed Depo., Pg. 81.)*

\* \* \* \* \* \* \* \* \* \* \*\*

The payment to Bottom Line Advertising was to be made as deferred compensation:

Q.   Next representation: "To the actual knowledge of the company, no employee, stockholder, officer, director or consultant of the company or member of his or her immediate family has any direct ownership - -any direct or indirect ownership interest in any firm or corporation with which the company is affiliated or with which the company has a business relationship, or any firm or corporation that competes with the company's business except stock ownership by employees, officers, or directors of the company and members of their immediate families and publicly traded companies."

Sir, was that representation true as of June 7, 2000?

A.   I would say it was partially true, yes.

Q.   And it was partially false?

A.   Partially false. Partially true and probably partially false.

9

>    Q.    Can you tell me what was partially false about this particular representation?
>
>    A.    Yes, because at that time the company was being saved 15 percent. At that time the company was being saved money. It wasn't costing the company any money. It was being saved at that point for future reimbursement to be paid for Don's advertising agency, as well as my other employees that they said they would take care of.

*(Creed Depo., 5-25-05, Pg. 87-88.)*

Creed's testimony in this regard raises material fact issues precluding summary judgment, because even though he did not have a specific figure in mind to pay Scollins, he knew Scollins wanted 15 percent of the savings realized by using his ad agency:

>    Q.    Your testimony is you agreed to give him something, right?
>
>    A.    Yes.
>
>    Q.    But the something was undefined?
>
>    A.    That's correct. I know what he wanted.
>
>    Q.    How do you know what he wanted?
>
>    A.    Because he wanted the 15 percent. I know what he wanted.
>
>    Q.    Yeah, he wanted the maximum amount he could get?
>
>    A.    Of course.

*(Creed Depo., 5-25-05, Pg. 128.)*

The point here is that, contrary to Defendant's assertions, there was a "meeting of the minds." Creed wanted to save 15% in advertising costs for his company, and Scollins' advertising agency was willing and able to provide its services to facilitate that savings. Creed knew that this was not a gratuitous transaction, that Scollins expected to be paid the 15% savings realized by Defendant "down the road," when Defendant was sold or Scollins left the company, whichever came first. Unfortunately for Scollins, the latter scenario came into fruition, but Defendant never made good on its obligation to pay.

Our case is distinguishable from *Held v. Zamparelli* and *Catex Vitol Gas, Inc. v. Wolfe*, cases cited by Defendant in its supporting memorandum. Unlike both matters, the amount

that Scollins was to be paid is easily calculable. Scollins wanted cash, and Creed knew this. If Defendant had no intent on paying Scollins, it could have stopped placing ads through Bottom Line. Instead, it used the Bottom Line Advertising moniker to place ads with *The Wall Street Journal*, even after Scollins got too busy to be involved in advertising activities.

Similarly, unlike the *Ross v. Raytheon* and *Armstrong v. Rohm & Haas Co., Inc.* cases, where the plaintiff in *Ross* sought to enforce a promise to provide him "an unspecified position on unspecified terms" and in *Armstrong* the plaintiff wanted "all the work" they could handle, Scollins' role with Bottom Line Advertising was explicitly understood by everyone involved:

**Examination of Donald Scollins:**

Q. Wasn't it your job to interface with the *Wall Street Journal* on issues like this?

A. It was my job to place the advertising, insertion orders, and save the company the money. That was my job.

Q. That was the - -

A. And I had some input on content, but no the ultimate say.

Q. Does that fully describe your duties regarding the advertising?

A. At this point in time, I would say yes.

*(Deposition of Donald Scollins ("Scollins' Depo., Pg. 317.)*

The "bottom line" here is that, despite the fact that no specific percentage was agreed upon, Defendant knew what Scollins wanted, and accepted the services without protest. Moreover, the exact amount of the benefit can be calculated from *The Wall Street Journal*'s records. Thus, unlike the cases cited by Defendant, this Court need not write the parties' agreement, but simply enforce the agreement formed by the parties' conduct.

Count I should not be dismissed.

### III. Scollins' Claim for Breach of the Covenant of Good Faith and Fair Dealing Should Not Be Dismissed.

Parties to contracts and commercial transactions must act in good faith toward one another. *Fortune v. NCR*, 373 Mass. 96, 102 (1977) (Abrams, J.) In *Fortune*, the

Massachusetts Supreme Court held that the covenant of good faith and fair dealing is violated when an employer terminates an at-will employee without good cause and deprives the employee of a clearly identifiable future compensation reflective of the employee's past services. *Fortune*, 373 Mass. at 104-05.

Here, Defendant had a duty to act in good faith in two contracts: the Advertising Placement Agreement, and the Stock Option Agreement. In both instances, Defendant violated the covenant.

First, with respect to the Advertising Placement Agreement, it failed to pay Scollins the 15% savings, or any of the savings, realized by the company by using Bottom Line Advertising. Mr. Creed has testified that Defendant was supposed to pay Scollins something for use of his advertising business. After it fired Scollins, it reneged on its agreement with him, causing damage.

Second, Defendant has never articulated the reasons why it fired Scollins for cause. Then, to make matters worse, it did not notify Scollins he was fired for cause until *after* his stock options had expired. Under these circumstances, Scollins' termination for cause deprived him of clearly identifiable benefits, i.e. his stock options.

This claim should not be dismissed.

## CONCLUSION.

Based on the foregoing, the Court should deny Defendant's motion for partial summary judgment.

Plaintiff Donald Scollins, by his attorneys,

John D. Parker, II, *Pro Hac Vice*
Anthony E. Young, *Pro Hac Vice*
141 E. Palm Lane, Suite 111
Phoenix, AZ 85082-3098

-and-

Edward C. Cooley, BBO #550117
GIARRUSSO, NORTON, COOLEY, ET. AL.
308 Victory Road
Quincy, MA. 02171
Attorneys for Plaintiff Donald Scollins

## CERTIFICATE OF SERVICE

I, John D. Parker, II, hereby certify that on this 14th day of October, 2005, I caused copies of **PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS RESPONSE TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT, PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT, SEPARATE STATEMENT OF FACTS, AND SECOND SUPPLEMENTAL DECLARATION OF FACTS OF DONALD SCOLLINS** to be served by first-class mail, postage pre-paid addressed to Max C. Perlman, Esq., Sullivan, Weinstein & McQuay, P.C., Two Park Plaza, Suite 610, Boston, MA 02116-3902 (Attorneys for Defendant).

John D. Parker, II

K:\978\021377\memo of law responding to Sentient's MPSJ