UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DONALD SCOLLINS, individually and on behalf of BOTTOM LINE ADVERTISING, <br><br> Plaintiff, <br><br> vs. <br><br> SENTIENT, f/k/a eBizJets, <br><br> Defendant. | Civil Action No. 03-12478-EFH |

## JOINT PRETRIAL MEMORANDUM

Pursuant to the Court's Order, plaintiff Donald Scollins d/b/a individually and on behalf of Bottom Line Advertising ("Scollins"), and defendant Sentient, f/k/a eBizJets ("Sentient") submit this Joint Pretrial Memorandum.

**1.   CONCISE SUMMARY OF THE EVIDENCE**

   A.   Plaintiff's Summary of the Evidence

Scollins will offer the following evidence:

Sentient (the "Company") is in the jet charter business. Mr. Scollins was a director of charter operations and one of six original employees of the Company. Back in 2000, when the company was in its start-up phase, its then-president, Joseph "Jeff" Creed, asked Scollins to allow the company to place advertising in *The Wall Street Journal* through Scollins' advertising agency, Bottom Line Advertising, so that the company could realize a 15% discount on its advertising costs. Per *The Wall Street Journal*'s internal guidelines, Defendant was required to

1

pay 15% more for its advertising than established companies, unless Defendant placed its advertising through an established agency.

From approximately September 1999 through December 2001, Defendant placed $2,406,791 in advertising in *The Wall Street Journal* through Bottom Line Advertising. By using Bottom Line Advertising during this timeframe, Defendant realized a cost savings of $361,018.60.

In November 2001, Scollins was told he was being fired without cause. When he was fired, he held 281,412 stock options at an exercise price of $0.50 per share. Defendant's then-chief executive officer, John I. Williams, presented Scollins with a "Mutual Termination Agreement" that Scollins declined to sign. Two months later, the company told Scollins by letter that he was being terminated "for cause." He did not receive this letter until 5:20 p.m., twenty minutes after his right to exercise his vested options had expired.

Defendant cancelled Scollins' stock options and did not pay Scollins any more money.

  B.  Defendant's Summary of the Evidence

Sentient will offer the following evidence:

Sentient Jets, Inc. ("Sentient"), formerly known as eBizJets.com, Inc., is a corporation that brokers charter jets for individuals and companies. Sentient was started in 1997 by Jeff Creed. Don Scollins, Creed's cousin and close friend, began working for Sentient in or about March 1999 as a charter representative. About three months later he became director of charter operations, a position he remained in until the termination of his employment. Throughout this time, he was a full-time, at-will employee of Sentient. At no time did Scollins have any employment contract with Sentient.

At some point in 1999, Creed decided that Sentient should begin to place advertisements in the Wall Street Journal. To save Sentient the 15% commissions, Creed instead asked Scollins to place the ads with the Wall Street Journal through the nominal advertising agency that Scollins had created in Arizona, d/b/a Bottom Line Advertising ("Bottom Line"). Scollins agreed to do so, and from approximately August 1999 to the end of 2000, he placed ads for Sentient with the Wall Street Journal at the discounted rate. The clear purpose of placing the ads through Bottom Line was so that Sentient could realize the 15% savings.

During the period of time that Scollins placed the Wall Street Journal ads, all the senior managers were working long hours and undertaking tasks beyond those in their narrow job description. For example Dan Underwood, who was Sentient's IT person, designed and performed computer work for Sentient's advertising, including the ads placed in the Wall Street Journal, in addition to the usual computer work he did for Sentient. Likewise, Creed initially attempted to place the Wall Street Journal ads himself and in fact placed ads with other publications for Sentient even though that was not in his job description.

Scollins and his cousin and close friend now claim that they entered into an oral contract whereby Sentient would compensate Scollins separately for placing the ads with the Wall Street Journal. Scollins himself cannot, however, get straight when this contract was formed, how it was formed, and what its terms are. He has told different stories on each of these aspects of the contract in his initial disclosures, his answers to interrogatories, and his two days of deposition testimony (including different stories on direct and cross examination.) Creed does not support Scollins's claims of a contract.

