UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DONALD SCOLLINS, individually and on
behalf of BOTTOM LINE ADVERTISING,

      Plaintiff,

  vs.

SENTIENT, f/k/a eBizJets,

      Defendant.

Civil Action No. 03-12478-EFH

## <u>SENTIENT'S TRIAL BRIEF</u>

This case begins with the termination of plaintiff Donald Scollins's at-will employment by defendant Sentient Jet, Inc. ("Sentient"). From March 1999 to November 2001, Scollins was a full-time employee of Sentient. In November 2001, Sentient terminated Scollins's employment after learning that Scollins had violated the company's policy regarding taking freebies from vendors. Angry that his employment was terminated, Scollins determined to seek to extract money from Sentient on various theories, which he concocted after Sentient terminated his employment. Though the complaint sets forth four counts, the essence of Scollins's claims are the following three issues:

(1)    Does Sentient owe Scollins, who was an at-will employee, anything for terminating his employment without first applying progressive discipline?

(2)    Does Sentient owe Scollins the value of his stock options?

(3)    Does Sentient owe Scollins money for advertising that he placed for Sentient with The Wall Street Journal while he was a full-time, paid employee of Sentient?

The answer to all of these questions is **<u>no</u>**.

Sentient does not owe Scollins anything for terminating his employment without applying progressive discipline. Scollins was an at-will employee whose employment could be terminated at any time for any reason or no reason at all. Sentient had no legal or contractual duty to apply progressive discipline to Scollins before terminating his employment.

Sentient likewise does not owe Scollins any money for stock options because his own actions caused him to forfeit any such options. Scollins did not exercise his stock options within the required 30-day period following the termination of his employment in November 2001. The Stock Option Agreement is clear that Scollins's failure to exercise within 30 days results in the termination of his options. Furthermore, even if Scollins had not permitted his stock options to lapse, which he did, they expired immediately when Sentient's Board of Directors later determined that Scollins's employment termination was for cause because under the Stock Purchase Agreement termination for cause results in the immediate termination of all stock options.

Lastly, Sentient does not owe Scollins any money for any advertising he placed for Sentient with The Wall Street Journal because there was never any contract, as a matter of fact and law, that obligated Sentient to pay Scollins for placing the ads and because Scollins is not entitled to any compensation under a theory of unjust enrichment as he did not confer a benefit upon Sentient for which he has not already been compensated.

**<u>Undisputed Fact and Expected Testimony</u>**

The evidence at trial will show the following:

*<u>Introduction</u>*

Jeff Creed founded eBizJets,[1] a company that brokers charter jets for individuals and companies, in 1997.  Don Scollins is Creed's cousin and close friend.  The two grew up together and worked together before.  Scollins began working for his cousin at eBizJets in or about March 1999 as a charter representative, and he subsequently became director of charter operations, a position he remained in until the termination of his employment.  Scollins was an at-will employee at all times.  He had no employment contract.

*<u>Advertising with The Wall Street Journal</u>*

At some point in 1999, Creed decided that Sentient should begin to place advertisements in The Wall Street Journal.  During a five-minute conversation where no details or specifics were discussed, Scollins claims that Creed asked Scollins to place the advertisements for Sentient, and Scollins agreed.  There was no discussion during that meeting of any additional money that Scollins would be paid for placing the advertising.  Though Creed, Scollins's close cousin and a former employee himself, now claims that he may have stated aspirationally that he would "take care" of Scollins when the company made money, he admits that Creed did not promise that he would give Scollins anything specifically for placing the advertisements and Scollins was given no additional consideration for his assumption of the task of placing his ads beyond his salary and the hope that the company would someday do well and provide financial benefits for all its employees.  Notably, nothing was ever reduced to writing concerning Scollins's placement of the

---

[1] Sentient was formerly known as eBizJets.com, Inc. (eBizJets).  eBizJets.com was incorporated in 2000 and became known as "Sentient" in or about September 2002.  Before the incorporation of eBizJets.com, the business was conducted under the name Executive Jet Charter Worldwide.  This brief will use the terms "Sentient" and "eBizJets" interchangeably to mean Sentient, eBizJets, or Executive Jet Charter Worldwide (without admitting or stipulating that eBizJets or Sentient assumed the liabilities of Executive Jet Charter Worldwide).

advertising for eBizJets, not at the time Scollins started placing the advertising and not at any later time.

### Credit Suisse's Investment in eBizJets

In June 2000, Credit Suisse First Boston ("Credit Suisse")(technically, a fund managed by Credit Suisse) purchased a significant percentage of eBizJets' stock.

### Scollins's $100,000 Bonus

At some point shortly after the Credit Suisse stock purchase, Scollins received a $100,000 bonus for the work he did for eBizJets. This bonus alone amounted to more than Scollins had ever made in one year.

### Stock Options

In November 2000, Scollins along with other employees received certain stock options pursuant to a stock option agreement (the "Stock Option Agreement"). This agreement provides for periodic vesting of stock options over the course of Scollins' employment as well as certain rules for exercising options. The Stock Option Agreement provides, among other things, that employees with vested stock options have to exercise those options within 30 days of ceasing to work for the company if they leave voluntarily or their employment is terminated without cause. The agreement also states that if an employee's employment is terminated for cause, the stock options expire immediately upon the termination.

### Change in Roles

Not long after Credit Suisse invested in eBizJets, Scollins ceased having an active role in the placement of the advertising with the Wall Street Journal. Instead, Steve Morton, whom Sentient hired in or about December 2000 to handle advertising and marketing as a full-time job, began to place all of Sentient's advertising, including The Wall Street Journal ads, as part of his

duties.  Once Morton was hired, Scollins's only role in connection with the ads was to sign a couple of insertion orders.  By early 2001, Scollins ceased doing even that.  By the time that the agreement with The Wall Street Journal needed to be renewed in mid-2001, Morton, not Scollins, renewed it.

Though Jeff Creed was the president and head of eBizJets before Credit Suisse made its investment in June 2000, after Credit Suisse made its investment, eBizJets searched for new CEO, and in October 2000, eBizJets hired John Williams as its CEO.  Williams and Creed worked together for some months, but the situation did not work out, and, acrimoniously, Creed ceased his day-to-day activities with eBizJets during the summer of 2001 and stopped being its president.  Creed disagreed strongly with the way Credit Suisse wanted to run the company, and he threatened to sue Credit Suisse.  The relationship was contentious.  The immediate dispute was resolved in September 2001, but the relationship between Creed and eBizJets was, effectively, severed at that time.

*Termination of Scollins's Employment*

On November 7, 2001, John Williams, then CEO of eBizJets, distributed to the company's employees, including Scollins, a "reinforce[ment] and clarif[ication]" of the company's policies regarding Conflicts of Interest.  Williams warned that the company's employees are prohibited from accepting free or discounted flights or other "gifts" from carriers (owners of aircraft) with whom eBizJets did business and that violation of this policy would be grounds for immediate termination.  The primary reason for this policy was that a free flight could be seen as a kickback to an eBizJets employee for selecting a particular carrier to do flights for eBizJets.  The business of eBizJets was dependent upon getting the least expensive qualified carrier to do its flights.  Free flights from a carrier, eBizJets was concerned, could influence

eBizJets employees to select that carrier without searching for and selecting less expensive options.

Nevertheless, just ten days after Williams' admonition, Scollins accepted a free flight to Las Vegas for himself and a couple of friends for personal recreation on Pacific Jet, a carrier with whom eBizJets regularly did business. Perhaps not coincidentally, Mr. Scollins had selected Pacific Jet more than any other carrier, over 100 times.

