UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DONALD SCOLLINS, individually and on behalf of BOTTOM LINE ADVERTISING,

    Plaintiff,

vs.

SENTIENT, f/k/a eBizJets,

    Defendant.

Civil Action No. 03-12478-EFH

**PROPOSED RULINGS**

**Proposed Findings Of Fact**

*Introduction*

    1.    Defendant Sentient Jet, Inc. ("Sentient"), formerly known as eBizJets.com, Inc., is a corporation that brokers charter jets for individuals and companies.  (Stipulated Fact)

    2.    Joseph (Jeff) Creed founded the company in 1997.  (Stipulated Fact)

    3.    Creed effectively left Sentient in or about September 2001.

    4.    At the time Creed left Sentient, his relationship with Sentient's CEO and Credit Suisse was contentious.

    5.    Plaintiff Don Scollins is Creed's cousin.

    6.    Scollins began working for eBizJets in or about March 1999.  (Stipulated Fact)

    7.    In June 2000, Credit Suisse First Boston ("Credit Suisse")(technically, a fund managed by Credit Suisse) purchased a significant percentage of eBizJets' stock.

    8.    eBizJets changed its name to Sentient Jet in or about September 2002.

*Salary and Bonus*

9. At all times from March 1999 to November 2001, Scollins was a paid, full-time employee of Sentient.

10. Sentient paid Scollins a salary for his full-time work. (Stipulated Fact)

11. At some point in 2000, Scollins received a $100,000 bonus for the work he performed for Sentient.

*Employment At Will*

12. Scollins was an at-will employee at all times.

13. Sentient's Employee Handbooks provide, in relevant part, that "[a]lthough employment with eBizJets is based on mutual consent and both the employee and eBizJets have the right to terminate employment at will with or without cause or advance notice, eBizJets may use progressive discipline at its discretion."

14. Scollins signed an acknowledgement, which he provided to the company during his employment, that states that "either I or eBizJets can terminate the [employment] relationship at will, with or without cause, at any time…."

*Stock Options*

15. Sentient granted Scollins certain stock options during his employment pursuant to the eBizJets.com, Inc. Stock Option Agreement (the "Stock Option Agreement") (Stipulated Fact)

16. On November 23, 2001, Sentient terminated Scollins's employment without cause. (Stipulated Fact)

17. At that time, Scollins had vested 122,540 options at a strike price of $0.50 per option exercised.

18. The Stock Option Agreement provides:

> [T]he Option shall terminate thirty (30) days following the date the Optionee ceases to be an employee of or consultant to the Company ….

19. Scollins did not exercise his stock options within the thirty day period following the termination of his employment on November 23, 2001. (Stipulated Fact)

20. Scollins's stock options, therefore, terminated on December 24, 2001.

21. In January 2002, the Board of Directors changed the termination of Scollins's employment to "for cause" as of January 15, 2002. (Stipulated Fact)

22. At the time that the employment termination was changed to "for cause," Scollins's stock options had already terminated pursuant to the Stock Option Agreement.

23. If Scollins's employment had not already been terminated in November 2001, Scollins would have vested 135,363 options at a strike price of $0.50 per option exercised as of January 2002.

24. The Stock Option Agreement provides with regard to termination of the options where the employment is terminated for cause (in Section 4(a)(iv) of the agreement):

> If the Optionee's employment … is terminated for Cause (as defined in Section 4(b) …) … as determined by the Board of Directors of the Company, such Option will terminate on the date the Optionee ceases to be an employee of … the Company … and be of no further force or effect. The Optionee's right to exercise any unexercised portion of the Option shall immediately terminate and all rights thereunder shall cease, whether the Option is vested or unvested.

25. Scollins's options terminated immediately upon the board's determination that his employment was terminated for cause.

26. Sentient did not wrongfully deprive Scollins of any stock options.

27. Furthermore, after the termination of his employment, Scollins had no rights in any unvested portion of the stock options that he received under the Stock Option Agreement,

3

which provides: "The Option shall be exercisable only to the extent that the Optionee is vested in the Option pursuant to Section 3 and the Option is in effect on the date the Optionee ceases to be an employee of … the Company."

28.     Even if Scollins had timely exercised his stock options or could have exercised them upon the termination being changed to "for cause," the only effect would have been that he could pay for the unvested options at that time; he would not have received any payment for them until March 23 when the company was sold to TH Lee because the Stock Option Agreement barred sale of stock until "the Company shall have effected a public offering of Common Stock," which was in March 2003.

*Wall Street Journal Advertising*

29.     At some point, Creed decided he wanted Sentient to advertise in The Wall Street Journal.  (Stipulated Fact)

30.     Scollins placed the advertising for Sentient with The Wall Street Journal. (Stipulated Fact)

31.     There was no agreement, written or oral, between Scollins and Sentient regarding payment to Scollins for the placement of advertising.

32.     Sentient never promised or agreed to pay Scollins for the placement of advertising.

33.     Though Creed told Scollins at various times, though not at the time that he asked Scollins to place the ads, that he would "take care" of Scollins when the company made money, Creed never promised that Scollins would receive additional compensation specifically for his placement of the ads.

