IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| DONALD SCOLLINS, | ) | CV03-12478-EFH |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| SENTIENT, fka eBizJets; JOHN I. WILLIAMS, | ) | |
| JR.; PAUL A SVENSEN, JR.; JOHN HENNESSY; | ) | |
| ED JOHNSON; and, PAUL MODEL. | ) | |
| | ) | |
| Defendants. | ) | |

**PROPOSED RULINGS**

Proposed Findings of Fact

*Introduction*

1.  Defendant Sentient Jet, Inc. ("Defendant") formerly known as eBizJets.com, Inc., is a corporation that brokers charter jets for individuals and companies. (Stipulated Fact)

2.  Joseph (Jeff) Creed founded the company in 1997. (Stipulated Fact)

3.  Creed left Defendant in or about September 1997, but stayed on as a consultant to the company through past Plaintiff Don Scollins' firing.

4.  Scollins began working for eBizJets in or about March 1999. (Stipulated Fact)

5.  In June 2000, Credit Suisse First Boston ("Credit Suisse") purchased a significant percentage of Defendant's' stock.

*Salary and Bonus*

6.  Defendant paid Scollins a salary for his full-time work. (Stipulated Fact)

7.  At some point in 2000, Scollins received a $100,000 bonus for the work he

performed for Defendant. (Stipulated Fact)

*Scollins' Employment Status*

8. Scollins was an at-will employee at all times. (Stipulated Fact)

9. Defendant had the discretion to use progressive discipline toward its employees.

10. Defendant did not use progressive discipline when it fired Scollins.

11. Defendant's human resources consultant, Carol Caliendo, recommended to Defendant that it utilize progressive discipline toward Scollins, but her recommendations were ignored.

*Stock Options*

12. Defendant granted Scollilns certain stock options during his employment purusant to a "Stock Option Agreement." (Stipulated Fact)

13. On November 23, 2001, Defendant fired Scollins without cause. (Stipulated Fact)

14. At that time Scollins had vested 122, 540 options at a strike price of $0.50 per option exercised. (Stipulated Fact)

15. Scollins did not exercise his stock options within thirty days of being fired on November 23, 2001. (Stipulated Fact)

16. Scollins did not exercise his options because (a) he was told not to by Defendant's chief executive officer, John Williams; and (b) he reasonably believed that Defendant was going to settle his outstanding compensation issues in good faith.

17. Sometime in early December 2001, Mr. Scollins, through Mr. Creed, informed Defendant that he would accept a settlement offer tendered by Defendant that would resolve all of Mr. Scollins' outstanding compensation issues.

18.     Defendant did not settle his outstanding compensation issues in good faith. Instead, after keeping him on the payroll through January 2002, and reneging on its promise to follow through with a settlement, on January 15, 2002, Mr. Williams sent Mr. Scollins a letter informing him that he was now being terminated "with cause."

19.     In that letter, Mr. Williams also informed him that his stock options terminated as of 5:00 p.m. that same day.

20.     Mr. Scollins did not receive that letter until 5:20 that same day.

21.     Defendant is estopped from relying on the thirty-day termination provision in the Stock Option Agreement because it convinced Mr. Scollins to refrain from exercising these options, wrongfully led him to believe that it would negotiate with him in good faith, and broke off negotiations in January 2002, by changing his firing from without cause to cause.

22.     Firing Mr. Scollins first without cause, convincing him not to exercise his options, then firing him with cause after his options expired under the terms of the Stock Option Agreement, was acting in bad faith.

*The Wall Street Journal Advertising and Bottom Line Advertising*

23.     At some point, Creed decided he wanted Defendant to advertise in *The Wall Street Journal*. (Stipulated Fact)

24.     Mr. Scollins placed advertising for Defendant in *The Wall Street Journal*. (Stipulated Fact)

25.     Mr. Scollins placed advertising through his dba, "Bottom Line Advertising" so that Defendant could save 15% off its advertising costs.

26.     Mr. Scollins told Creed, Williams and other employees that he expected to be paid the advertising costs realized by Defendant for placing advertising through Bottom Line in

*The Wall Street Journal* as deferred compensation.

27. Mr. Creed told Mr. Scollins on several occasions that Creed "would take care of" Mr. Scollins when the company was sold, or Mr. Scollins separated from Defendant, whichever came first.

28. Mr. Scollins interpreted Creed's statements to mean that Mr. Scollins would be paid the 15% advertising costs realized by Defendant for placing advertising through Bottom Line in *The Wall Street Journal*.

29. Creed informed Credit Suisse about Defendant's business relationship with Bottom Line and Mr. Scollins when Creed negotiated Credit Suisse's purchase of a significant portion of Defendant's stock.

30. Mr. Scollins was never paid for providing advertising services to Defendant through Bottom Line.

31. Mr. Scollins scaled back his advertising duties in December 2000, because it was determined he was more valuable to Defendant in charter operations.

32. Mr. Scollins unjustly enriched Defendant by placing advertising through Bottom Line in *The Wall Street Journal*, and not being paid for it, because he reasonably expected to be paid for these services, at the industry standard of 15%.

*Termination For Cause*

33. After Mr. Scollins was told he was being fired without cause, Defendant kept Mr. Scollins on the payroll and told him that it was investigating further alleged wrongdoing.

34. On or about November 28, 2001, at Mr. Williams' and Mr. Creed's request, Mr. Scollins contacted John Jardin at *The Wal Street Journal* and asked Mr. Jardin to send him a breakdown of money saved by Defendant by placing ads through Bottom Line Advertising.