The short of it is that Creed never promised to pay Scollins the 15% savings or any amount for placing the ads with the Wall Street Journal, and there was never any agreement

3

between Sentient and Scollins that Sentient would pay Scollins for placing the ads, which he placed during his regular working hours, using telephone lines paid for by Sentient. In fact, the first time that the purported contract surfaced was after Credit Suisse purchased a significant percentage of Sentient's stock and Creed was no longer working at Sentient. Notably, Creed did not disclose this purported agreement as part of Credit Suisse's acquisition, as he was required to do if it actually existed, and instead signed the warranty that there were no undisclosed contracts of which he was aware. The contract, had it existed, would have had to have been disclosed at that point.

At best, according to Creed, he *hoped* to be able to compensate Scollins, along with the rest of the management, for all their hard work through the sale of the company. He in fact did this: Creed gave Scollins a $100,000 bonus in 2000. But Creed never *agreed* to pay Scollins anything special for the placement of ads through Bottom line, and Creed definitely never intended to pay Scollins the full amount of the discount that Sentient obtained by placing its ads through Scollins. In the same vein, Scollins *wanted* to be paid, but he had no reasonable expectation of it. Moreover, given that Scollins placed the ads during work hours on company property, he provided no benefit to Sentient other than the 15% savings, which redounded to Scollins's benefit when Sentient prospered and when Credit Suisse invested in Sentient.

Bottom The only business Bottom Line ever did was to place yellow pages ads for a strip club and three other small businesses in 1997 and 1998 in Arizona. During the time that Scollins placed Sentient's Wall Street Journal ads, Bottom Line did no business and acted merely as a pass-through for Sentient. It did not act as a typical advertising agency for Sentient. Scollins passed the invoices through to Sentient, which paid them directly (except for the first invoice or two), and Bottom Line did not incur any expenses in connection with the placement of Sentient's

4

advertising. Bottom Line did not even have a checking account during this time through which it could have paid for the ads. It likewise did not maintain any of the documents or files in connection with the advertising; Sentient did. Though Bottom Line nominally had a phone number, Sentient paid all the bills for that number from the time it was established in 1999 until shortly after Scollins ceased working for Sentient in November 2001. Scollins was the only "employee" of Bottom Line, which was not even registered to do business in Massachusetts until after Scollins ceased working for Sentient, and according to Scollins. Bottom Line did not perform any services for anyone else during or after Scollins's employment with Sentient.

In early 2000, Credit Suisse purchased a significant percentage of Sentient's stock. At some point after that sale, Scollins was granted stock options pursuant to a certain stock option agreement (the "Stock Option Agreement"). The "Stock Option Agreement" provided, among other things, that Scollins had to exercise his stock options within 30 days of ceasing to work for the company but that if his employment was terminated for cause, the stock options would terminate on his last day of employment.

Not long after Credit Suisse's stock purchase, Scollins ceased having any active role in the placement of the advertising with the Wall Street Journal. Instead, Steve Morton, whom Sentient hired in September 2000 to handle the advertising as a full-time job, began to place all of Sentient's advertising, including the Wall Street Journal ads. Once Mr. Morton was hired, Scollins's only role in connection with the Wall Street Journal ads was, for some brief period, to sign the insertion orders, which were still nominally being placed through Bottom Line. By about February 2001, though, Scollins ceased doing even that. When the agreement with the Wall Street Journal needed to be renewed in 2001, Mr. Morton, not Scollins, renewed it.

5

On November 23, 2001, Sentient terminated Scollins employment without cause. John Williams made the decision to terminate plaintiff's employment based on plaintiff's failure to conform to certain expectations and standards with regard to accounting documents and flight calendars and on the fact that plaintiff took a free flight with a carrier after Sentient had instituted a company policy prohibiting the taking of gratuities or freebies from companies with whom Sentient did business. Then CEO John Williams explained these reasons to Mr. Scollins in a meeting on November 23 and gave Scollins an opportunity to respond. His responses were not satisfactory. After further investigation, the Board of Directors determined that the termination was "for cause," and Scollins was notified of this on January 15, 2002. Scollins never attempt to exercise his stock options.