On November 23, 2001, Williams told Scollins that he had learned of the free flight and terminated Scollins's employment. At that time, Williams also told Scollins that he had learned that Scollins had falsified the company's flight calendar. In the following days or weeks, Scollins undertook to cover up his wrongdoing. He had Pacific Jet issue him an invoice, which it did on November 28, 2001, and he also sent Pacific Jet a check sometime in December 2001 for some part of the value of the free flight in an effort to make it look like the flight was not free. Given the seriousness of the allegations, Sentient's Board of Directors undertook to determine whether the termination was to be for cause or not for cause. Williams did not have the authority to make this determination, as it was solely for the company's Board of Directors. When the Board of Directors met in January 2002, it determined that the termination would be for cause.

Before the Board's determination that Scollins' termination was for cause, Scollins allowed his stock options to lapse. Under the Stock Purchase Agreement, Scollins had 30 days from November 23, 2001 to exercise his stock options. He did not, and the options terminated pursuant to the terms of the agreement.

*Bottom Line Advertising*

Though Scollins will try to make much of his so-called advertising company, in fact it was little more than just a name.  Doing business in Arizona as "Bottom Line Advertising" ("Bottom Line"), an unincorporated sole proprietorship, Scollins placed Yellow Pages ads in 1997 and 1998 for a few "clients," including a carburetor supplier and a topless bar.  By the time Scollins moved to Massachusetts to join eBizJets, he was no longer doing any business through Bottom Line, and Bottom Line did not perform any services for any paid customers during or after Scollins's employment with eBizJets or Sentient.  Significantly, Bottom Line never had an office or a staff; Scollins was the only "employee" of Bottom Line, which was not even registered to do business in Massachusetts until after Scollins ceased working for Sentient.   In short, Bottom Line was Scollins.

Nevertheless, Scollins, under the guise of Bottom Line, placed advertising for eBizJets with The Wall Street Journal from approximately August 1999 to about December of 2000.  Scollins's role in the advertising was merely to send the ads to, and to be the contact with, The Wall Street Journal.  The task took him only a few hours per week, and eBizJets allowed him to take time from the other duties of his job to attend to this work, all the while, paying Scollins a salary as a full-time employee.  Another employee, Dan Underwood, designed and laid out the advertisements on the computer, and eBizJets handled all of the bookkeeping and administrative work.  Other than being the conduit, Bottom Line did nothing.  During the short period of time that Scollins placed eBizJets's ads with The Wall Street Journal, Scollins passed along the invoices to eBizJets, which paid them directly to The Wall Street Journal, and Bottom Line did not incur any expenses in connection with the placement of advertising for eBizJets.  Bottom Line did not even have a checking account during this time through which it could have paid for the ads.  It likewise did not maintain any of documents or files in connection with the

advertising; eBizJets did.  Though Bottom Line nominally had a phone number, eBizJets paid the bills for that phone line.

**Argument**

**I.      Scollins Is Not Entitled to Any Compensation Because His Employment Was Terminated Without Progressive Discipline.**

Scollins claims that he had an implied agreement with Sentient that required Sentient to apply progressive discipline before terminating his employment.  The basis for this claim appears to be Sentient's employment policies and procedures.  Sentient's Employee Handbooks provide, however, that "[a]lthough employment with eBizJets is based on mutual consent and both the employee and *eBizJets have the right to terminate employment at will with or without cause or advance notice, eBizJets may use progressive discipline at its discretion*," and Scollins has admitted that this language does not create an agreement or promise by Sentient to use progressive discipline.  Further, Scollins has acknowledged in a signed writing he provided to the company during his employment that "either I or eBizJets can terminate the [employment] relationship at will, with or without cause, at any time…."

There was no contract, implied or express, as a matter of fact and law, and without a contract, there can be no breach of contract claim.  And because there can be no breach of the good faith covenant without a contract, Count II for breach of covenant of good faith and fair dealing count, which is simply a recast of the breach of contract count, fails as well.

**II.      Scollins is Not Entitled to Any Money for His Stock Options.**

         **A.      *Scollins Permitted His Stock Options To Terminate By Failing To Exercise Them Within Thirty Days Of His Termination.***

Plaintiff's claim that Sentient denied him the right to exercise his stock options by changing his termination to one for "cause" on January 15, 2002, is misleading at best.  To have been denied the right, he would have had to have had the right, but he did not.  Scollins's right to

8

exercise his stock options expired on December 24, 2001, thirty days after his employment was terminated without cause, because Scollins failed to exercise his options within those thirty days.

The Stock Option Agreement clearly and unambiguously provides:

> [T]he Option shall terminate thirty (30) days following the date the Optionee ceases to be an employee of or consultant to the Company ….

The parties have stipulated that "[o]n November 23, 2001, Sentient terminated Scollins's employment." That is the date that he ceased to be an employee of Sentient. The parties have also stipulated that "Scollins's stock options were not exercised." Accordingly, Scollins's stock options terminated per the Stock Option Agreement due to Scollins's own inaction weeks before Sentient changed his termination to one for "cause." Regardless of whatever reasons Scollins may try to offer, the unambiguous language of the Agreement dictates that Scollins, not Sentient, caused his options to terminate.

### B.    *Sentient Did Not Breach The Stock Option Agreement.*

In Count I of his Complaint, Plaintiff pleads that Sentient breached the Stock Option Agreement by "wrongfully terminating [him] for 'cause,' and depriving [him] of his stock options." This claim fails because Sentient properly terminated Scollins's employment for cause. Specifically, Sentient terminated Scollins's employment because he took a free flight with a carrier with whom Sentient contracted in direct contravention of an express prohibition against such "freebies," an indisputable fact that he later tried to cover up, which in itself was a grounds for termination for cause. Moreover, as John Williams informed Scollins, Scollins was not performing his duties as required. Mr. Williams will testify that Scollins falsified and/or provided wrong information in the flight calendar.

As to the definition of "cause", the Stock Option Agreement provides, in Section 4(b):

> <u>Cause Defined.</u>  For purposes of this Agreement, "Cause" shall mean, as determined by the Board of Directors of the Company, (i) deliberate or

9

> intentional failure, in a continuing or repeated manner, by the Optionee to
> substantially perform the material duties of Optionee's employment …,
> (ii) material breach or threatened material breach by the Optionee of the
> covenants contained in Section 9, (iii) **deliberate or intentional
> engagement by the Optionee in conduct which is materially detrimental
> to the reputation, goodwill, business or operations [of] the Company** …,
> (iv) **willful fraud or material dishonesty by the Optionee in connection
> with the performance of the duties of the Optionee** or (v) conviction or
> plea of *nolo contendere* by the Optionee to a felony or a misdemeanor
> involving moral turpitude.

The Board of Directors had ample reason to determine that Scollins's termination would be for

cause.  First, his acceptance of a free flight from Pacific Jet, a carrier with whom Sentient did

business, on November 17, 2001, just ten days after Mr. Williams sent around a policy

prohibiting such free flights, satisfies the third part.  As Mr. Williams will testify, the policy was

put in place to protect the company's business and operations, in that it prevented kickbacks that

could influence an eBizJets employee to select more expensive carriers, which would increase

Sentient's expenses and reduce its profit.  The policy was also needed to protect eBizJets'

reputation against charges that it favored certain carriers over others because those carriers

provided company employees with special "perks."  Second, Scollins committed material

dishonesty by falsifying the company's flight calendar.

Either of these reasons would suffice individually; together, they constituted grounds to

determine that termination of Scollins's employment was for cause.

The consequence of the termination being for cause was the cancellation of any

unexercised stock options that Scollins had vested as of that time.[2]  As of November 23, 2001,

Scollins had not exercised any options, nor did he at any time thereafter.  The Stock Option

---

[2] Scollins was never entitled to unvested stock options, as he claims.  The Agreement provides unambiguously: "The Option shall be exercisable only to the extent that the Optionee is vested in the Option pursuant to Section 3 and the Option is in effect on the date the Optionee ceases to be an employee of … the Company."