34.     Creed never promised to pay Scollins a 15% commission for the ads.

4

35.     Scollins lacks credibility on the issue of whether he ever had an agreement to be paid for the advertising.  He has provided conflicting testimony under oath as to when the alleged agreement was made, who was present when it was made, whether it was made in one conversation before he placed the first ad or over a series of conversations after he started placing the ads, what was said that constituted the alleged agreement, the terms of the alleged agreement, and the amount that Sentient paid The Wall Street Journal for advertising between August 1999 and December 2001.

36.     Even beyond the inconsistencies in Scollins's testimony, various essential terms of the alleged oral contract in this case are indefinite and vague: (a) the exact percentage that eBizJets allegedly was to pay him for his placement of advertising, (b) the form of the payment – whether cash or stock, (c) what triggered the obligation to pay Scollins – his presentation of a bill, termination of his employment for cause or without cause, a significant third-party stock purchase, sale of the entire company, or some other event, (d) whether Scollins was entitled to be paid even if another employee placed the advertising and he did not, (e) whether the contract would terminate when Scollins' duties were assumed by another Sentient employee, (f) how credits from The Wall Street Journal would be handled, and (g) whether Scollins was obligated to obtain discounted pricing directly for Sentient at some point.

37.     The alleged agreement is not listed in the appropriate schedules of contracts or debts (including Schedule 5.8) contained in the Stock Purchase Agreement, which Jeff Creed signed on behalf of eBizJets, though such an agreement would have to be listed if it existed. Despite this absence Creed, on behalf of eBizJets, warranted in the Stock Option Agreement that "except as set forth on Schedule 5.8, [eBizJets] is not indebted … or otherwise obligated to any [employee, officer, director, or stockholder] , other than, (i), for payment of salary for services

5

rendered, (ii), reimbursement for reasonable expenses incurred on behalf of the company, (iii), for other standard employee benefits made generally available to all employees, and, (iv), for options granted pursuant to the company's stock option program …."

38. Scollins's work placing the advertisements in The Wall Street Journal took him no more than two to three hours a week from August 1999 to December 2000 when Sentient hired Steve Morton, a paid, full-time employee, who took over responsibility for these ads and all advertising and marketing.

39. Sentient permitted Scollins to take time from his other job duties to handle the advertising.

40. After Morton took over, Scollins performed no further work in placing the ads in The Wall Street Journal, except, possibly twice signing the insertion orders.

41. Sentient paid all expenses connected with Scollins's placement of the ads in The Wall Street Journal.

42. Neither Scollins nor Bottom Line incurred any expenses in placing the advertising for Sentient.

43. Dan Underwood, another Sentient employee, did the computer layout of The Wall Street Journal ads, and Creed and other employees all participated in the design of the ads.

44. Sentient paid The Wall Street Journal directly. It was never billed by Bottom Line Advertising, and Bottom Line Advertising never paid The Wall Street Journal for the ads.

45. At some point when Scollins was still placing the ads, Sentient could have begun placing them directly, but Scollins never inquired about this possibility.

46. Bottom Line was little more than just a name. An unincorporated sole proprietorship, Bottom Line, through Scollins, placed Yellow Pages ads in 1997 and 1998 in

6

Arizona for a few "clients," including a carburetor supplier and a topless bar. By the time Scollins moved to Massachusetts to join eBizJets, he was no longer doing any business through Bottom Line, and Bottom Line did not perform any services for any paid customers during or after Scollins's employment with eBizJets or Sentient. Bottom Line had no offices, no employees, and no bank account. Bottom Line was not even registered to do business in Massachusetts until after Scollins ceased working for Sentient.

47. Scollins was reasonably compensated through salary and bonus for placing the ads.

48. Sentient was not unjustly enriched by Scollins's placement of advertising with The Wall Street Journal.

49. There is no competent evidence that Sentient saved 15% by placing ads through Bottom Line.

50. Sentient did not reasonably expect to pay Scollins more than his salary for placing ads for Sentient with The Wall Street Journal.

51. Scollins did not reasonably expect to be compensated beyond his salary for placing ads for Sentient with The Wall Street Journal.

*Termination For Cause*

52. On November 7, 2001, John Williams, then CEO of eBizJets, distributed to the company's employees, including Scollins, a memorandum to "reinforce and clarify" the company's policies regarding Conflicts of Interest.

53. In the memorandum, Williams warned that the company's employees are prohibited from accepting free or discounted flights or other "gifts" from carriers (owners of

aircraft) with whom eBizJets did business and that violation of this policy would be grounds for immediate termination.

54. Scollins violated this policy on November 17, 2001 by accepting a free flight to Las Vegas on Pacific Jet, a carrier with whom eBizJets regularly did business.

55. On November 23, 2001, Williams told Scollins that he had learned of the free flight and terminated Scollins's employment. At that time, Williams also told Scollins that he had learned that Scollins had falsified the company's flight calendar.

56. In the following days or weeks, Scollins undertook to cover up his wrongdoing. He had Pacific Jet issue him an invoice, which it did on November 28, 2001, and he also sent Pacific Jet a check sometime in December 2001 for some part of the value of the free flight in an effort to make it look like the flight was not free.