35. Dan Underwood, an employee asked to investigate Mr. Scollins, did not find any wrongdoing.

36. Mr. Underwood reported his findings (or lack thereof) to Paul Svensen, Defendant's then-vice president, and Mr. Williams. Mr. Svensen asked Mr. Underwood to "dig deeper." Mr. Williams seemed satisfied at the results of the investigation.

37. When Mr. Scollins kept asking about the status of his settlement with Defendant, he was told by Mr. Williams and/or Edward Johnson, a Credit Suisse representative, that Mr. Scollins's alleged wrongdoing was being investigated further.

38. The Board of Directors met in January 2002 and determined that Mr. Scollins' termination was for cause. (Stipulated Fact)

39. The Board of Directors did not have grounds to determine that Mr. Scollins' termination was for cause.

40. Defendant is estopped from claiming that Mr. Williams did not have authority to fire Mr. Scollins without cause or for cause.

41. To this day, Defendant has never disclosed why it changed Mr. Scollins' termination from "without cause" to "cause."

42. Mr. Williams' January 15, 2002 letter is superfluous if Defendant concedes that (a) Defendant now concedes that Mr. Scollins' was fired without cause; and (b) Mr. Scollins was fired on November 23, 2001.

43. Defendant's firing of Mr. Scollins was completely contrary to recommendations made by its human resources consultant, Carol Caliendo.

44. Mr. Scollins did not take a "free ride" in violation of Defendant's company policy. Mr. Scollins paid the carrier for the trip.

45. Other employees, including vice president Paul Svensen, took "free rides" and were not disciplined for this offense.

46. Defendant selectively enforced its prohibition against "free rides" and other company policies to suit its own purposes.

47. Mr. Williams never presented Mr. Scollins with any documentation supporting his allegations that Mr. Scollins had violated company policies or falsified documents.

48. Mr. Scollins did not "cover up" his alleged wrongdoing. He asked Pacific Jet to send an invoice directly to him, at his business address, for his flight <u>before</u> his November 23, 2001 meeting with Mr. Williams, during which he was fired.

*Wage Act Claim*

49. Plaintiff filed his Wage Act claim after discovering, through deposition testimony of John Williams, taken July 15, 2004, that Defendant awarded stock options to Mr. Scollins part of an overall compensation program that Defendant instituted for all its employees.

## Conclusions

Count I - Breach of Contract

*As to Progressive Discipline*

50. Defendant's failure to engage in progressive discipline is evidence of its bad faith in how it fired Mr. Scollins.

*As to Stock Options*

51. Mr. Scollins' stock options did not terminate on November 23, 2001, because he relied to his detriment on promises made by Mr. Williams and Mr. Creed that Defendant would, in good faith, resolve his outstanding compensation issues.

52.     As further evidence of Defendant's bad faith, it (a) made him a settlement offer during the first week of December, after Mr. Williams had apparently fired him without cause; (b) kept him on the payroll through January 15, 2002; and (c) told him on January 15, 2002 he was being fired for cause, and that stock options it is now claiming had already expired had been terminated; and (d) never told him the reasons why he was being fired for cause.

53.     Defendant's bad faith in denying him stock options, whether due to being fired for cause, or without cause, is a breach of the Stock Option Agreement, entitling him to damages.

54.     Defendant concedes that Mr. Scollins is entitled to the value of his vested stock options. Depending on the date Mr. Scollins is found to have been fired, that figure is either (a) $37,987.40 (as of November 23, 2001) or (b) $41,962.53 (as of January 15, 2002).

55.     Mr. Scollins is entitled to interest on either sum at the rate of 12% per year from the date of breach (November 23, 2001 or January 15, 2002).

*As to Advertising Placement-Unjust Enrichment*

56.     Mr. Scollins conferred a measurable benefit on Defendant; Defendant accepted the services with the expectation of compensating Mr. Scollins; and Mr. Scollins' expections of being paid were reasonable.

57.     The measurable value of the conferred benefit through November 26, 2001 is $274,184; through January 15, 2002 is $328,978.09.

58.     Mr. Scollins is entitled to interest on either foregoing sum at the rate of 12% per year, from the date of nonpayment (either November 23, 2001 or January 15, 2002).

*As to Violation of the Wage Act*

59.     "Wages" under the Wage Act are payment of money earned by an employee for

work already performed.

60.     Mr. Scollins received the vested portion of his stock options for work already performed on behalf of Defendant.

61.     Mr. Scollins is entitled to treble damages, calculated from the date that Mr. Scollins was terminated without cause (November 23, 2001) in the sum of $113,962.20, or on January 15, 2002, in the sum of $125,887.59, which should also be without cause, because Defendant never had a cause to fire Mr. Scollins, and kept him on the payroll as an employee through that date.

62.     Mr. Scollins is entitled to his attorneys' fees and costs under the Wage Law.

63.     Mr. Scollins' claim is not time barred because it is based upon discovery.


DATED this ___18th__ day of April, 2006.

           Plaintiff Donald Scollins, by his attorneys,


           By: /s/ John D. Parker, II
           John D. Parker, II, *Pro Hac Vice*
           PARKER LAW FIRM, PLC
           141 E. Palm Lane, Suite 111
           Phoenix, AZ  85082-3098
           (602) 257-8100

           -and-

           Edward C. Cooley, BBO #550117
           GIARRUSSO, NORTON, COOLEY
           & MCGLONE, P.C.
           308 Victory Road
           Quincy, MA. 02171
           (617) 770-2900
           *Attorneys for Plaintiff Donald Scollins*

## CERTIFICATE OF SERVICE

I, John D. Parker, II, hereby certify that the above document was faxed to counsel of record in this matter on April 18, 2006.

/s/ John D. Parker, II
John D. Parker, II