**2.    FACTS ESTABLISHED BY THE PLEADINGS, BY ADMISSIONS, OR BY STIPULATIONS**

A.    Sentient Jets, Inc. ("Sentient"), formerly known as eBizJets.com, Inc., is a corporation that brokers charter jets for individuals and companies.

B.    Sentient was started in 1997 by Jeff Creed.

C.    Don Scollins ("Scollins") began working for Sentient in or about March 1999 as a charter representative. He subsequently became director of charter operations, a position he remained in until the termination of his employment.

D.    Sentient paid Scollins a salary for his work.

E.    Creed decided that he wanted Sentient to advertise in The Wall Street Journal.

F.    From approximately August 1999 to the end of 2000, Scollins placed ads for Sentient with the Wall Street Journal at the discounted rate through Bottom Line Advertising.

G.    Sentient granted Scollins certain stock options during his employment.

H.    On November 23, 2001, Sentient terminated Scollins employment without cause.

  I. In January 2002, the Board of Directors changed the termination to "for cause," and Scollins was notified of this on January 15, 2002.

  J. Scollins's stock options were not exercised.

**3. CONTESTED ISSUES OF FACT**

Scollins and Sentient identify the following contested issues of fact:

  A. Whether Sentient ever agreed to pay Scollins a commission for the ads placed for Sentient with the Wall Street Journal through Bottom Line, and if so, what the contract terms are and whether Sentient breached the contract.

  B. Whether Sentient ever promised to engage in progressive discipline before terminating Scollins's employment, and if so, whether Sentient breached it.

  C. Whether Sentient wrongfully deprived Scollins of the right to exercise stock options.

  D. Whether Sentient had cause for terminating Scollins's employment.

  E. Whether Sentient violated any covenant of good faith and fair dealing in terminating Scollins's employment, not paying him a commission for the ads placed through Bottom Line, or depriving him of the opportunity to exercise his stock options by terminating his employment for cause.

  F. Whether Sentient received a benefit from the placement of the ads through Bottom Line, whether Sentient reasonably expected to compensate Scollins for the placement of the ads through Bottom Line, and whether Scollins reasonably expected compensation for the placement of the ads through Bottom Line, and if so, what a fair compensation would be.

  G. Whether Sentient already compensated Scollins for placement of the ads through Bottom Line.

    H.    Whether Sentient violated the Wage Act by depriving Scollins of the ability to exercise his stock options by terminating his employment for cause.

For the parties' positions on these contested issues of fact, see Section 1 above.

Plaintiff also asserts that the following is a question of fact in the case: Whether Defendant lulled Scollins into believing that it would negotiate with him in good faith regarding the terms and conditions of his severance, including (a) money owed to Bottom Line Advertising and (b) his stock options so that Scollins refrained from exercising his stock options. Defendant contends that this issue was never raised in the pleadings or in discovery and objects to it being made part of the case at this point

**4.    JURISDICTIONAL QUESTIONS**

None.

**5.    QUESTION RAISED BY PENDING MOTIONS**

Defendant believes that its Motion to Dismiss Count IV (Wage Act) is still pending. In that Motion, Sentient argued that there were both procedural and substantive deficiencies with plaintiff's Wage Act claim. The Court granted plaintiff leave to deal with the procedural issue, which plaintiff did by obtaining a right to sue letter from the Attorney General, but the Court still has not ruled on the substantive question of whether plaintiff has stated a Wage Act claim. The specific issue is whether stock options are "wages" under the Wage Act. The plaintiff believes the Court has properly disposed of the issue. Because the Wage Act issue is fully briefed, the legal arguments are not repeated in this memorandum.

Plaintiff's Motion for Partial Summary Judgment on two of plaintiff's three breach of contract claims and plaintiff's Wage Act claim remains under advisement. Defendant's Motion for Summary Judgment on plaintiff's quantum meruit claim and Wage Act claim likewise remains under advisement.