Agreement provides with regard to termination of the options (in Section 4(a)(iv) of the agreement):

> If the Optionee's employment … is terminated for Cause (as defined in Section 4(b) …) … as determined by the Board of Directors of the Company, such Option will terminate on the date the Optionee ceases to be an employee of … the Company … and be of no further force or effect. The Optionee's right to exercise any unexercised portion of the Option shall immediately terminate and all rights thereunder shall cease, whether the Option is vested or unvested.

In full accordance with the Stock Option Agreement, Sentient terminated Mr. Scollins's employment for cause and that resulted, per the Agreement, in Scollins's loss of all his unexercised options. Nothing in these facts suggests a breach of contract.

### C.    *Sentient Did Not Breach the Covenant of Good Faith and Fair Dealing in Connection with The Stock Options.*

In Count II Scollins claims that Sentient breached the covenant of good faith and fair dealing by "wrongfully claiming that Mr. Scollins was terminated for 'cause' so as to deprive him of his vested stock options under the Stock Option Agreement." There is no merit to this claim. First, as explained above, Sentient had good reason to terminate Scollins's employment for cause. Second, also as explained above, Sentient did not change Scollins's termination to one for "cause" until well after the 30-day period for him to exercise his options for a "termination without cause" had expired. Scollins's employment was terminated on November 23, 2001. Under the Stock Option Agreement, he had until December 23, 2001 to exercise his options but did not. As such, the options terminated, and by January 15, 2001 when his employment was terminated for cause, there were no options to deny him.

At various times, Scollins has also tried to make much of the fact that Sentient sent him the termination-for-cause letter after business hours on January 15, 2002. This is a red herring. There was nothing magical about the time of the termination. The Stock Option Agreement

provides that the options terminate when the employment is terminated for cause, i.e. the moment the employment is terminated, not just any time during that day. Any other result would be absurd – it would mean that an employee could be fired for stealing from the company, being convicted for a felony, or harming the company, for example, and then could still exercise lucrative stock options as long as he did so before the close of business that day. No. The point of the termination provision in the Stock Option Agreement is to end *immediately* the options of the employee whose employment is terminated for cause. As such, even if Sentient had sent Scollins the letter at the start of the business day, he would not have been able to exercise the options – which in any event had already terminated 30 days after his termination without cause, as explained above – and, therefore, Sentient did not deprive him of any benefit under the contract.

### D. *Failure to Pay Stock Options is Not a Violation of the Wage Act.*

Although his pleadings are not clear, Scollins seemingly claims that eBizJets' decision to change his termination to "for cause" violated Mass. Gen. L. ch. 149, §§ 148 and 150 (the "Wage Act") because it caused him to lose his stock options. This claim fails because as a matter of law stock options are not wages under the Wage Act. Furthermore, what Scollins claims eBizJets did wrong, *i.e.*, terminated his employment for cause when it did not have cause, is not a violation of the Wage Act even if stock options were wages. Lastly, his claim is barred by the statute of repose.

### 1. *Stock Options are Not Wages Under the Wage Act.*

The Wage Act prescribes the timing and intervals for payment of wages by Massachusetts employers. Mass. Gen. L. c. 149, §148. It requires, among other things, that employers pay all "wages earned by" a discharged employee to the discharged employee in full on the day of discharge. *Id.* The term "wages" is not defined in the Wage Act. Mass. Gen. L. c.

149, § 148, *et seq.*  The statute does, however, "wages" includes "any holiday or vacation payments due an employee under an oral or written agreement" as well as "commissions when the amount of such commissions, less allowable or authorized deductions, has been definitely determined and has become due and payable to such employee."  *Id.*  Courts have, however, generally given the term an extremely narrow construction.  *See Prozinski v. Northeast Real Estate Services, LLC*, 59 Mass. App. Ct. 599, 603-605 (2003); *Cumpata v. Blue Cross Blue Shield of Massachusetts, Inc*., 113 F. Supp. 2d 164, 167-168 (D. Mass. 2000)(Young, J.).   In fact, in *Prozinski*, the Massachusetts Appeals Court held that Wage Act Claims are strictly limited to the specific types of employment compensation enumerated in the statute, which do not include stock options.  59 Mass. App. Ct. at 603-605.As such, the Massachusetts Appeals Court has held that severance payments are not "wages."  *Id.*

Although no Massachusetts appeals court has yet addressed the issue, two Massachusetts federal district courts have specifically held that stock options are not "wages" under the Wage Act.  *See Sterling Research Inc. v. Pietrobono*, 2005 WL 3116758 (D. Mass.)(Saylor, J.); *Baptista v. Abbey Healthcare Group, Inc*., 1996 WL 33340740 (D. Mass. 1996)(Stearns, J.).   At least two state superior court judges have followed the *Baptista* holding.  *See Kohli v. RES Engineering, Inc*., C.A. No. 00-02458, slip. op. at 4-5 (Mass. Super. Dec. 19, 2000) (Garsh, J.)(stock options are not compensation "encompassed by" the Weekly Wage Law); *Dennis v. Jager, Smith & Stetler*, 2000 WL 782946 (Mass. Super. 2000)(Ball, J).  *See also NaviSite, Inc. v. Cloonan*, 2005 WL 1528903, at *14 (retention bonus and performance bonus not wages under Wage Act).

These holdings are clearly what the legislature intended.  The types of compensation defined as wages in the statute are all definitely determined types of compensation, either

expressly for commissions or implicitly for weekly or biweekly wages and holiday or vacation pay, all of which are readily calculable on the date of termination. Stock options, in stark contrast, are not readily calculable on the date of termination. Indeed, they are not even immediately remittable. Furthermore, all of the types of compensation defined as wages in the statute are not contingent. The stock options in this case were, however, contingent – they were contingent on Scollins's not being fired for cause *and* on his payment of the strike price. These types of contingencies preclude stock options from being the types of compensation deemed "wages" under the Act. *See Wessling v. Massachusetts Turnpike Authorit*y, C.A. No. 97-3808-E, at *26 (Mass. Super. 2001)(Botsford, J.)(holding that severance pay and benefits pursuant to employment contract were not "wages" under the Wage Act because the contract provided "their availability was wholly contingent on [the plaintiff's] termination without cause"); *Kunzi v. Katzenstein*, 03-11931 (D. Mass. 2004)(Lindsay, J.)(relying upon the holding *Wessling* in dismissing a claim under the Wage Act); *see also Weir v. The Anaconda Company*, 773 F.2d 1073, 1083-1086 (10th Cir. 1985)(stock options not "wages" under analogous Kansas wage statute because plaintiff's right to receive benefits were not absolute and would terminate if plaintiff was terminated for cause).

Plaintiff has attempted to avoid the clear dictate of the statute by arguing that the stock options he was allegedly denied were part of an overall compensation plan. That may or may not be true, but regardless not all compensation is wages, and the statute applies ***only*** to non-contingent, quantifiable wages. Plaintiff also has attempted to bring his claim within the Wage Act by arguing that the circumstances of the denial of his stock options were flagrant and willful. Even if that were true, which it is not, it would not matter. Compensation that is not wages under the statute does not become so because of the manner in which it was denied. In this regard,

even if eBizJets had hit Scollins over the head and *stolen* the stock options right out of his

pocket, it would still not make the stock options "wages" under the statute.