57. In the meantime, Sentient's board of directors undertook to determine whether the termination was to be for cause or not for cause.

58. Only the Board of Directors of eBizJets had the authority to determine that a termination was "for cause" under the Stock Purchase Agreement.

59. Sentient's CEO, John Williams, did not have the authority to determine that a termination was "for cause" under the Stock Purchase Agreement.

60. The Stock Option Agreement defines "cause," in Section 4(b), as the following:

> (i) deliberate or intentional failure, in a continuing or repeated manner, by the Optionee to substantially perform the material duties of Optionee's employment …, (ii) material breach or threatened material breach by the Optionee of the covenants contained in Section 9, (iii) ***deliberate or intentional engagement by the Optionee in conduct which is materially detrimental to the reputation, goodwill, business or operations [of] the Company*** …, (iv) ***willful fraud or material dishonesty by the Optionee in connection with the performance of the duties of the Optionee*** or (v) conviction or plea of *nolo contendere* by the Optionee to a felony or a misdemeanor involving moral turpitude.

61.  The Board of Directors met in January 2002 and determined that the termination was for cause.

62.  The Board of Directors had grounds to determine that Scollins's termination was for cause.

Wage Act Claim

63.  Plaintiff did not properly file his Wage Act claim until May 2005, more than three years past the date that the violation allegedly occurred.

## Conclusions

Count I - Breach of Contract

*As to Progressive Discipline*

64.  There was no contract between Scollins and Sentient requiring Sentient to engage in progressive discipline in advance of terminating Scollins's at-will employment.

65.  Accordingly, there is no breach of contract.

*As to Stock Options*

66.  Scollins's stock options terminated on December 24, 2001 because he failed to exercise them by that date.

67.  Sentient did not breach the Stock Option Agreement by changing the termination of Scollins's employment to "for cause."

68.  The consequence of this change, even if his options had not expired, was the cancellation of any unexercised stock options that Scollins had vested as of that time.

69.  Accordingly, Sentient did not breach the contract.

70.  In no event was Scollins ever entitled to more than his vested stock options.

*As to Advertising Placement*

71. There was no contract between Scollins and Sentient regarding the placement of advertising.

72. Even if there were a promise or agreement, the terms of the purported contract are too vague and indefinite to be enforceable.

73. Even if there were a valid contract and its terms were definite enough to be enforceable, it still would not be enforceable because it violates the statute of fraud, which requires that all brokerage contract be in writing.

Count II - Breach of Covenant of Good Faith and Fair Dealing

*As to Progressive Discipline*

74. Because there is no contract requiring Sentient to engage in progressive discipline before terminating Scollins's employment, there can be no covenant of good faith and fair dealing on the issue.

75. Accordingly, there is no breach of covenant.

*As to Stock Options*

76. Sentient had a legitimate basis for terminating Scollins's employment for cause.

77. Furthermore, the change to a "for cause" termination did not affect Scollins's right to exercise his stock options, which had already terminated on December 24, 2001 because Scollins had not exercised them by then.

78. Scollins did not have until the end of the business day on the date that his employment was terminated for cause to exercise his stock options; they terminated immediately upon the termination "for cause" becoming effective.

79. Sentient, therefore, did not violate the covenant of good faith and fair dealing by changing the termination of Scollins's employment to "for cause" or by, allegedly, informing him after 5:00 p.m.

### *As to Advertising Placement*

80. Because there is no contract concerning payment between Scollins and Sentient regarding the placement of advertising, there can be no covenant of good faith and fair dealing on the issue.

81. Accordingly, there is no breach of covenant.

### Count III – Unjust Enrichment

82. Scollins did not confer any benefit to Sentient for which he was not compensated.

83. Sentient did not reasonably expect to compensate Scollins for placing the ads beyond his salary and bonus.

84. Scollins did not reasonably expect to be paid beyond his salary and bonus for placing the ads.

85. Justice does not require that Scollins receive any money for placing the ads.

86. There has been no unjust enrichment of Sentient.

87. Even if there were, Scollins is not entitled to damages due to his own unclean hands.

### Count IV – Violation of the Wage Act

88. Stock options are not "wages" under the Wage Act.

89. Terminating someone's employment, even wrongfully, is not a violation of the Wage Act, which only addresses timely payment of wages upon termination.

90. Accordingly, there can be no violation of the Wage Act.

91. Even if there were, Scollins's claim is barred by the statute of repose.

92. Even if the claim were valid and not barred, Scollins cannot prove any damages.

                                          SENTIENT JET, INC., f/k/a eBizJets.com,
                                          By its attorneys,

                                          /s/ C. Max Perlman_____
                                          C. Max Perlman (BBO# 630395)
                                          Andrea C. Kramer (BBO # 632584)
                                          SULLIVAN WEINSTEIN & McQUAY, PC
                                          Two Park Plaza, Suite 610
                                          Boston, Massachusetts 02116
                                          (617) 348-4300
Dated: April 18, 2006                      Email: max@swmlawyers.com