In connection with those motions, the parties have briefed the following legal issues:

A.  Whether stock options are "wages" under the Wage Act.

B.  Whether plaintiff's Wage Act claim is time barred.

C.  Whether the alleged contract to pay Scollins a commission for the placement of ads through Bottom Line is too indefinite to be enforceable.

D.  Whether, as a matter of law, there is any evidence of a contract to exercise progressive discipline.

E.  Whether Sentient was unjustly enriched by the placement of ads through Bottom Line such that it owes Scollins quantum meruit.

F.  Whether Defendant breached the covenant of good faith and fair dealing in either the advertising placement agreement or the stock option agreement.

**6.  ISSUES OF LAW, INCLUDING EVIDENTIARY QUESTIONS**

The primary legal issues are those raised by the parties in their respective Motions for Summary Judgment and defendant's Motion to Dismiss, as summarized in Section 5 above. Because these legal issues have been fully briefed by the parties, the legal arguments are not repeated in this memorandum.

There is also an issue of the valuation of plaintiff's stock options if there is a finding that Sentient owes Scollins something for his stock options. Sentient plans to file a motion in limine to establish the share price to be that which was paid at the time of the acquisition of Sentient in March 2004, which would have been the first and only time that Scollins could have sold his shares had he exercised his options. Scollins will oppose this motion and may file a cross-motion.

Defendant contends that there is an evidentiary issue concerning the admissibility of statements made during settlement discussions between the parties.

9

Defendant also contends that there is an evidentiary issue as to whether Scollins should be allowed to testify concerning the existence of or terms of the purported contract concerning the advertising given that his testimony in this case is internally inconsistent.

### 7. REQUESTED AMENDMENTS TO THE PLEADINGS

None.

### 8. ADDITIONAL MATTERS

If the Court determines that the stock options are "wages" under the Wage Act, there will need to be a determination of the date they were due and the price.

### 9. PROBABLE LENGTH OF TRIAL

This action will be tried to a jury. The parties estimate that trial will last four to five days.

### 10. WITNESS LISTS

A. <u>Plaintiff's Potential Witnesses</u>

1. Donald Scollins
2. Joseph "Jeff" Creed
3. Earle Cooley
4. Galen Daniel Underwood
5. Carol Caliendo
6. Greg Goodwin
7. John Jardin
8. Custodian of records for *The Wall Street Journal*
9. All witnesses listed by Defendant
10. All foundation witnesses
11. All rebuttal witnesses

    B.    <u>Defendant's Potential Witnesses</u>

        1.    Joseph Creed, 4307 Southeast Bay, 8 View Street, Stuart, Florida

        2.    John Williams, Jr., 71 Arborway, Jamaica Plain, Massachusetts

        3.    Edward Johnson, 150 White Road, Scarsdale, New York

        4.    Carol Caliendo, Madison Road, Wellesley, Massachusetts

        5.    Robert Herlihy, 1 Whip-O-Will Lane, Milford, Massachusetts

        6.    Dan Underwood – address unknown at this time – to be supplemented

        7.    Steve Morton – address unknown at this time – to be supplemented

**11.**    **PROPOSED EXHIBITS**

The parties request the opportunity to supplement this information to the Court on or before November 16, 2005.

**12.**    **OBJECTIONS TO EVIDENCE IDENTIFIED IN PRETRIAL DISCLOSURE**

The parties request the opportunity to supplement this information to the Court on or before November 16, 2005.

Plaintiff Donald Scollins                              Sentient, f/k/a eBizJets

/s/ John D. Parker_____                  /s/ Andrea C. Kramer_____
John D. Parker, II, *Pro Hac Vice*                  C. Max Perlman, BBO # 630395
PARKER LAW FIRM, P.L.C.                    Andrea C. Kramer, BBO # 632584
141 E. Palm Lane, Suite 111                        SULLIVAN WEINSTEIN & MCQUAY
Phoenix, AZ 85082-3098                           Two Park Plaza
                                                      Boston, MA 02116
Edward C. Cooley, BBO #550117              (617) 348-4300
GIARRUSSO, NORTON, COOLEY, ET. AL.
308 Victory Road
Quincy, MA. 02171