2.    *The Wrong Complained of Is Not a Violation of the Wage Act.*

Even if stock options were, in the abstract, considered "wages" under the Wage Act, the

stock options in this case would still not fall within the Wage Act because Scollins was not

entitled to any *payment* on the day his employment was terminated.  A stock option is "a right to

buy a designated stock, if holder of option chooses, at any time within specified period, at a

determinable price…"  Black's Law Dictionary, 6th ed.  It is a *choice* given to an employee.  On

the day Scollins's employment was terminated, the only right Scollins had was whether to

purchase eBizJet stock at a certain price.  That is, the *only* thing that could have happened that

day was that Scollins would have been allowed to write a check to eBizJets for over $60,000.

Under the unambiguous language of the Stock Option Agreement, he did not on that date have

the right to *sell* the stock, which is the only way he would receive compensation.  The Stock

Option Agreement required that no one could sell their stock until the stock was offered in a

public offering.  That event did not occur until TH Lee purchased Sentient in March 2003.  In

other words, even if Scollins had fully exercised all rights he claims he was denied, he would not

have received a single penny on his last day of employment; he would only have been $60,000-

plus poorer.  Therefore, because eBizJets did not deny *any* money, whether wages or not, to

Scollins, there can be no violation of the Wage Act.

Furthermore, the Wage Act is violated when wages are denied, not when an employer

wrongfully breaches a stock option agreement by mischaracterizing a "without cause"

termination as "for cause."  Yet, this is exactly what Scollins claims.  The purpose of the Wage

Act is to ensure timely payment to employees of money owed for work completed and to protect

wage earners from the long-term detention of wages by unscrupulous employers.  *Cumpata v.*

*Blue Cross Blue Shield of Massachusetts, Inc.*, 113 F. Supp. 2d 164, 167-168 (D. Mass. 2000) (Young, J.). It does not, however, forbid wrongful termination (except in retaliation for filing a claim). As a reading of Count IV makes abundantly clear, the crux of Scollins's Wage Act claim is that Sentient's decision to fire him for cause deprived him of stock options. He does not dispute that under the Stock Option Agreement he was not entitled to stock options if he was fired for cause; rather, he seemingly disputes that he was properly fired for cause. In short, Scollins claims that Sentient violated the Wage Act by wrongfully firing him for cause, not that Sentient failed to pay him something he was owed. Wrongfully firing for cause, even if that Sentient had actually done that, is simply not a violation of the Wage Act.

> 3.    *Scollins's Wage Act Claim is Barred by the Statute of Repose.*

Not only is plaintiff's claim not cognizable under the Wage Act, it is also barred because Scollins brought the claim more than three years the date of the alleged violation.

Mass. Gen. L. c. 149, § 150 provides in pertinent part:

> Any employee claiming to be aggrieved [with regard to wages, hours, or commissions] may … , at the expiration of ninety-days *after the filing of a complaint with the attorney general, or sooner, if the attorney general assents in writing and within three years of such violation*, institute and prosecute in his own name and on his own behalf ... a civil action for injunctive relief and any damages incurred.…

(Emphasis added.) The latest that the wrong of which Scollins complains in his Wage Act count occurred is January 15, 2002, when Sentient informed him that his termination was changed to "for cause." Scollins was not, however, permitted to file his Wage Act claim until April 2005 after the Attorney General issued the necessary certificate (his assent in writing); therefore, Scollins's Wage Act claim was not properly filed until May 2005 when the court accepted the

Attorney General's certificate.[3]  Since this is clearly beyond the three-year statute of limitations, the claim is barred.  Furthermore, because the three years is also a statute of repose, *Gordon v. Millivision Holdings, LLC,* 2005 WL 705110 (Mass. Super.)(Agostini, J.), the proper filing in May 2005 (or even April 2005) cannot "relate back" to any earlier filing under rule 15(c), *Tindol v. Boston Housing Auth.*, 396 Mass. 515, 519 (1986)("relation back" doctrine not applicable in statute of repose context).

### E.    *Plaintiff Cannot Prove Any Causation or Damages Connected with the Stock Options.*

As explained above, a stock option is the right to purchase a company's stock at a certain price, the strike price.  To convert an option to a cash benefit, the employee with the option must first exercise the option by purchasing the stock at the strike price and then selling the stock at a higher price.  Though in the typical transaction, the employee purchases and sells his stock virtually simultaneously, such that the employee does not actually have to pay out any money for the stock, in this case, the Stock Option Agreement clearly stipulates that holders of stock pursuant to the Stock Option Agreement could not sell their stock until "the Company shall have effected a public offering of Common Stock," which was not until March 2003, when the company was sold to Sentient.  As such, to have received any financial benefit from the stock options, Scollins would have had to have given Sentient a check for over $60,000 for the right to see whether the stock would rise.  Not only can Scollins offer no evidence that he was prepared

---

[3] The procedural history is somewhat convoluted because plaintiff sought to bring his Wage Act claim before satisfying the mandatory statutory requirement of first filing his claim with the Attorney General.  Thus, although plaintiff filed a motion to amend his complaint in November 2004, he did not in fact obtain authority from the Attorney General to file his complaint until April 2005, and the Court did not approve his request to be able to pursue the Wage Act claim until May 17, 2005.  At the very least, the count cannot be considered properly filed until the Attorney General granted permission for plaintiff to file it in April 2005 since his permission is a statutory requirement.  In this way, this case is different from *Nett v. Bellucci*, 437 Mass. 630 (2002), in which the Court held that a claim can be considered commenced for purposes of the statute of repose even in the face of a procedural defect as long as the court accepts the filing of the pleading.  In this case, Scollins did not make a mere procedural error – he attempted to bring his suit before he was entitled to do so under the statute.  Therefore, his filing of the motion to amend and of the amended complaint cannot be deemed "commencement" of the action for purposes of the statute of repose.

or able to pay for the stock in November 2001 or January 2002, but what evidence there is suggests strongly that Scollins would never had made such an investment because he thought that John Williams and Paul Svensen, the two top managers at Sentient, were doing a poor job of running company.  Absent evidence that he would have invested in Sentient at that time, i.e. that he was actually denied an opportunity he would have taken, Scollins cannot prove causation even if it were found that Sentient had denied him the opportunity in breach of contract.

III.    **Scollins is Not Entitled to Any Money for Placing Sentient's Advertising with The Wall Street Journal.**

Scollins claims that Sentient owes him approximately $350,000 as a commission for the advertising Sentient placed with The Wall Street Journal between mid-1999 and the end of 2001. His claim is based on three theories: (1) breach of contract (Count I), (2) breach of the covenant of good faith and fair dealing (Count II), and (3) quantum meruit.  These claims all fail both legally and factually.

A.    ***There Was No Contract Requiring Sentient to Pay Scollins for the Advertising as a Matter of Fact and Law.***

Scollins claims that he had an oral agreement with Creed, his cousin, that Sentient would pay Scollins a 15% commission that he claims Sentient saved by having Scollins instead of a professional advertising agency place advertising with The Wall Street Journal.

1.    *The Facts Will Show There Was Never Any Contract.*

The testimony will show unequivocally, however, that Creed ***never*** promised to pay Scollins 15% of the supposed "list" price for the ads.[4]  Indeed, the testimony will show that Creed never ***promised*** to pay Scollins anything or any specific amount for placement of the ads with The Wall Street Journal.  At best, the evidence will show that Creed told his cousin that he

---

[4] Importantly, there is no competent evidence that the "mark-up" would result in a 15% commission.  Both Creed and Scollins have testified that the basis for this number is an assumption each has made based on what they supposedly know from limited previous experience with a few advertising agencies.  Scollins is not producing any evidence that Sentient would actually have paid a real advertising agency a 15% commission.

"would take care of" him and that his intention was to reward Scollins <u>and</u> all the other employees who helped him start and grow eBizJets (such as Dan Underwood and Greg Goodwin) with stock options or some other type of financial benefit once the company was purchased. As it turned out, Creed, though not legally obligated to do so, did "take care of" Scollins – he gave him a $100,000 bonus right after Credit Suisse's stock purchase was completed in 2000, a sum that represents more money than Scollins had ever made in a single year up until that time and manifold what he ever made through Bottom Line.

Beyond these uncontested facts, that the alleged agreement never existed is made clear by the facts that (1) there is not a single piece of written evidence of the agreement and (2) no one at eBizJets, including Jeff Creed, ever mentioned any such agreement to Credit Suisse at any time before the sale of stock to Credit Suisse was completed.

That nothing was reduced to writing is not coincidence. In fact, when Scollins attempted at some point after he had already been placing the ads to get Creed to sign a document stating that eBizJets was obligated to pay Scollins 15% of the amount it spent on advertising with The Wall Street Journal, Creed expressly refused. And when Scollins presented Creed with a "bill" for commissions equaling 15% of what Sentient spent on ads in The Wall Street Journal, Creed was furious and refused to pay it, explaining that he never agreed to pay Scollins that money.

The notion that there was an agreement between eBizJets and Scollins or Bottom Line Advertising is contradicted by what Jeff Creed told Credit Suisse at the time of its investment in eBizJets. Credit Suisse, led by Edward Johnson, performed due diligence of eBizJets. At no time during this due diligence process did Creed or anyone at eBizJets ever inform Credit Suisse of any agreement concerning Scollins's placement of advertising for eBizJets with The Wall Street Journal. In fact, at no point during the whole due diligence process did anyone mention

"Bottom Line Advertising" to Credit Suisse, and no one at eBizJets ever disclosed to Credit Suisse that eBizJets was allegedly receiving a discount or saving money by placing the advertisements through Scollins's nominal advertising agency. The first time Credit Suisse *ever* heard of Bottom Line was, not coincidently, *after* Scollins's employment was terminated. (Since Bottom Line passed along the bills to eBizJets, which paid The Wall Street Journal directly, there was nothing in eBizJets' ledger that would have indicated the existence of Bottom Line so the only way it would have know of Bottom Line is if someone deemed it important enough to tell Credit Suisse. Clearly, no one did.) Moreover, and quite significantly, the alleged agreement between Scollins and eBizJets is not listed in the schedule of contracts or the schedule of debts contained in the Stock Purchase Agreement, which Jeff Creed signed on behalf of eBizJets, though such an agreement unquestionably would have to be listed if it existed, and in the Stock Purchase Agreement Creed, on behalf of eBizJets, warranted that "except as set forth on Schedule 5.8, [eBizJets] is not indebted … or otherwise obligated to any [employee, officer, director, or stockholder] , other than, (i), for payment of salary for services rendered, (ii), reimbursement for reasonable expenses incurred on behalf of the company, (iii), for other standard employee benefits made generally available to all employees, and, (iv), for options granted pursuant to the company's stock option program …."

That the alleged arrangement between Scollins and eBizJets was not mentioned in the Stock Purchase Agreement or during due diligence is not fraud or an oversight – it is, simply, evidence that the agreement did not exist.

The reality is, as the evidence will show, that Mssrs. Creed and Scollins, both angry with eBizJets about their respective departures, concocted the agreement ***after*** eBizJets terminated Scollins's employment. They did not, evidently, hash out the details, though, for their stories

about the agreement do not mesh and Scollins's own testimony about the terms of the agreement and when it was formed is, nicely put, a moving target:  Scollins has alternately stated, under oath, that the agreement (a) was made in February 1999, June or July 1999, August 1999, or October 1999, (b) in a five-minute meeting, a twenty-minute conversation, or over a series of conversations, (c) that the discussion was either a screaming match or friendly, (d) and that Creed said either that he would "take care of" Scollins or expressly promised that Scollins would receive a 15% commission when the company was sold or his employment terminated or simply said Scollins would be compensated for all of his work.  Moreover, Scollins cannot actually quantify what he allegedly is owed:  he has offered different numbers in his Initial Disclosures, his interrogatory responses, and his deposition, even though the number would be easily calculable if Scollins had kept the paperwork and billing, like an actual advertising agency would have.

In the end, Scollins lacks any credibility on the issue of whether he ever had an agreement to be paid for the advertising, and the only credible evidence will show that no such agreement ever existed.

2.     *The Terms of the Alleged Contract Are Too Indefinite to be Enforceable As A Matter of Law.*

Scollins's contract claim based on The Wall Street Journal fails not only factually but also as a matter of law.

To prevail on a claim for breach of contract, a plaintiff must establish that there was a valid and enforceable contract between the parties. *Lafayette Place Assoc. v. Boston Redevelopment Auth.,* 427 Mass. 509, 517 (1998).  To create an enforceable contract, "[i]t is a necessary requirement that [the] agreement … be sufficiently definite to enable the courts to give it an exact meaning."  Williston on Contracts § 4:18 (4th ed.1990); *see also Caggiano v.*

*Marchegiano*, 327 Mass. 574, 579 (1951)("it is essential to the existence of a contract that its nature and the extent of its obligations be certain").  Whether an alleged contract is legally enforceable in light of indefinite terms is a question of law for the court.  *Ross v. Raytheon,* 2001 WL 1455863 at *4 (Mass. Super.)(Brassard, J.).

Massachusetts state and federal courts have repeatedly found contracts in the context of employment or services provided unenforceable where the terms were too vague or indefinite.

For example, the Massachusetts Appeals Court ruled as a matter of law on a motion to dismiss that the alleged promise by a defendant to pay a plaintiff one-fourth of the profits from leased land if the plaintiff would refrain from exercising her option to repurchase the land was too vague and indefinite to be enforced and thus dismissed the complaint.  *Held v. Zamparelli*, 13 Mass. App. Ct. 957 , 958-59 (1982).  In that case, the plaintiff claimed to have refrained from repurchasing the land in reliance on the defendant's alleged promise.  *Id.*  The court explained that the purported oral agreement, as set forth by the plaintiff, was unenforceable because it was silent as to essential terms, such as when and how plaintiff's share of the profits was to be calculated and paid, the duration of the agreement, the effect of a sale of the property, and the plaintiff's responsibilities should there be a claim against the owners of the property.  *Id.*  Under these conditions, the court held, "[c]onstruction and enforcement of the agreement … would be futile, … and we cannot supply these provisions without writing a contract for the parties which they themselves did not make."  *Id.* (citations omitted).

Likewise, a Massachusetts Superior Court refused to find that there was a valid contract where the plaintiff alleged that the president of the company promised to find him another job in the company if he continued to work on the close-out of the project on which he had been working due to the "uncertainty and ambiguity" of the terms.  *Ross v. Raytheon Co.*, 2001 WL

1455863, *5 (Brassard, J.).  In granting summary judgment on plaintiff's breach of contract claim, the court explained that "[t]he promise of an unspecified position on unspecified terms is too indefinite and ambiguous to be enforceable as a matter of law."  *Id.* at *4.  In so holding, the court emphasized that one of the fatal ambiguities in the purported contract was the lack of "specified formulae and procedures that can narrow any uncertainties to the point that an agreement is binding."  *Id.*

Following this law, the Massachusetts federal district court held in granting a motion to dismiss that a company's alleged promise to two former employees that it would provide them "all the work" they could handle if they left the company and formed their own company was too vague to be enforceable.  *Armstrong v. Rohm & Haas Co., Inc.*, 349 F. Supp. 2d 71, 79 (D. Mass. 2004).  In that case, the plaintiffs claimed that they left their employment with the company and in turn set up their own company based on their former employer's alleged promise to provide them with all their ceramic work.  The Court explained its decision as follows:

> Here, defendant's alleged promise is too vague for this Court to ascertain a reasonably certain basis for providing an appropriate remedy. … What was the nature and scope of the work? Was it all of the ceramic grinding work of the company? Only that work which had formerly gone to [another company]? … What price would be paid for the work? Were there different prices for different types of work? … What would be the duration of the contract?  If it was terminable at will, how can plaintiffs make out a claim for breach?  If it was not, what is its term?  Not all of these issues are insurmountable for plaintiff, taken separately. … Taken together, however, the omissions are fatal. This Court cannot supply the missing terms without "writing a contract for the parties which they themselves did not make." *Held,* 13 Mass. App. Ct. at 958 ….

*Id.* at 79-80.

In a case with similarities to the one at bar, the Court of Appeals for the First Circuit granted summary judgment to the defendant on the plaintiff's breach of contract claim on the ground that the alleged oral modification to plaintiff's employment agreement, which was the

basis of his claim, was too vague to be enforceable. *Catex Vitol Gas, Inc. v. Wolfe*, 178 F.3d

572, 577 (1st Cir. 1999)(applying analogous Texas law that provides that "to be legally binding,

a contract must be sufficiently definite in its terms so that a court can understand what the

promisor undertook").  The plaintiff claimed that the former president of the company entered

into an agreement with him whereby the company would calculate his compensation in a

different way that included in a bonus package in exchange for his devoting his time to

developing new business.  The court rejected this claim, noting that "[e]ven giving all reasonable

inferences to [the plaintiff], as we must do on summary judgment, the terms of the alleged oral

modification are so indefinite and uncertain that [the plaintiff] himself was unable to articulate

exactly what he was owed and under what formula the extent of the deficit could be calculated."

*Id.*  After reviewing the relevant portions of the deposition transcripts, the court stated:

> In order to enforce the oral modifications, [plaintiff] asks us to fill in
> critical details.  We would have to decide, for example, what percentage of
> [the company's] net income between 10 and 20 percent would be allocated
> to the bonus program and, based on his "contribution to the company,"
> what part of that allotment [the company] owed [plaintiff].  This we
> cannot do.  In the end, all of the sources which might flesh out the terms of
> his alleged oral contract – [plaintiff's] recollection of the specifics of his
> agreement with [the president of the company], the [bonus plan] memo,
> minutes from Board of Directors meetings, etc. – provide nothing more
> than general and indefinite comments.  [Plaintiff] cannot forge a contract
> out of such hazy materials

*Id.* at 579.

Courts have decided similarly in other cases applying Massachusetts law, as well as in

other jurisdictions applying analogous law from other jurisdictions.  *See, e.g., Lieberman v.*

*Storagenetworks, Inc.,* 2004 WL 360489, at *2-3 (Mass. App. Ct.)(affirming grant of summary

judgment on breach of contract claim on basis that oral promise to grant plaintiff stock options

was too vague and indefinite to be enforced because it did not contain essential terms and court

could not supply terms "without writing the parties' contract itself"); *Buker v. Nat'l Mgmt.*

24

*Corp.,* 16 Mass. App. Ct. 36, 42 (1983) (affirming grant of summary judgment on breach of contract claim on basis that defendant's purported oral promise to "work things out" was too vague to constitute the basis of a contract); *Realty Central LLC v. ReMax*, 2005 WL 235932 (Mass. App. Ct.)(affirming grant of summary judgment on contract claim on basis that, among other things, oral agreement was too indefinite as to duration to enforce and explaining that parties' disagreement as to duration prevented formation of oral contract because parties did not agree on essential term); *Mass Cash Register, Inc.  v. Comtrex Systems Corp.*, 901 F. Supp. 404, 417-418 (D. Mass. 1995)(granting summary judgment on contract claim on ground that parties had failed to come to agreement on certain essential terms, including how they would share income); *Douglass v. Panama, Inc.*, 487 S.W.2d 228 (Tex. Civ. App. Houston 14th Dist. 1972), and judgment aff'd, 504 S.W.2d 776 (Tex. 1974)(employer's promises of a "good bonus next year" held indefinite); *Petersen v. Pilgrim Village*, 256 Wis. 621 (1950) (promise to pay employee unspecified percentage of profits deemed too indefinite to create valid contract); *Butler v. Kemmerer*, 218 Pa. 242 (1907) (employer's promise to split profits on "very liberal" basis insufficiently definite to merit enforcement).

    As in these cases, the terms of the alleged oral contract in this case are too indefinite and vague to form a valid and enforceable contract.  The alleged oral agreement, as Scollins himself will testify, does not specify, among other essential terms of a contract, (a) the exact percentage that eBizJets allegedly was to pay him for his placement of advertising, (b) the form of the payment – whether cash or stock, (c) what triggered the obligation to pay Scollins – his presentation of a bill, termination of his employment for cause or without cause, a significant third-party stock purchase, sale of the entire company, or some other event, (d) whether Scollins was entitled to be paid even if another employee placed the advertising and he did not,

(e) whether the contract would terminate when Scollins' duties were assumed by another Sentient employee, (f) how credits from The Wall Street Journal would be handled, and (g) whether Scollins was obligated to obtain discounted pricing directly for Sentient at some point. As in *Held* and *Armstrong*, in this case the court cannot answer these questions that must be answered for the alleged contract to be enforceable without writing (not simply "rewriting") the contract for the parties, something it cannot do. As the court explained in *Armstrong*, even if one of these indefinite terms alone would not make the contract unenforceable, taken together, they are insurmountable. In short, there is no enforceable contract in this case.

To be clear, in this case there was not merely a failure to agree on many essential terms of the agreement; there simply was not even any discussion of them. *Cf. Realty Central LLC*, 2005 WL 235932. At best, both Scollins and Creed had their own subjective, personal intentions, but neither ever shared them with the other. As such, there certainly cannot be any meeting of the minds, as is necessary to form a contract.

There was, therefore, no enforceable contract as a matter of law.

### 3. *Even if There Were A Contract, It Violates the Statute of Frauds.*

The Massachusetts Statute of Frauds provides that "[a]ny agreement to pay compensation for service as a broker … shall be void and unenforceable unless such agreement is in writing, signed by the party to be charged therewith, or by some other person authorized." Mass. Gen. L. c. 259 § 7. Scollins has testified that he was acting as a broker in placing advertising for eBizJets in the Wall Street Journal. As such, because the agreement that Scollins alleges he had with eBizJets was, by his own admission, at best an oral agreement, it is barred by the Statute of Frauds.

**B.    *There Was No Breach of the Covenant of Good Faith and Fair Dealing in Connection with The Advertising.***

Where there is no contract, there can be no breach of the covenant of good faith and fair dealing.  *See, e.g., Vision Systems, Inc. v. Emc Corp.*, 2005 WL 705107 (Mass. Super.)(van Gestel, J.)(dismissing count for good faith and fair dealing where there was no contract because in the absence of a contract, the covenant cannot exist); *Realty Cent., LLC v. Re/Max of New England, Inc.*, 2003 WL 22285512 (Mass. Super.)(McLeod, J.)(granting summary judgment on good faith and fair dealing claim, holding that "[t]o prevail on this claim, there must first be a binding contract").  Therefore, this claim must fail because, as explained above, there is no contract.

Even if there were a binding contract, though, Plaintiff has failed to allege any action by Sentient that would breach the covenant of good faith and fair dealing.  The implied covenant of good faith and fair dealing provides "that neither party shall do anything that will have the effect of destroying the right of the other party to receive the fruits of the contract …." *Anthony's Pier Four, Inc. v. HBC Associates,* 411 Mass. 451, 471-72 (1991).  In general, defendants have been found to have breached the implied covenant only where they manipulate contract rights as a means to extract more money or pay less money or to gain some other unfair advantage beyond what the parties originally bargained for or reasonably expected.   In those cases, the defendant generally does not breach the express contract but instead exercises its contractual rights in some manipulative or unfair way.  That is not the claim in this case.  Plaintiff does not claim that Sentient acted manipulatively or unfairly, as that term is used in the law; rather, he claims no more than that Sentient failed to fulfill an express term of an alleged contract.  Indeed, as to this part of Count II in the First Amended Complaint, Plaintiff pleads **only** that Sentient breached the covenant by failing to pay Scollins the amount of the alleged discount when his employment was

27

terminated. In this regard, the claim is simply a recast of the breach of contract claim. For this reason as well, Count II should fail to the extent it concerns any alleged contract concerning Sentient's advertising in The Wall Street Journal.

### C.  *Scollins Is Not Entitled to Any Damages Under a Theory of Unjust Enrichment.*

Scollins claims that under a theory of unjust enrichment he is entitled to hundreds of thousands of dollars for placing ads for eBizJets. This claim likewise fails, even if Scollins loses on his contract claim,[5] because he has been fully compensated through salary and a generous bonus for any benefit he may conferred on eBizJets for placing the advertisements for eBizJets while he was a full-time, salaried employee of the company, especially given that his work was minimal, he was given time off from his regular work duties to place the advertising, and eBizJets paid for all overhead expenses and provided all the ad design through another full-time, paid employee.

Unjust enrichment is the "retention of money or property of another against the fundamental principles of justice or equity and good conscience." *Taylor Woodrow Blitman Constr. Corp. v. Southfield Gardens Co.,* 534 F. Supp. 340, 347 (D.Mass.1982)(quoting 66 Am. Jur. 2d Restitution & Implied Contracts § 3 (1962)). Though unjust enrichment is an equitable claim that must be determined on the facts of each case, court have held that to prove a claim for unjust enrichment, the plaintiff has to prove that (1) he conferred a measurable benefit upon eBizJets, (2) eBizJets accepted the services with the reasonable expectation of compensating the plaintiff, and (3) he provided the services with the reasonable expectation of receiving compensation from the defendant. *Mass. Cash Register, Inc. v. Contrex Systems Corp.,* 901 F.

---

[5] A plaintiff is not entitled to unjust enrichment damages where a valid contract covers the subject matter of dispute. *Zarum v. Brass Mill Materials Corp.,* 334 Mass. 81, 134 (1956); *see also Boswell v. Zephyr Lines, Inc.,* 414 Mass. 241, 250 (1993); *Marshall v. Stratus Pharms., Inc.,* 51 Mass. App. Ct. 667, 670 n.6 (2001); *Okmyansky v. Herbalife Intern. of America, Inc.,* 415 F.3d 154, 161 (1st Cir. 2005)(applying Massachusetts law). Scollins, therefore, cannot prevail on his unjust enrichment claim unless he loses on or waives his express contract claim in Count I.

Supp. 404, 423 (D. Mass.1995); *Bolen v. Paragon Plastics,* 747 F. Supp. 103, 106-07 (D. Mass. 1990); *Salamon v. Terra,* 394 Mass. 857, 859 (1985); *see also Cecio Bros. v. Greenwich,* 156 Conn. 561, 564-565 (1968) ("[The] right of recovery under the doctrine of unjust enrichment is essentially equitable, its basis being that in a given situation it is contrary to equity and good conscience for one to retain a benefit which has come to him at the expense of another. With no other test than what, under a given set of circumstances, is just or unjust, equitable or inequitable, conscionable or unconscionable, it becomes necessary in any case where the benefit of the doctrine is claimed to examine the circumstances and the conduct of the parties and apply this standard." (Quotations and citations omitted)) *quoted in Santagate v. Tower,* 64 Mass. App. Ct. 324, 329 (2005).  Plaintiff cannot prove these elements.

### 1. Scollins Did Not Confer Any Benefit for Which He Was Not Compensated.

The **only** benefit that Scollins conferred on eBizJets was his time in placing the ads, which amounted to just two to three hours a week and for which he was paid through both his salary (since he placed the advertising during hours he would otherwise have been performing his regular duties if eBizJets had not given him time off from those duties to do the advertising) and the $100,000 bonus he received in the summer of 2000.  In this respect, the benefit he conferred was simply part of the job for which he was already being paid and for which he received a bonus, just as Dan Underwood's design and layout of the advertising was part of his job and he received a salary and a bonus.

At the time that Scollins was placing the ads for eBizJets, eBizJets was, essentially, a start-up.  Though people had job titles and specific job responsibilities, in reality everyone did whatever needed to be done and everyone worked long hours doing it.  In other words, as the evidence will make clear, Scollins was not unique in handling a task that was nominally beyond his actual job description.  It did not in fact add any more benefit to the company than did the

design and computer work that Dan Underwood, eBizJets' IT person, performed, which would have cost eBizJets additional money had eBizJets had to hire an outside person to perform the tasks.

Scollins has argued that the benefit he conferred is not just the work but the savings eBizJets realized by placing its advertising through Bottom Line instead of a full-service advertising agency. This argument fails logically and legally.

First, saying that the benefit was that eBizJets saved money is just a different way of saying that Scollins performed work that eBizJets would have had to pay for if a non-employee did it, as explained above. It does not add anything to the analysis and fails for the reasons explained above.

Second, if the benefit conferred is the cost savings, then essentially his claim is for disgorgement, not unjust enrichment. In the typical unjust enrichment claim, the defendant retains the benefit conferred though it may have to compensate the person who conferred it. Here, if the benefit is the savings, then eBizJets will not be able to retain any of the benefit if it has to pay it to Scollins. If this were to happen, then effectively eBizJets would have had Scollins place the advertising through Bottom Line for no one's benefit but Scollins since eBizJets will realize no gain (it will pay the same or perhaps greater commission to Scollins than it would have paid to a full-service advertising agency).

This last point warrants further consideration because it highlights the illogic of the claim. If Scollins receives a commission, as he demands, and the sole benefit he conferred to Sentient is the saving of a commission, as he contends, then eBizJets will be in exactly the same position it would have been had it paid an outside firm – it would have had ads placed with the Wall Street Journal for a commission. Actually, eBizJets will be in a worse position because had

30

it paid the commission to a full-service advertising agency, Scollins would have had more time for his other tasks, the design and accounting services would have been provided to eBizJets instead of its doing those services itself through paid employees, and eBizJets would not have incurred costs in paying for all of the expenses and all the other costs attendant with placing the ads, as it did.  Basically, if eBizJets knew it was going to have to pay Scollins a commission, it could just have gone with a real advertising agency and the cost would have been less and the service better.  This point is particularly salient given that by late 2000 Scollins was not even placing the ads himself and instead another employee, Morton, whom Sentient was paying a salary, was placing the ads.

Lastly, even if Scollins were to convince the court that he conferred a benefit on eBizJets, there is the question of how to value that benefit.  In assessing the fair and reasonable value of the services rendered, there are "numerous factors for the fact finder to consider in making this assessment." *Boston Athletic Association*, 392 Mass. at 367.  Among the things to consider in determining whether Scollins was entitled to any compensation in this case would how much work Scollins performed, any expenses he incurred in placing the ads, and when and how he performed the work.  As the evidence will show, Scollins placed the ads on company time while being paid as a full-time employee, and he spent only about two to three hours per week placing the ads.  By December 2000 he was not even doing that much since Morton had assumed the duties.  Further, Bottom Line did not have its own place of business, created and placed the orders using eBizJet equipment (such as fax machines and telephones that eBizJet paid for), did not keep his own filing, did not pay the bills, and did not even keep records of the work Scollins performed, and unlike a real advertising agency, Bottom Line had ***no*** expenses.  All of these add up to the fact that Scollins added no value for which he has not already been compensated.

2.     *The Services Were Not Accepted With the Reasonable Expectation of Compensating Scollins Beyond His Salary and Bonus.*

The test for whether a defendant expected to compensate the plaintiff for the services provided is not just whether the defendant subjectively expected to pay but whether a reasonable person would have expected to pay under the circumstances.  *Bolen*, 747 F. Supp. at 107.  In this regard, even Scollins admits that the purpose of placing the ads through Bottom Line was to save eBizJets money.  Indeed, Scollins himself admitted in his Motion for Partial Summary Judgment that the plan was to save Sentient money.  Since that purpose would be defeated by disgorging the alleged discount (plus more if in fact an actual advertising agency would have charged less than 15%) and giving it to Scollins, it reasonably follows that eBizJets did not expect to pay Scollins for placing the ads.  This conclusion is supported by the uncontroverted fact that eBizJets was already paying Scollins, who placed the ads on company time while he was a paid, full-time Sentient employee, with equipment paid for by Sentient, as discussed above,.

Scollins relies entirely on a vague statement by Creed sometime after Scollins began placing the ads that he would at some point "work something out" for Scollins as proof that eBizJets expected to pay Scollins for his advertising work.  Not only is this thin, vague statement not a basis for finding that eBizJets subjectively expected at the time that Scollins was placing the ads to pay Scollins for doing so, but even if Creed made the alleged statement, it did not indicate an intention by eBizJets to compensate Scollins, but instead a general hope or aspiration by Creed that if the company were successful, Scollins would be rewarded, along with the rest of eBizJet's management team, for *all* their hard work in growing the business.  This view will be supported by testimony at trial.

And Scollins was, in fact, rewarded handsomely.  In 2000, Scollins received a $100,000 bonus on top of his salary.  This bonus was more than Scollins had ever made in a year in his

entire life.  The evidence points to the conclusion that this was Creed "working something out" for Scollins.

Furthermore, the facts make clear that no reasonable person would have expected to pay Scollins for the advertising that he himself did not place.  As of December 2000, Morton was handling all the details of the advertising.  At that point, Scollins's only role was that the ads were nominally placed through Bottom Line.  This is not a benefit that Scollins conferred in any real sense since Bottom Line incurred no expenses in connection with the placement of the ads, and, in fact, The Wall Street Journal was aware by this time that eBizJets' advertising person, Morton, was placing the ads directly.

3.    *Scollins Could Not Reasonably Have Expected to Be Paid.*

The question for the third element of the claim is *not* whether Scollins *wanted* to be paid – clearly he did – indeed, as the evidence will show, Scollins was always looking for money. The question is whether *at the time he placed ads* he *actually expected* to be compensated for doing so *and* whether a reasonable person would have expected compensation under the circumstances.  *Bolen*, 747 F. Supp. at 107 ("Massachusetts law requires that the plaintiff demonstrate that he provided the services with the reasonable expectation of receiving compensation from the defendant. … As stated by one court:  '[t]he mere performance of services in association with the defendant does not justify a cause of action in contract or quasi-contract based on an alleged expectation of compensation formed after the services are completed.'"(internal citation omitted))  Although Scollins will baldly assert that he expected compensation when he first began placing the ads, there really is no objective basis for Scollins's alleged expectation.  He claims that he expected that he would be compensated simply because he told people that he wanted to be compensated and because Creed told him that he would "work something out" for him.  This is not sufficient objective evidence that Scollins expected to

be compensated and not a reasonable basis for Scollins to expect to be compensated, especially in light of the entire course of Creed's discussions with him on this issue and the fact that he performed this work on company time, using company equipment, and was paid for that work both in salary and through a generous bonuses, as discussed above.

    4.    *Justice Does Not Require That Scollins Receive Any Money for Placing the Ads.*

Because the unjust enrichment claim is an equitable claim, the ultimate consideration is whether the interests of justice and equity require that the plaintiff be compensated.  In this case, justice and equity do not require that Sentient pay Scollins, and, in fact, requiring Sentient to pay would be an unjust and unfair result because Sentient has already paid for any benefit it may have received.

As discussed above, Sentient did not receive any benefit other than, at most, the two to three hours per week that Scollins spent handling The Wall Street Journal from September 1999 to September 2000.  Scollins (and Bottom Line) did not do any bookkeeping, incurred no expenses since Sentient paid The Wall Street Journal directly and Sentient paid for the fax and phone, and did not do the design work on the ads, which was done by Dan Underwood.  And, by September 2000, Sentient was paying the full-time salary of Steve Morton, who fully handled the ads as part of his job at Sentient.

Sentient has already paid manifold for this benefit.  First, Scollins was compensated through his salary.  His work on The Wall Street Journal was not something beyond his work for Sentient; it was simply an additional task he did, just as Dan Underwood did the advertising design.  In fact, as the evidence will show, Sentient gave Scollins time away from his other job responsibilities to attend to the advertising.  Furthermore, he, along with Dan Underwood, received a $100,000 bonus when Credit Suisse made its investment, the purpose of which was to

compensate them, along with a few other employees for performing additional tasks and working hard during the start-up period of Sentient. This amount represents more than four-fold the amount Bottom Line has ever grossed during its entire existence. Second, as noted above, by September 2000 Sentient was paying the salary of Steve Morton, so it was not realizing the full amount of the alleged discount.

Significantly, Scollins admits that Sentient could have gotten a 15% discount from The Wall Street Journal on its own at some point during his employment with the Company.

Further, as noted above, unjust enrichment is an equitable claim. As such, it is subject to the principle that "he who comes into equity must come with clean hands." *See, e.g., Precision Instrument Mfg. Co. v. Automotive Maintenance Mach. Co.,* 324 U.S. 806, 814 (1945)("'[H]e who comes into equity must come with clean hands.' This maxim is far more than a mere banality. It is a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief."); *see also Fidelity Management & Research Co. v. Ostrander*, 40 Mass. App. Ct. 195 (1996). "[W]hile 'equity does not demand that its suitors shall have led blameless lives' … as to other matters, it does require that they shall have acted fairly and without fraud or deceit as to the controversy in issue." *Precision Instrument Mfg. Co.,* 324 U.S. at 814-815.

Taken at face value, Scollins's claim is that he duped The Wall Street Journal into accepting advertising through Bottom Line, while failing to disclose that he was a full-time employee of eBizJets. To the extent that resulted in a savings or discount, Scollins essentially obtained the discount he claims to have received by misleading The Wall Street Journal about the status of Bottom Line and his status as a full-time employee of eBizJets. Even though this

did not result in harm to The Wall Street Journal, it is conduct for which Scollins should not be rewarded by a court in equity.

The testimony will show both that at some point The Wall Street Journal knew that Scollins was a full-time employee of eBizJets who was placing the advertisements and that at some point Scollins knew that The Wall Street Journal would have given the discount directly to Sentient. Nevertheless, Scollins, who had a fiduciary duty as well as a duty of loyalty to his employer, never explored the possibility of removing Bottom Line from the account, presumably so that he could rack up his eventual claim against the company. In other words, Scollins was working for two masters, himself and Sentient, and in so doing was violating his obligations to Sentient and engaging in a conflict of interest. This type of behavior should not be rewarded in equity.

## Conclusion

For the foregoing reasons, Sentient requests that this Court enter judgment for Sentient on all counts of Plaintiff's Complaint.

SENTIENT JET, INC., f/k/a eBizJets.com,
By its attorneys,

/s/ C. Max Perlman
C. Max Perlman (BBO# 630395)
Andrea C. Kramer (BBO # 632584)
SULLIVAN WEINSTEIN & McQUAY, PC
Two Park Plaza, Suite 610
Boston, Massachusetts 02116
Dated:  April 17, 2006                    (617) 348-4300